No. 25-1759

In the
United States Court of Appeals
For the Sixth Circuit

HELLO FARMS LICENSING MI, LLC,
*Plaintiff-Appellee*,

v.

GR VENDING MI, LLC; CURA MI, LLC,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Michigan, Southern Division
The Honorable Matthew F. Leitman
No. 1:21-cv-10499-MFL-PTM

**OPENING BRIEF OF DEFENDANTS-APPELLANTS
GR VENDING MI, LLC AND CURA MI, LLC**

William B. Berndt
Nicholas A. Burandt
HONIGMAN LLP
321 North Clark Street,
  Suite 500
Chicago, IL 60654
(312) 701-9300
wberndt@honigman.com
nburandt@honigman.com

Andrianna D. Kastanek
  *Counsel of Record*
Simon A. de Carvalho
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
akastanek@jenner.com
sdecarvalho@jenner.com

*Counsel for Defendants-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Sixth Circuit Case Number: 25-1759

Case Name: *Hello Farms Licensing MI, LLC v. GR Vending MI, LLC, et al.*

Name of Counsel: Andrianna D. Kastanek

Defendant-Appellant **GR Vending MI, LLC** makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

   Yes. CURALEAF HOLDINGS, INC. is the 100% indirect owner of GR Vending MI, LLC.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

   Yes. CURALEAF HOLDINGS, INC. is the 100% indirect owner of GR Vending MI, LLC.

Defendant-Appellant **CURA MI, LLC** makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

   Yes. CURALEAF HOLDINGS INC. is the 100% indirect owner of CURA MI, LLC.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

   Yes. CURALEAF HOLDINGS INC. is the 100% indirect owner of CURA MI, LLC.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT.................................................i

TABLE OF AUTHORITIES .............................................................v

STATEMENT REQUESTING ORAL ARGUMENT...............................1

INTRODUCTION ........................................................................2

JURISDICTIONAL STATEMENT ..................................................6

ISSUES PRESENTED ..................................................................7

STATEMENT OF THE CASE .........................................................7

I.    Legal Background...............................................................7

    A.    The Controlled Substances Act.....................................7

    B.    Michigan's State Marijuana Laws.................................9

II.    Factual Background .........................................................10

    A.    The Parties' Contract .................................................10

    B.    The Breakdown of the Parties' Relationship..............12

III.    Procedural Background....................................................14

    A.    Hello Farms's Lawsuit ...............................................14

    B.    Defendants' Motion for Summary Judgment..............14

    C.    The Jury Trial.............................................................17

        1.    Testimony Bearing on Illegality.................................17

        2.    Testimony Bearing on Damages .................................18

        3.    Hello Farms's Damages Expert...................................22

        4.    Defendants' Rule 50(a) Motions .................................23

5. The Verdict ................................................................. 24

D. Post-Trial Proceedings ........................................................ 24

SUMMARY OF ARGUMENT .................................................................. 25

STANDARD OF REVIEW .................................................................... 27

ARGUMENT ................................................................................ 28

I. The District Court Erred in Enforcing a Contract for the
   Purchase and Sale of a Federally Controlled Substance ............... 28

   A. The District Court's Ruling ................................................ 29

   B. Analysis ..................................................................... 30

      1. As a Contract to Violate Federal Criminal
         Law, the Agreement Is Per Se Unenforceable ............. 30

         a. A Contract to Commit a Crime Is Per Se
            Unenforceable. ................................................. 30

         b. Because the Parties' Agreement Was a
            Contract to Violate Federal Law, It Is
            Unenforceable. ................................................. 33

         c. The District Court's Contrary Conclusion
            Misunderstands Federal Marijuana
            Policy. ............................................................ 36

      2. The Agreement Is Unenforceable Even Under
         *Jackson Purchase*'s Balancing Test. ........................... 42

      3. Regardless, Because the Agreement Was Not
         One for Medical Marijuana, It Is
         Unenforceable Even if the Appropriations
         Riders Alter Federal Policy. ..................................... 48

II. At Minimum, the District Court Erred by Allowing Hello
    Farms to Collect Damages for Recreational Marijuana ............... 52

III. Hello Farms Failed to Carry Its Burden to Prove Damages
for the 2021 Harvest With Reasonable Certainty. ........................ 54

    A.    The District Court's Ruling ............................................................ 56

    B.    Analysis ........................................................................................ 58

        1.    No Credible Evidence Permitted the Jury to
Find the 2021 Harvest Had a THC Potency
Over 12%. .................................................................... 60

        2.    No Evidence Permitted the Jury to Conclude
That the 2021 Harvest Was Not Contaminated
With Pesticides. .......................................................... 65

CONCLUSION ............................................................................... 67

RULE 30(g)(1) ADDENDUM .......................................................... Add. 1

# TABLE OF AUTHORITIES

**CASES**

*AgriAuto Genetics, LLC v. Harris*, No. 22-cv-273, 2023 WL 8371940 (E.D. Okla. Dec. 4, 2023)......................................................34

*Alan Custom Homes, Inc. v. Krol*, 667 N.W.2d 379 (Mich. Ct. App. 2003)...............................................................................54

*Associated Press v. Taft-Ingalls Corp.*, 340 F.2d 753 (6th Cir. 1965) ......................................................................................36

*Barry v. Capen*, 23 N.E. 735 (Mass. 1890) ............................................48

*Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818 (6th Cir. 1977) ......................................................................................31

*In re Burton*, 610 B.R. 633 (B.A.P. 9th Cir. 2020)..................................41

*CCH Acquisitions, LLC v. J&J&D Holdings, LLC*, No. 23-cv-2983, 2025 WL 601249 (S.D. Ohio Feb. 25, 2025) .............................35

*Cocroft v. Graham*, 712 F. Supp. 3d 866 (N.D. Miss.), *aff'd*, 122 F.4th 176 (5th Cir. 2024) ........................................................... 37

*Continental Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227 (1909) ....................................................31, 32, 33, 39, 42

*Doe v. Henry Ford Health System*, 865 N.W.2d 915 (Mich. Ct. App. 2014)...............................................................................54

*Dudley v. Bell*, 213 N.W.2d 805 (Mich. Ct. App. 1973) .........................43

*Ewing v. Howard*, 74 U.S. 499 (1868)...............................................48, 49

*Federoff v. Ewing*, 192 N.W.2d 242 (Mich. 1971)..................................49

*Fera v. Village Plaza, Inc.*, 242 N.W.2d 372 (Mich. 1976) ................55, 63

*Fitzgerald Truck Parts & Sales, LLC v. United States*, 132 F.4th 937 (6th Cir. 2025) ..................................................................28

*Gonzalez v. Raich*, 545 U.S. 1 (2005) ......................................2, 7, 8, 9, 40

*Hastings Mutual Insurance Co. v. Safety King, Inc.*, 778 N.W.2d 275 (Mich. Ct. App. 2009)........................................................50

*Hemphill v. Liberty Mutual Insurance Co.*, No. 10-cv-861, 2013 WL 12123984 (D.N.M. Mar. 28, 2013) ......................................35

*Hillside Productions, Inc. v. County of Macomb*, 389 F. App'x 449 (6th Cir. 2010) ..............................................................................54

*J. Lilly, LLC v. Clearspan Fabric Structures International, Inc.*, No. 18-cv-1104, 2020 WL 1855190 (D. Or. Apr. 13, 2020) ...............................................................................................34-35

*Jackson Purchase Rural Electric Cooperative Ass'n v. Local Union 816, International Brotherhood of Electrical Workers*, 646 F.2d 264 (6th Cir. 1981) .................... 16-17, 30-33, 41-47

*Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982) .............2, 14, 25, 31, 32

*Kelly v. Kosuga*, 358 U.S. 516 (1959) ...........................................3, 32, 33

*Kornea v. Miller*, No. 22-cv-4454, --- F. Supp. 3d ----, 2025 WL 2306962 (S.D.N.Y. Aug. 11, 2025) .............................................34

*McMullen v. Hoffman*, 174 U.S. 639 (1899) .....................................31, 38

*Michelson v. Voison*, 658 N.W.2d 188 (Mich. Ct. App. 2003).................43

*Mino v. Clio School District*, 661 N.W.2d 586 (Mich. Ct. App. 2003) ..........................................................................................43

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) ....................27

*In re Morgan Brown*, 2016 WL 4140917 (T.T.A.B. 2016) ......................40

*Morrison v. Marsh & McLennan Cos.*, 439 F.3d 295 (6th Cir. 2006) ..........................................................................................30

*Nallaballi v. Achanta*, No. 298042, 2011 WL 2555717 (Mich. Ct. App. June 28, 2011) ..........................................................43-44

*Nallaballi v. Achanta*, No. 322021, 2016 WL 359161 (Mich. Ct. App. Jan. 26, 2016) ........................................................ 44

*Nurmi v. Beardsley*, 278 N.W. 805 (Mich. 1938) ................................ 54

*Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017) ......................................................................................... 40

*Schlosser v. VRHabilis, LLC*, 113 F.4th 674 (6th Cir. 2024) ................. 27

*Shulman v. Kaplan*, 58 F.4th 404 (9th Cir. 2023) ............................... 40

*Testa v. Katt*, 330 U.S. 386 (1947) ............................................... 32, 45

*Tracy v. USAA Casualty Insurance Co.*, No. 11-cv-487, 2012 WL 928186 (D. Haw. Mar. 16, 2012) ....................................... 35

*United States v. Nixon*, 839 F.3d 885 (9th Cir. 2016) ......................... 39

*United States v. Trevino*, 7 F.4th 414 (6th Cir. 2021) .................................................. 4, 8, 10, 36-39, 42, 47

*United States v. Wheat*, 988 F.3d 299 (6th Cir. 2021) ...................... 9, 33

*Van Buren Charter Township v. Visteon Corp.*, 904 N.W.2d 192 (Mich. Ct. App. 2017) ................................................... 63

STATUTES

18 U.S.C. § 924(e)(1) ........................................................................ 46

18 U.S.C. § 924(e)(2)(A)(i) ........................................................... 46, 47

18 U.S.C. § 1964(c) .......................................................................... 40

18 U.S.C. § 3282(a) .......................................................................... 39

21 U.S.C. § 812(c) ......................................................................... 2, 33

21 U.S.C. § 841(a)(1) ................................................................ 2, 28, 33

21 U.S.C. § 841(b)(1)(A) ................................................................ 45-46

21 U.S.C. § 841(b)(1)(A)(vii) ................................................ 46

21 U.S.C. § 846................................................ 7, 28, 33

28 U.S.C. § 1291 ............................................................. 6

28 U.S.C. § 1332(a) ......................................................... 6

28 U.S.C. § 1441 ............................................................. 6

28 U.S.C. § 1446 ............................................................. 6

Consolidated and Further Continuing Appropriations Act,
  2015, Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217
  (2014) .................................................................. 8, 38

Full-Year Continuing Appropriations and Extensions Act,
  Pub. L. No. 119-4, §§ 1104, 1106, 139 Stat. 9, 12 (2025) ..................... 8

Mich. Comp. Laws § 333.26421 *et seq.* ................................... 9

Mich. Comp. Laws § 333.26422(c) ........................................ 9

Mich. Comp. Laws § 333.27101 *et seq.* ................................... 9

Mich. Comp. Laws § 333.27952 ........................................... 9

Mich. Comp. Laws § 333.27959 ........................................... 9

Mich. Comp. Laws § 333.27967 ........................................... 9

**OTHER AUTHORITIES**

13 C.F.R. § 120.110(h) ..................................................... 40

21 C.F.R. § 1308.11(d)(23) ................................................ 8

Fed. R. Civ. P. 50(a) ....................................................... 24

Fed. R. Civ. P. 50(a)(1) .................................................... 28

Fed. R. Civ. P. 50(b) ....................................................... 24

Fed. R. Civ. P. 56(a) ....................................................... 27

Fed. R. Civ. P. 59 ...................................................................24

*Restatement (First) of Contracts* § 598 cmt. b (1932) .............................47

*Restatement (Second) of Contracts* § 178(1) (1981) ...............................48

*Restatement (Second) of Contracts* § 178 cmt. b (1981) ................... 42, 46

*Restatement (Second) of Contracts* § 178 cmt. e (1981).................... 43, 44

8 Richard A. Lord, *Williston on Contracts* § 19:75 (4th ed.
　　2025) ........................................................... 30, 31, 36, 37, 43

## STATEMENT REQUESTING ORAL ARGUMENT

This case involves important issues concerning the contract-law doctrine of illegality with significant implications for principles of federalism and the supremacy of federal law. Defendants-Appellants GR Vending MI, LLC and CURA MI, LLC therefore believe that oral argument would assist the Court in deciding this appeal.

## INTRODUCTION

Defendants engaged in the distribution of marijuana in Michigan, whose state laws permit the practice. But like all participants in state marijuana markets across the country, Defendants were clearheaded about the risks associated with their business. Despite state legalization efforts, marijuana remains a Schedule I controlled substance under the federal Controlled Substances Act, *see* 21 U.S.C. §§ 841(a)(1), 812(c), making it "contraband for *any* purpose" nationwide, *Gonzalez v. Raich*, 545 U.S. 1, 27 (2005). That fact means marijuana businesses, like it or not, must order their affairs differently from other businesses. Among other impediments, they cannot obtain federal trademarks to protect their brands; file for bankruptcy; or secure small business loans.

Nor can they turn to the courts to enforce contracts for the purchase and sale of marijuana. From time immemorial, federal courts have adhered to the rule that "no court will lend its assistance in any way towards carrying out the terms of an illegal contract," *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982) (quoting *McMullen v. Hoffman*, 174 U.S. 639, 654 (1899)), including by awarding damages for breach of such a contract. Thus, when marijuana businesses enter contracts with one

another to manufacture and distribute marijuana—"the precise conduct made unlawful" by the Controlled Substances Act, *Kelly v. Kosuga*, 358 U.S. 516, 520 (1959)—they do so with open eyes that if the deal goes south, their remedies are limited. Nevertheless, the parties here entered into a contract to buy and sell over 53,000 pounds of marijuana. Under black-letter law, this contract to violate federal law is void and unenforceable, and both parties should have known it.

The district court recognized the contract's illegality. But it rejected the clear implication of that conclusion, choosing instead to conduct an amorphous inquiry into the nature of federal marijuana "policy." It then determined that the Rohrabacher-Farr amendments—a series of annual appropriations riders that appear to prohibit the Department of Justice (DOJ) from prosecuting medical-marijuana crimes in certain states—changed federal policy to permit enforcement of medical-marijuana contracts. Finding the contract here concerned medical marijuana, the court deemed it enforceable. After a jury trial, the court entered a first-of-its-kind judgment awarding Hello Farms over $30 million in damages for the breach of a contract to sell drugs.

That judgment cannot stand. This Court has settled what effect the Rohrabacher-Farr riders have on the policy embodied in the CSA: none. "There is no ambiguity" that distributing medical marijuana "remains criminal." *United States v. Trevino*, 7 F.4th 414, 427 (6th Cir. 2021). And the district court's singular focus on the riders ignored the myriad other ways in which federal law—through denial of trademark, bankruptcy, and other protections—makes clear that, notwithstanding Rohrabacher-Farr, marijuana remains very much illegal.

Even if the district court was right about the riders' impact, it was wrong about their application, because the contract here was not a medical-marijuana contract. The contract covered two years of harvests, and although Hello Farms had only medical-marijuana licenses in 2020, nothing in the contract prohibited it from obtaining recreational licenses, growing recreational marijuana, and forcing Defendants to buy that marijuana in 2021. Indeed, after the deal fell apart in early 2021, that is precisely what Hello Farms did, and the jury awarded it damages for doing so. The court was wrong to hold that Rohrabacher-Farr applied to this contract, and wrong again to force Defendants to pay damages for marijuana that would not come within the riders' protection.

In any event, even if the parties' contract were enforceable, the judgment below must be reversed. The contract set out a tiered pricing system based on THC potency, with the highest price going to marijuana above 12% THC. And Defendants were not required to buy *any* of the marijuana if it contained pesticides or heavy metals. It follows that, in order to obtain the maximum contract price as damages for the 2021 harvest, Hello Farms needed to put forth *some* evidence showing that the harvest would have satisfied those contractual requirements.

Hello Farms abdicated that responsibility, offering only assurances that, because its 2020 harvest earned the maximum price, its 2021 harvest should too. But it adduced no testimony explaining why that was so. And the undisputed evidence showed the opposite: harvests vary greatly each year, and it is impossible to know a harvest's THC or pesticide content without testing, which Hello Farms did not conduct. Nor did Hello Farms submit any other evidence supporting the inference that the 2021 harvest would have earned the maximum contract price absent a breach. The jury nevertheless awarded Hello Farms maximum damages, a result that could only have been based on speculation. That result, too, cannot stand.

# JURISDICTIONAL STATEMENT

After Plaintiff-Appellee Hello Farms Licensing MI, LLC filed this breach of contract action in Michigan state court, *see* Compl., RE1-1, Defendants-Appellants GR Vending MI, LLC and CURA MI, LLC removed the case to federal court under 28 U.S.C. §§ 1441 and 1446, *see* Not. of Removal, RE1. The district court had jurisdiction under 28 U.S.C. § 1332(a) because the parties are completely diverse and the amount in controversy exceeds $75,000. *See* RE1, PageID.3.

On May 6, 2025, the district court entered judgment for Hello Farms. *See* Judgment, RE295. Defendants then sought judgment as a matter of law or, in the alternative, a new trial. *See* Defs.' Renewed Mot. for Judgment, RE277; Defs.' Mot. for New Trial, RE278. On July 30, 2025, the district court denied those motions, *see* Order, RE317, thereby adjudicating all remaining claims and the rights and obligations of all remaining parties.

On August 21, 2025, Defendants timely filed a notice of appeal. *See* Not. of Appeal, RE326. This Court accordingly has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether the district court erred in enforcing a contract for the manufacture and distribution of marijuana, conduct that violates the Controlled Substances Act.

2.      Whether, even if the parties' contract is enforceable in part, the district court erred by permitting Hello Farms to collect damages for marijuana grown under recreational licenses.

3.      Whether Hello Farms carried its burden to establish a nonspeculative basis for the jury's award of the maximum contract price for the 2021 harvest.

## STATEMENT OF THE CASE

### I.    Legal Background

#### A.    The Controlled Substances Act

In 1970, Congress enacted the Controlled Substances Act, or CSA—a "comprehensive regime" that made it "unlawful to manufacture, distribute, dispense, or possess any controlled substance," *Raich*, 545 U.S. at 12-13 (citing 21 U.S.C. §§ 841(a)(1), 844(a)), as well as to conspire to engage in such conduct, *see* 21 U.S.C. § 846. "In enacting the CSA, Congress classified marijuana as a Schedule I drug," *Raich*, 545 U.S. at

14 (citing 21 U.S.C. § 812(c)), and it remains one today, *see* 21 C.F.R. § 1308.11(d)(23).

Each year since 2014, Congress has included in its annual budget "an appropriations rider known as the 'Rohrabacher-Farr Amendment,'" *Trevino*, 7 F.4th at 419, which provides in relevant part that "[n]one of the funds made available in this Act to the Department of Justice may be used, with respect to [33] States … [including] Michigan … to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana." Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217 (2014).[1] The riders apply to *medical*-marijuana laws only—not to state laws authorizing recreational-marijuana use—and are effective only for one year at a time. The last such rider expired on September 30, 2025. *See* Pub. L. No. 119-4, §§ 1104, 1106, 139 Stat. 9, 12 (2025). As of the date of this brief, due to the ongoing government shutdown, it is unclear if the rider will be reauthorized.

Notwithstanding these riders, marijuana (even for medical uses that comply with state law) remains a Schedule I controlled substance.

---

[1] "The rider has been reenacted annually using substantially the same language." *Trevino*, 7 F.4th at 419-20, 420 n.3.

That means marijuana is—and has been continuously since 1970—"contraband for *any* purpose" nationwide. *Raich*, 545 U.S. at 27, 29. And it means that federal law "prohibit[s] two individuals from knowingly reaching an agreement to distribute [marijuana]." *United States v. Wheat*, 988 F.3d 299, 304 (6th Cir. 2021) (citing 21 U.S.C. § 846).

### B. Michigan's State Marijuana Laws

Despite marijuana's federal illegality, several States have legalized the drug under state law. One is Michigan. In 2008, Michigan authorized the use of marijuana in limited medical circumstances. Mich. Comp. Laws § 333.26421 *et seq.* In 2016, it created a licensing regime for medical-marijuana growers and processors. *Id.* § 333.27101 *et seq.* And in 2018, it legalized *recreational* marijuana "under state and local law for adults 21 years of age or older," and created a regime allowing the issuance of licenses to grow adult-use marijuana. *See id.* §§ 333.27952, 333.27959. But all the while, Michigan has made clear that it does not "purport[] to supersede any applicable federal law," *id.* § 333.27967, recognizing that "federal law currently prohibits any use of mari[j]uana," *id.* § 333.26422(c).

9

Rightly so. "[I]t is an elementary feature of our federal system that … state statute[s] cannot override or amend federal law." *Trevino*, 7 F.4th at 427 (citing U.S. Const., art. VI, § 2). "[U]nder the Supremacy Clause," therefore, even "'marijuana possession and cultivation [done] in accordance with state law' is not 'beyond congressional reach.'" *Id.* (quoting *Raich*, 545 U.S. at 29). Thus, in Michigan as in every other state, the CSA's criminal prohibitions on the manufacture and sale of marijuana, as well as on conspiracies to engage in those acts, remain in full effect. *See id.*

## II.   Factual Background

### A.   The Parties' Contract

On November 23, 2020, the parties here executed a contract (the "Agreement") under which Defendants, subject to certain conditions, were to "purchase 100% of the marijuana biomass … produced by Hello Farms in its 2020 and 2021 harvests." Am. Compl., Ex. A ("Agreement"), RE32-1, PageID.2789.[2] The Agreement—which nowhere stated it was

---

[2] The Agreement was also attached as Exhibit B to Defendants' motion for summary judgment, *see* RE80-2, and as Exhibit 1 to Defendants' renewed motion for judgment as a matter of law, *see* RE277-1, and was admitted at trial as Plaintiff's Exhibit 2, *see* Trial Tr., Vol. 2-A ("Tr.2-A"), RE230, PageID.11923-24. For simplicity, this brief cites the Agreement as attached to Hello Farms's Amended Complaint.

only for medical marijuana—estimated that the 2020 harvest alone would entail "approximately 6,000 plants generating an anticipated 12,000-15,000 pounds of [marijuana]." *Id.* And it provided that Defendants could obtain a refund of a required deposit if Hello Farms failed to supply marijuana that "pass[ed] local and state *recreational* cannabis testing requirements." *Id.* (emphasis added).

The Agreement made both Defendants' duty to accept Hello Farms's biomass and the price of that biomass contingent upon Hello Farms's satisfaction of certain conditions, as follows:

***Testing requirements.*** Defendants agreed to accept the biomass only if Hello Farms could prove, via testing, that it was not contaminated with "heavy metals, additives, [or] pesticides." *Id.*, PageID.2789-90. The Agreement provided that "at least every 50 lbs. of biomass must be tested," with each 50-pound "[b]atch" required to "have a Passing COA" (Certificate of Analysis) demonstrating the absence of the specified contaminants. *Id.*, PageID.2790. Any batch that did not yield a Passing COA was "subject to rejection [by Defendants] or price renegotiation." *Id.* If ten batches failed, Defendants could terminate the Agreement. *Id.*

11

***THC potency.*** The price Defendants agreed to pay depended on the biomass's THC content. Hello Farms was to deliver the marijuana in "[l]ots" made up of "between 10 and 20 [b]atches." *Id.*, PageID.2791. The Agreement provided that "the per lb. price paid for all batches in a [given] [l]ot" would be determined by the average THC potency of all batches in that lot. *Id.*

The Agreement's price schedule, accounting for decreased prices in 2021 due to market developments, was as follows:

| THC % | Price Per Pound | |
|---|---|---|
| | **2020** | **2021** |
| 12.00% and above | $1,000 | $850 |
| 11.00%–11.99% | $917 | $834 |
| 10.00%–10.99% | $834 | $751 |
| 9.00%–9.99% | $751 | $668 |
| 8.00%–8.99% | $668 | $585 |
| 7.00%–7.99% | $585 | $502 |
| 6.99% and below | $100 | $17 |

*See id.*, PageID.2790-92; *see also* Trial Tr., Vol.8-A ("Tr.8-A"), RE260, PageID.13895-98.

## B.     The Breakdown of the Parties' Relationship

The parties' relationship quickly soured. Defendants paid Hello Farms a deposit of $2.2 million, *see* Agreement, RE32-1, PageID.2789; Trial Tr., Vol. 5-A ("Tr.5-A"), RE239, PageID.12774, and took delivery of

two lots (just over 2,000 pounds) of biomass, for which they paid Hello Farms another $2 million, *see* Trial Tr., Vol. 6-B ("Tr.6-B"), RE247, PageID.13373. But by January 2021, the parties had reached an impasse, and Defendants did not accept any further deliveries or remit to Hello Farms any further payments.

Hello Farms sold the balance of its 2020 harvest—around 14,000 of the 16,362 total pounds—to a third party, Choice Labs, for $8.5 million (about $600/pound). *See* Tr.6-B, RE247, PageID.13372-76. Later, Hello Farms obtained several new licenses, including licenses to grow *recreational* marijuana, *see id.*, PageID.13439-40, and planted a 2021 crop totaling 37,492 pounds, far exceeding the 2020 total, *see* Trial Tr., Vol. 6-A ("Tr.6-A"), RE241, PageID.13118. Hello Farms sold the entire 2021 harvest to Choice for $2.2 million (around $60/pound) without marketing it to other parties. *See* Tr.8-A, RE260, PageID.13913; Tr.6-A, RE241, PageID.13118; Trial Tr., Vol. 7-A ("Tr.7-A"), RE252, PageID.13733-34.

Under its contract with Choice (unlike the Agreement here), Hello Farms was not required to test its biomass for either contamination or THC content. *See* Tr.6-B, RE247, PageID.13384.

## III. Procedural Background

### A. Hello Farms's Lawsuit

On February 1, 2021, Hello Farms sued Defendants for breach of contract in Michigan state court. Compl., RE1-1. Defendants removed the case to federal court. Not. of Removal, RE1. On February 21, 2022, after selling the 2021 harvest to Choice, Hello Farms filed the operative amended complaint, seeking damages for "the difference between the Contract price … and the actual sale price" for both the 2020 and 2021 harvests. Am. Compl., RE32, PageID.2782.

### B. Defendants' Motion for Summary Judgment

Following discovery, the parties each moved for summary judgment. As relevant here, Defendants contended that the doctrine of illegality rendered the Agreement unenforceable. *See* Defs.' Mot. for Summary Judgment ("Defs.' MSJ"), RE80, PageID.3692-702. Under that doctrine, "no court will lend its assistance in any way towards carrying out the terms of an illegal contract." *Kaiser*, 455 U.S. at 77. Here, because the Agreement was for the purchase and sale of marijuana—a violation of federal law, even if compliant with state law—Defendants argued that the court lacked authority to award Hello Farms damages for breach of contract. *See* Defs.' MSJ, RE80, PageID.3692-93.

14

For its part, Hello Farms agreed that "[t]he CSA criminalizes most marijuana related activities" and that "[g]enerally, a contract in violation of federal law … is unenforceable." Pl.'s Opp'n to Defs.' Mot. for Summary Judgment, RE90, PageID.3888, 3898. But it argued that, in view of state legalization efforts, the court should enforce the contract under "a more flexible approach" to the illegality doctrine. *Id.*, PageID.3898, 3905.

After an initial hearing, the district court sought supplemental briefing on whether the Rohrabacher-Farr riders impacted the illegality analysis. Order, RE117, PageID.5875-76. Hello Farms argued that the riders repealed the CSA by implication, rendering medical-marijuana contracts enforceable if they complied with state law, and characterized the Agreement as one for medical marijuana allowed by state law. *See* Pl.'s Supp. Br., RE123, PageID.5972-76, 5986-88. Defendants responded that the riders did not repeal or undermine the CSA's ban on marijuana. *See* Defs.' Supp. Br., RE136, PageID.7402-06 (citing *United States v. Walsh*, 654 F. App'x 689, 695 (6th Cir. 2016)). Defendants also observed that, even if the riders *did* change federal policy on medical marijuana, the Agreement here was not limited to medical marijuana. *See id.*, PageID.7407-08 & n.3.

15

On July 29, 2024, the district court denied Defendants' motion. *See* Hearing Tr. ("MSJ Hearing Tr."), RE147, PageID.8322. The court acknowledged that there is "no doubt that the contract calls for conduct that is unlawful under the [CSA]." *Id.*, PageID.8323. But it saw the illegality doctrine as turning on "public policy instead of laws," and viewed the Rohrabacher-Farr riders as effectuating "a meaningful and material policy shift by Congress" toward "allowing states to develop medical marijuana markets." *Id.*, PageID.8325-27. The district court therefore held the Agreement enforceable. *See id.*

The court also viewed this result as mandated by *Jackson Purchase Rural Electric Cooperative Ass'n v. Local Union 816, International Brotherhood of Electrical Workers*, in which this Court identified several factors that might lead a court to hold that an illegal contract should nonetheless be enforced because refusing to do so would be "disproportionately inequitable," namely:

> [1] the justified expectations of the parties; [2] the forfeiture that would result from non-enforcement of the agreement; [3] any special public interest in enforcement; [4] the strength of the public policy that the agreement violates, as shown by legislation or court decision; [5] the likelihood that refusal to enforce will further that policy; and [6] the seriousness of the misconduct.

16

646 F.2d 264, 267 (6th Cir. 1981). The district court found that each *Jackson Purchase* factor supported the Agreement's enforceability. *See* MSJ Hearing Tr., RE147, PageID.8329-32.

## C. The Jury Trial

With summary judgment denied, the parties proceeded to a jury trial. This brief recounts portions of the trial relevant to the issues in this appeal—the Agreement's illegality and the appropriateness of the jury's damages award.

### 1. Testimony Bearing on Illegality

While the district court's summary judgment ruling was premised on the idea that the Agreement was a contract for *medical* marijuana only, evidence at trial demonstrated that Hello Farms sought—and ultimately received—damages for sales of *recreational* marijuana.

Specifically, while Hello Farms possessed only medical licenses in 2020, it subsequently obtained recreational licenses and "s[old] directly into the adult use market" in 2021. Tr.6-B, RE247, PageID.13439-40. Whitney Conroy, who helped negotiate the Agreement for Defendants, testified that this was always Hello Farms's plan: "[I]n early conversations Brian [Farah]," a business leader at Hello Farms who

17

served as its point person for the Agreement, "indicat[ed] that he would be able to secure adult use licensure." Trial Tr., Vol. 3-B ("Tr.3-B"), RE231, PageID.12018; Tr.6-B, RE247, PageID.13430-31. Hello Farms's plan to harvest marijuana for recreational use aligned with Defendants' goals in contracting with Hello Farms in 2020: to "take advantage of the very large and growing opportunity in adult use" in Michigan, which had only recently legalized recreational marijuana. Tr.5-A, RE239, PageID.12758.

### 2.    Testimony Bearing on Damages

To collect damages for a breach, Hello Farms had to establish its lost profits, which here equaled "the unpaid contract price," minus avoided expenses and amounts recovered from the alternate buyer, Choice. Trial Tr., Vol. 8-B ("Tr.8-B"), RE263, PageID.14078-79. Under the Agreement, the unpaid contract price turned on two variables: (1) the degree to which the harvests were free from the "heavy metals, additives, and pesticides" that would have permitted Defendants to refuse delivery; and (2) the harvests' THC content, which determined the applicable price. Agreement, RE32-1, PageID.2789-92.

For 2020, Defendants did not dispute that Hello Farms produced test results showing the biomass was free of heavy metals and pesticides and had THC levels over 12%, *see* Tr.2-A, RE230, PageID.11959; Tr. 8-A, RE260, PageID.13908, so the jury could fairly award Hello Farms the maximum contract price of $1,000/pound for the entire harvest.

Damages were not so easily calculated for the 2021 harvest, however, because Hello Farms did not conduct widespread testing of that harvest. Tr.7-A, RE252, PageID.13725, 13731. Instead, it tested only six 50-pound batches—less than 1% of the 2021 biomass. *Id.*, PageID.13725; *see* Tr.6-A, RE241, PageID.13177. And one of those six "R&D tests" "failed for heavy metals," meaning it "would not be saleable under the … [A]greement." Tr.7-A, RE252, PageID.13723-25.

Having opted not to test the 2021 harvest, Hello Farms sought to prove its saleability and price through circumstantial evidence. But the district court precluded Farah from testifying that the price Hello Farms received from Choice for the 2021 biomass was indicative of its THC content, or that it was "permissible to extrapolate the R&D tests" to make judgments about the 2021 harvest. Tr.6-A, RE241, PageID.13193.

19

What remained was Farah's testimony that Hello Farms had "the same grower in 2021 as [it] did in 2020," "the same field," and "the same farm," Tr.7-A, RE252, PageID.13814, that it "use[d] similar techniques" from year to year and its "plants generally look[ed] the same," Tr.6-A, RE241, PageID.13122-24, and that 2021 was "a better growing season" with "[m]ore favorable conditions," Tr.7-A, RE252, PageID.13801. But neither Farah nor any other witness testified as to why these similarities mattered in terms of THC content or the presence or absence of heavy metals or pesticides. Moreover, between 2020 and 2021, Hello Farms acquired new growing licenses, expanding its plantable land from seven to 25 acres, *see* Tr.7-A, RE252, PageID.13730, and its biomass production from 16,362 to 37,492 pounds, *see* Tr.6-A, RE241, PageID.13118. Yet no one testified as to the characteristics of these additional acres. And even Farah admitted at trial that "[i]t would [have] ma[de] sense to test" these new acres to assess the harvest's THC content and the presence of heavy metals or pesticides. Tr.7-A, RE252, PageID.13730.[3]

---

[3] Farah also testified that Hello Farms planted marijuana in 2022, 2023, and 2024, but did not identify the THC content of those harvests or specify whether pesticides or heavy metals were present. *See* Tr.6-A, RE241, PageID.13122-23.

Indeed, on the latter point, the jury heard unrebutted evidence that the 2021 harvest *was* contaminated with pesticides. *See* Trial Tr., Vol. 4-B ("Tr.4-B"), RE234, PageID.12356-58. As Farah explained, Hello Farms was "surrounded by cornfields" that use "pesticides and herbicides" that could have "drift[ed]" onto Hello Farms's crops. Tr.7-A, RE252, PageID.13730-31. And Joseph Bayern—a former Curaleaf employee who later worked for a company that acquired Choice Labs—testified that he learned from a review of Choice's business records that "there was a lot of work that had to be done to remediate pesticides" in Hello Farms's 2021 harvest. Tr.4-B, RE234, PageID.12355-58, 12363-64.

Ultimately, Farah acknowledged that growing marijuana outdoors is not "year to year exactly the same" and that "challenges ... arise," "dictate[d]" by "Mother Nature." Tr.6-A, RE241, PageID.13123. And he admitted that, if Hello Farms *had* tested the entire 2021 harvest, "some batches or even some lots could have come in under the 12[%] [THC] threshold" or "fail[ed] for heavy metals or pesticides." Tr.7-A, RE252, PageID.13725-26. Several other witnesses testified to similar effect, confirming that harvest-to-harvest variances meant that testing was the only way to assess potency and contamination. *See* Trial Tr., Vol. 5-B

21

("Tr.5-B"), RE240, PageID.12994 (Chris Mastro: the "potency [of] outdoor biomass ... could change year over year"); *id.*, PageID.12987 (Mastro: growers' "stats" and "test results" "are only as good as your last harvest"); Trial Tr., Vol. 2-B ("Tr.2-B"), RE229, PageID.11783 (Chris Ramos: "you need a test result to know the potency" of any given batch of marijuana); Tr.4-B, RE234, PageID.12439 (Robert Sciarrone: "no way to ensure that the product will be 12[%] unless [Hello Farms] had the test results").

### 3. Hello Farms's Damages Expert

In support of its damages calculation, Hello Farms called Jacob Katz as an expert. Katz estimated that Hello Farms's damages—the unpaid contract price for 2020 and 2021 less Hello Farms's costs, any savings it enjoyed as a result of the breach, and the revenue it received from Choice—were $31,848,279. *See* Tr.8-A, RE260, PageID.13885-86. To reach that figure, Katz assumed that Hello Farms was entitled to the maximum contract price for both harvests—the price reserved for a harvest with greater than 12% THC content: $1,000/pound in 2020 and $850/pound in 2021. *See id.*, PageID.13874, 13877.

While Katz reviewed the results of the 2020 COAs to confirm Hello Farms was entitled to that maximum price for the first harvest, he "did

no analysis" of the 2021 biomass. *Id.*, PageID.13874, 13904-05. Instead, he deemed $850 "the most reasonable price" for 2021 based on his "understanding that … once there was a breach, [Hello Farms] w[as] not required to do testing." *Id.*, PageID.13903, 13934. But he agreed that, "if testing w[ere] performed in 2021 … that did not meet the contract[']s requirements," he would "absolutely" have to "adjust" his analysis. *Id.*, PageID.13910.

### 4. Defendants' Rule 50(a) Motions

At the close of evidence, the parties moved orally for judgment as a matter of law under Rule 50(a). As relevant here, Defendants renewed their illegality argument, explaining that even if the Rohrabacher-Farr riders changed federal policy as to *medical* marijuana, "[a]s the evidence came out, [the Agreement] was not" a medical-marijuana contract. Trial Tr., Vol. 7-B, RE251, PageID.13607. Defendants also argued that Hello Farms failed to demonstrate an entitlement to damages for the 2021 harvest: It was "undisputed that the 2021 harvest contained pesticides" and Hello Farms failed to "put on [any] evidence that the 2021 harvest would have been over 12[%] potency." *Id.*, PageID.13610-11. The court

took the parties' motions under advisement and submitted the case to the jury. Tr.8-A, RE260, PageID.13940.

### 5.    The Verdict

The jury found Defendants liable for breach of contract and awarded Hello Farms $31,848,279 in damages, representing the maximum contract price for both 2020 and 2021. *See* Verdict Form, RE257, PageID.13851-53.

### D.    Post-Trial Proceedings

Following trial, Defendants moved for judgment as a matter of law or, in the alternative, for a new trial. *See* Fed. R. Civ. P. 50(a)-(b), 59.

Defendants again argued that the Agreement was unenforceable due to illegality, contending that the district court's summary judgment ruling overstated the significance of the Rohrabacher-Farr riders and improperly elevated Michigan policy over federal policy when analyzing the *Jackson Purchase* factors. *See* Defs.' Renewed Mot. for Judgment, RE277, PageID.15034-44. "At *most*," Defendants added, "the contract could be only partially enforceable as to marijuana grown and sold pursuant to Hello Farms' medical licenses," while the jury awarded damages for marijuana sold under *recreational* licenses in 2021. *Id.,*

PageID.15044 n.6. Because Hello Farms introduced no evidence "that would allow apportionment between [its] medical and recreational licenses," Defendants asked that damages "be reduced to $0" or that a new trial be ordered for Hello Farms to make that showing. *Id.*

Defendants also renewed their argument that Hello Farms failed to establish damages for 2021 due to pesticide contamination and the lack of evidence about the harvest's THC potency, *see id.*, PageID.15053-55, adding that at minimum a new trial was warranted on these issues.

The district court denied Defendants' motions on July 29, 2025. *See* Post-Trial Tr., RE319. The court's holdings are discussed in detail below.

## SUMMARY OF ARGUMENT

The jury awarded Hello Farms $31.8 million in damages for breach of a contract to manufacture and distribute marijuana in violation of federal law. For three independent reasons, that judgment cannot stand.

*First*, the Agreement is per se unenforceable. For centuries, courts have followed the rule that "illegal promises will not be enforced." *Kaiser*, 455 U.S. at 77. And while Michigan law permits marijuana cultivation and sale, federal law unambiguously makes marijuana illegal, meaning that all parties to any contract for the cultivation and distribution of

marijuana necessarily assume and shoulder the attendant risks. Here, the parties agreed to manufacture and distribute over 53,000 pounds of marijuana, a criminal violation of the CSA. The district court acknowledged the Agreement's federal illegality but enforced it anyway based on its misinterpretation of the Rohrabacher-Farr riders. Those riders merely restrict funding to DOJ for certain prosecutions; they do not repeal the CSA, change federal policy toward marijuana, or authorize courts to enforce marijuana contracts. Even under *Jackson Purchase*'s balancing test, which is inapplicable to a contract calling for the commission of a federal crime, every factor weighs against enforcement.

*Second*, even if the appropriations riders changed federal policy on *medical* marijuana, the Agreement here was not so limited. Its plain language says nothing of medical marijuana, and in fact contemplates that Defendants would sell biomass into the recreational market. Moreover, Hello Farms undisputedly secured recreational licenses for 2021, and the jury awarded damages based on marijuana grown under those licenses. At minimum, those damages must be vacated.

*Third*, and in any event, Hello Farms failed to prove its 2021 damages with reasonable certainty. The Agreement's tiered pricing

structure required Hello Farms to demonstrate that its 2021 harvest would have exceeded 12% THC potency and been free from pesticides. Hello Farms offered no such proof. It relied on vague assertions that 2021 was like 2020, contradicted by undisputed testimony that harvests vary from year to year and THC content cannot be assessed without testing. Unrebutted evidence also showed the 2021 harvest was contaminated with pesticides, rendering it non-saleable under the Agreement. The jury's award of maximum damages was based entirely on speculation.

This Court should reverse the judgment and remand either for entry of judgment in Defendants' favor, for a reduction in the damages award, or, at minimum, for a new trial on damages.

## STANDARD OF REVIEW

This Court "review[s] *de novo*" both "the district court's denial of a renewed motion for judgment as a matter of law," *Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 683 (6th Cir. 2024), and its "denial of summary judgment," *Moldowan v. City of Warren*, 578 F.3d 351, 373 (6th Cir. 2009). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Judgment as a matter of law is proper when

"a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party on [an] issue." Fed. R. Civ. P. 50(a)(1).

The Court "review[s] the denial of a motion for a new trial for an abuse of discretion, which occurs when a district court 'improperly applies the law[] or uses an erroneous legal standard.'" *Fitzgerald Truck Parts & Sales, LLC v. United States*, 132 F.4th 937, 942 (6th Cir. 2025).

## ARGUMENT

### I. The District Court Erred in Enforcing a Contract for the Purchase and Sale of a Federally Controlled Substance.

The Agreement was a contract for the purchase and sale of thousands of pounds of marijuana. Federal law criminalizes not only the conduct the Agreement calls for, *see* 21 U.S.C. § 841(a)(1), but also the Agreement's *formation, see id.* § 846. Thus, as the district court acknowledged, there is "no doubt that the contract calls for conduct that is unlawful under the [CSA]," and no doubt that this promise to violate federal law is "the core of [the parties'] contract." MSJ Hearing Tr., RE147, PageID.8323. Federal courts may not give effect in any way to agreements to violate federal law, including by awarding damages for breach of contract. Because the district court's ruling that the Agreement

is enforceable violates this well-settled principle, this Court should reverse and remand for the entry of judgment for Defendants.

## A. The District Court's Ruling

The district court held the Agreement enforceable based entirely on its conclusion that, in light of Rohrabacher-Farr, "federal policy ... is to permit sales of medical marijuana in states that allow them." Post-Trial Tr., RE319, PageID.15689.[4] And although the court recognized that the Agreement's "four corners" did not "strictly limit[] the transaction to medical marijuana," it believed the parties "understood and intended that the transaction" was for medical marijuana. *Id.*, PageID.15691.

With respect to *Jackson Purchase*'s analysis, the court rejected Defendants' arguments that its earlier summary judgment ruling improperly "elevat[ed] state interests above federal policy," reiterating its view that the Rohrabacher-Farr riders tipped each of the *Jackson Purchase* factors toward enforceability. *See id.*, PageID.15692-94.

---

[4] At a hearing on Defendants' post-trial motions, the district court stated it "st[ood] by" and "incorporate[d] ... in full" its summary judgment ruling on illegality. Post-Trial Tr., RE319, PageID.15688. Defendants thus address the reasoning from both rulings.

Nor did the court see any significance in Hello Farms's 2021 sales of marijuana "into the recreational market." *Id.*, PageID.15692. Instead, it saw these sales "as an effort by [Hello Farms] to mitigate [its] damages" that "[i]nured to … [D]efendants' benefit, because [Defendants] received a credit for the sales into the recreational market." *Id.*

## B. Analysis

### 1. As a Contract to Violate Federal Criminal Law, the Agreement Is Per Se Unenforceable.

"A basic principle of contract law is that agreements to commit a crime are illegal, void. Without question, courts will not order damages for breach of such a contract." 8 Richard A. Lord, *Williston on Contracts* § 19:75 (4th ed. 2025) (quotation marks omitted). That principle resolves this case. The parties' Agreement was a contract to violate the CSA. "Without question," therefore, it is unenforceable, *id.*, and the Rohrabacher-Farr riders in no way undermine that result. This Court should reverse the district court's contrary conclusion.

### a. A Contract to Commit a Crime Is Per Se Unenforceable.

"As a matter of public policy, this Court is generally precluded from enforcing illegal contracts." *Morrison v. Marsh & McLennan Cos.*, 439 F.3d 295, 300 (6th Cir. 2006); *see Jackson Purchase*, 646 F.2d at 267

("[E]nforcement of an illegal contract is contrary to public policy." (citing *Weil v. Neary*, 278 U.S. 160, 174 (1929)); *see also, e.g.*, *Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818, 823 (6th Cir. 1977) ("On grounds of public policy clauses in a contract which violate statutory provisions are nugatory and without legal effect."). Accordingly, "agreements to commit a crime are illegal" and "void," and "[w]ithout question, courts will not order damages for breach of such a contract." 8 Williston § 19:75. Crucially, that is so *without regard to the interests of [the] individual parties*" involved in the contract. *Cont'l Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 262 (1909) (emphasis added).

Cases dating back centuries affirm this commonsense principle, "leav[ing] no doubt that illegal promises"—promises to violate the law— "will not be enforced." *Kaiser*, 455 U.S. at 77. In *McMullen v. Hoffman*, for example, the Supreme Court recounted "the famous [1725] case of *The Highwayman*," in which one robber "file[d] a bill in equity for an accounting against his partner" of the proceeds of their crimes, only to have the case summarily dismissed once "its real nature [was] discovered." 174 U.S. 639, 654 (1899) (citing 9 L. Q. R. 105, 197 (1893)); *see id.* at 654-55 (collecting "only a few of the numerous" English and

American cases which "unanimously h[eld] that no court will lend its assistance in any way towards carrying out the terms of an illegal contract"). Likewise, in *Continental Wall Paper Co. v. Louis Voight & Sons Co.*, where the contract at issue "was illegal under the anti-trust act of 1890," the Court categorically refused to permit an award of damages, because to do so would "aid the execution of the [illegal] agreements." 212 U.S. at 266-67. And in *Kelly v. Kosuga*, the Supreme Court took as given that an "agreement between the parties could not be enforced by a court, if its unlawful character under the Sherman Act be assumed," without resorting to a balancing of other considerations. 358 U.S. at 521.

The logic behind this policy is easy to understand. "When Congress, in the exertion of the power confided to it by the Constitution," proscribes certain conduct via a criminal statute, it "establishe[s] a policy for all." *Testa v. Katt*, 330 U.S. 386, 392 (1947). Courts' power to enforce private contracts is, in turn, "subject to the restrictions and limitations" of that congressional policy. *Kaiser*, 455 U.S. at 83-84 (quoting *Hurd v. Hodge*, 334 U.S. 24, 34-35 (1948)). So, when parties contract to engage in "the precise conduct made unlawful" under a federal statute, *Kelly*, 358 U.S. at 520, "the aid of the court is denied, not for the benefit of the defendant,

but because public policy demands that it should be denied without regard to the interests of individual parties," *Cont'l Wall Paper*, 212 U.S. at 262. That is, the contract cannot be enforced regardless of the equities. *See id.* (parties' "interests must be put out of view altogether" if they seek "the assistance of the court in accomplishing ends forbidden by the law").

> ### b. Because the Parties' Agreement Was a Contract to Violate Federal Law, It Is Unenforceable.

Applying the settled law just discussed, the Agreement at issue in this case is categorically unenforceable.

The parties here agreed to engage in "the precise conduct made unlawful" by the CSA, *Kelly*, 358 U.S. at 520, *i.e.*, the "manufacture" and "distribut[ion]" of marijuana, 21 U.S.C. §§ 841(a)(1), 812(c). Regardless of what state law says about marijuana, entering into the Agreement was *itself* a violation of the CSA: conspiracy to manufacture and distribute marijuana. *See id.* § 846; *see also Wheat*, 988 F.3d at 306 ("[A] drug conspiracy" occurs when two or more individuals knowingly and voluntarily "agree[] to violate a drug law"); *cf. Jackson Purchase*, 646 F.2d at 267 (declining to enforce a contract where Congress prohibited both the act itself and "the agreement to do that act").

In line with these principles, so far as Defendants are aware, every federal district court to have considered the enforceability of a contract to purchase and sell marijuana—except the district court here—has deemed it per se unenforceable. In *Kornea v. Miller*, the plaintiff sought damages for lost profits stemming from a contract whose sole object was, as here, "the sale and distribution of marijuana, acts which are illegal under federal law." No. 22-cv-4454, --- F. Supp. 3d ----, 2025 WL 2306962, at *4 (S.D.N.Y. Aug. 11, 2025). The court's analysis was short and sweet: "The object of the [contract] being illegal under federal law, the [c]ourt cannot enforce its terms." *Id.* In *AgriAuto Genetics, LLC v. Harris*, plaintiff "was engaged to plant, harvest, and grow cannabis at [d]efendants' property" consistent with Oklahoma's medical-marijuana laws and sought damages for breach of that contract. No. 22-cv-273, 2023 WL 8371940, at *1 (E.D. Okla. Dec. 4, 2023). Once again, the court's reasoning was categorical: courts "cannot issue orders that facilitate illegal activity, namely violations of the CSA," so the contract could not be enforced. *Id.* at *2. And in *J. Lilly, LLC v. Clearspan Fabric Structures International, Inc.*, the court refused to "require [d]efendant to pay

[p]laintiff for marijuana plants in violation of federal law and policy." No. 18-cv-1104, 2020 WL 1855190, at *12 (D. Or. Apr. 13, 2020).

Other courts assessing similar marijuana-related contracts have reached the same result in the same categorical fashion. *See, e.g.*, *CCH Acquisitions, LLC v. J&J&D Holdings, LLC*, No. 23-cv-2983, 2025 WL 601249, at *5 (S.D. Ohio Feb. 25, 2025) (declining to award damages for breach of contract to purchase marijuana business because doing so "would 'give legal effect to [the parties'] illegal acts'" (quoting *Jackson Purchase*, 646 F.2d at 268)); *Tracy v. USAA Cas. Ins. Co.*, No. 11-cv-487, 2012 WL 928186, at *13 (D. Haw. Mar. 16, 2012) (declining to order insurer to pay claim for stolen marijuana plants because "[p]laintiff's possession and cultivation of marijuana, even for State-authorized medical use, clearly violates federal law"); *Hemphill v. Liberty Mut. Ins. Co.*, No. 10-cv-861, 2013 WL 12123984, at *2 (D.N.M. Mar. 28, 2013) ("This federal court … cannot force [d]efendant [insurer] to recompense [p]laintiff for medical [marijuana] expenses that are contrary to federal law and federal policy," because "[s]uch payment violates federal law.").

The district court here recognized that the parties' Agreement "calls for conduct that is unlawful under the [CSA]," MSJ Hearing Tr., RE147,

PageID.8323, but failed to assign proper significance to that fact: The Agreement "to commit [these] crime[s] [was] … void," and the court lacked power to "order damages for [its] breach." 8 Williston § 19:75; *see Associated Press v. Taft-Ingalls Corp.*, 340 F.2d 753, 759 (6th Cir. 1965) ("A party to an illegal bargain cannot 'recover damages for breach thereof.'" (citation omitted)). That is the end of the matter.

### c. The District Court's Contrary Conclusion Misunderstands Federal Marijuana Policy.

The district court resisted this straightforward conclusion, finding that the Rohrabacher-Farr riders marked a shift in "federal policy" to "permit sales of medical marijuana in states that allow them." Post-Trial Tr., RE319, PageID.15689. That conclusion was wrong.

Start with what cannot be disputed: the appropriations riders have not legalized marijuana, medical or otherwise. This Court has said so explicitly: "Though [the riders] purport[] to temporarily deny funding for the prosecution of certain crimes, [their] text contains no suggestion that the substantive conduct prohibited by the CSA has now been made legal." *Trevino*, 7 F.4th at 427. Thus, they "did not alter the CSA's substance." *Id.* So even if the Agreement here *did* fall within the riders' scope—and it did not, as discussed below—"[t]here is no ambiguity" that the conduct

36

it called for "remain[ed] criminal nonetheless." *Id.* The district court recognized this, conceding that "sales of marijuana are criminal" even after Rohrabacher-Farr. Post-Trial Tr., RE319, PageID.15689; *see* MSJ Hearing Tr., RE147, PageID.8326 ("[T]hese riders do not technically legalize marijuana.").[5] That conclusion should have ended this case: "[A]greements to commit a crime are … void" and unenforceable. 8 Williston § 19:75.

The district court, however, believed that the Rohrabacher-Farr riders meant that the Agreement could be enforced even if, "in a technical sense," it called for the commission of "a crime." Post-Trial Tr., RE319, PageID.15637. The court reasoned that the CSA must be "read together" with the Rohrabacher-Farr riders, which the court viewed as reflecting "a federal policy of staying out of the way of states[] with respect to the implementation of medical marijuana regimes" that would be "undermine[d]" if courts "decline[d] to enforce contracts involving

---

[5] Underscoring this point, federal legislation to *actually* legalize marijuana has repeatedly been proposed in Congress in recent years. Even while the Rohrabacher-Farr riders have been in effect, "all [of these] efforts … have failed." *Cocroft v. Graham*, 712 F. Supp. 3d 866, 872 (N.D. Miss.), *aff'd*, 122 F.4th 176 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 2682 (2025).

medical marijuana." *Id.*, PageID.15689, 15691. For two reasons, that reasoning does not withstand scrutiny.

First, the Rohrabacher-Farr riders are simply not as broad as the district court believed. The riders provide that "[n]one of the funds made available" to DOJ for the ensuing fiscal year "may be used … to prevent [Michigan] from implementing [its] own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana." 128 Stat. at 2217 (emphasis added). The text is vague and its effect narrow: Each time it is renewed, the rider limits "DOJ's ability to use certain funds to pursue individual prosecutions under [the CSA]" *for the next fiscal year*. *Trevino*, 7 F.4th at 427 (quoting *United States v. Nixon*, 839 F.3d 885, 888 (9th Cir. 2016)). Even if this narrow, time-limited decision to withdraw prosecutorial discretion did enunciate "a federal policy of staying out of the way of states" with respect to medical marijuana, Post-Trial Tr., RE319, PageID.15691, it in no way mandates that federal courts take the further, affirmative step of "lend[ing] [their] assistance … towards carrying out the terms," *McMullen*, 174 U.S. at 654, of agreements that "remain[] criminal," *Trevino*, 7 F.4th at 427.

That is especially true because the riders "do[] not provide immunity from prosecution for federal marijuana offenses" committed while they are in effect. *United States v. Nixon*, 839 F.3d 885, 888 (9th Cir. 2016) (citation omitted). The statute of limitations under the CSA is five years. 18 U.S.C. § 3282(a). If Congress were to "restore funding tomorrow, a year from now, or four years from now, … the government could … prosecute individuals who committed offenses while [it] lacked funding." *Nixon*, 839 F.3d at 888 (citation omitted). That reality underscores the central point: Because the riders "d[o] not alter the CSA's substance," *Trevino*, 7 F.4th at 427, a contract to purchase and sell marijuana, even if it complies with state medical-marijuana laws, is nevertheless an unenforceable agreement that violates the CSA. Were it otherwise, a court that enforced a marijuana contract in reliance on the Rohrabacher-Farr riders only for Congress to let the rider lapse would have "aid[ed] the execution of [an] agreement[] which constituted" an illegal, and now fully prosecutable, drug conspiracy. *Continental Wall Paper*, 212 U.S. at 266-67.

Second, and in any event, the district court's myopic focus on the Rohrabacher-Farr riders missed the forest for the trees. Criminal

prosecution is but one potential sanction for engaging in activity that violates a federal statute. While the riders temporarily take the threat of that sanction off the table for certain marijuana offenses, Congress's determination that marijuana is "contraband for *any* purpose," *Raich*, 545 U.S. at 27, nevertheless manifests in several other real-world consequences for businesses and individuals that deal in marijuana— including those who do so in compliance with permissive state medical-marijuana laws. Take just a few non-exhaustive examples:

- Marijuana businesses, because they "engage[] in … activity that is illegal under Federal … law," are ineligible for loans from the Small Business Administration, 13 C.F.R. § 120.110(h), even if they comply with state medical-marijuana law.

- Marijuana businesses cannot obtain federal trademark protection, "[r]egardless of individual state laws that may provide for legal activities involving marijuana." *In re Morgan Brown*, 2016 WL 4140917, at *3 (T.T.A.B. 2016).

- Businesses that "cultivat[e] marijuana for sale" consistent with state law "by definition [engage in] racketeering activity" within the meaning of the federal RICO statute, 18 U.S.C. § 1964(c), and thus may face potential civil (and criminal) liability. *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 882 (10th Cir. 2017).

- Conversely, businesses "engaged in cultivation of and commerce in cannabis" consistent with state law may not themselves bring suit to "recover damages under RICO for injury to that business." *Shulman v. Kaplan*, 58 F.4th 404, 411 (9th Cir. 2023).

- Finally, marijuana businesses generally cannot seek federal bankruptcy protection. "[A] bankruptcy case must be dismissed if [its] continuation … would require the court, trustee, or debtor in possession to administer assets that are illegal under the CSA or that constitute proceeds of activity criminalized by the CSA." *In re Burton*, 610 B.R. 633, 638 (B.A.P. 9th Cir. 2020) (collecting cases).

Taken together, these examples eviscerate the district court's conclusion that the appropriations riders embody "a federal policy of staying out of the way of states, with respect to … medical marijuana[.]" Post-Trial Tr., RE319, PageID.15691. Rohrabacher-Farr aside, federal law prevents medical-marijuana businesses from claiming myriad benefits and protections available to other businesses, and subjects medical-marijuana businesses to potential liability. Those realities "undermine" any supposed federal policy in favor of medical marijuana just as much, if not more, than "declin[ing] to enforce contracts involving medical marijuana." *Id*. That is because no such federal policy exists. The CSA's prohibition on marijuana is alive and well, and the district court erred by concluding otherwise. And with that error established, it is clear that "enforcement of [the] illegal contract [here] is contrary to public policy." *Jackson Purchase*, 646 F.2d at 267.

41

## 2. The Agreement Is Unenforceable Even Under *Jackson Purchase*'s Balancing Test.

Because the Agreement in this case is a contract to violate the CSA several times over, "the contravention of public policy is so grave … that unenforceability is plain," *Restatement (Second) of Contracts* § 178 cmt. b (1981) ("Second Restatement"), regardless of "the interests of [the] individual parties," *Cont'l Wall Paper*, 212 U.S. at 262. But even if the Court were to deem it proper to conduct the balancing inquiry reserved for lesser public-policy violations, the *Jackson Purchase* factors confirm that the Agreement cannot be enforced.

*Factor 1. Jackson Purchase* first directs courts to ask whether the parties had "justified expectations" in the contract's enforceability. 646 F.2d at 267. The district court thought so, "in light of Rohrabacher-Farr." Post-Trial Tr., RE319, PageID.15693 (italics omitted). But as discussed, Rohrabacher-Farr's time-limited withdrawal of funds from a single federal agency (DOJ) in no way signals Congress's blessing for federal courts (an entirely different Branch of government) to enforce medical-marijuana contracts, since the conduct called for by such contracts "remains criminal." *Trevino*, 7 F.4th at 427.

Given this unambiguous illegality and the bright-line rule "that agreements to commit a crime are illegal, void," and unenforceable, 8 Williston § 19:75, any expectations Hello Farms had of the Agreement's enforceability were not "justified," *Jackson Purchase*, 646 F.2d at 267; *see* Second Restatement § 178 cmt. e ("To the extent[] … [the plaintiff has] engaged in misconduct that was serious or deliberate, [its] claim to protection of [its] expectations fails."); *contra* MSJ Hearing Tr., RE147, PageID.8330 (concluding that while Hello Farms "should have been on notice about the counter-arguments under the CSA, … it still was reasonable to expect that this [contract] would be enforced").

Nor could Hello Farms have justifiably expected a Michigan court to enforce the Agreement. Michigan has a robust doctrine of illegality, under which "[c]ontracts founded on acts prohibited by a statute … are void." *Michelson v. Voison*, 658 N.W.2d 188, 190 (Mich. Ct. App. 2003); *see Mino v. Clio Sch. Dist.*, 661 N.W.2d 586, 594 (Mich. Ct. App. 2003). And because "state courts must give effect to Federal statutes," *Dudley v. Bell*, 213 N.W.2d 805, 807 (Mich. Ct. App. 1973) (citing *Testa*, 330 U.S. 386), a Michigan state court—like this Court—cannot enforce a federally illegal contract, *see, e.g.*, *Nallaballi v. Achanta*, No. 298042, 2011 WL

2555717, at *1 (Mich. Ct. App. June 28, 2011); *see also Nallaballi v. Achanta*, No. 322021, 2016 WL 359161, at *4 (Mich. Ct. App. Jan. 26, 2016) (O'Connell, J., concurring in part and dissenting in part) ("As the majority aptly concludes, [the contract] is against federal law and therefore illegal.").

***Factor 2.*** *Jackson Purchase* next looks to "the forfeiture that would result from non-enforcement." 646 F.2d at 267. The district court found the forfeiture here "would be very large and have serious consequences." MSJ Hearing Tr., RE147, PageID.8330. The court did not explain that conclusion, and it does not withstand scrutiny. The forfeiture factor only comes into play "*after* the promisee has relied … on [its reasonable] expectations" in the contract's enforcement. Second Restatement § 178 cmt. e (emphasis added). Here, as just discussed, Hello Farms could not have justifiably expected that the Agreement would be enforced. Not receiving damages for breach of a contract that both parties knew violated federal criminal law cannot be described as a "forfeiture."

***Factor 3.*** Next, *Jackson Purchase* asks whether there is any "special public interest in enforc[ing]" the agreement. 646 F.2d at 267. There is no such interest. The district court believed that Rohrabacher-

Farr revealed "a federal interest" in enforcing the Agreement, and likewise identified Michigan's "interest in having a medical marijuana market," MSJ Hearing Tr., RE147, PageID.8331. But on the first point, it suffices to observe again that Rohrabacher-Farr did not render the Agreement legal under federal law. From there, the second point falls away. The Supremacy Clause means there is no such thing as state policy that contradicts federal policy. "When Congress … adopted [the CSA], it spoke for all the people and all the states, and thereby established a policy for all." *Testa*, 330 U.S. at 392. "That policy is as much the policy of [Michigan] as if the [CSA] had emanated from its own legislature, and should be respected accordingly in the courts of th[at] state." *Id.* There is no cognizable public interest in enforcing the Agreement in this case.

***Factor 4.*** *Jackson Purchase* next refers to "the strength of the public policy that the agreement violates, as shown by legislation or court decision." 646 F.2d at 267. Here, Hello Farms produced more than 50,000 pounds of marijuana in 2020 and 2021. *See* Tr.6-B, RE247, PageID.13374-76, 13378-81. Under the CSA, producing that much marijuana (or conspiring to do so) is a felony punishable by "not … less than 10 years or more than life" and a fine not to exceed $50,000,000. 21

U.S.C. § 841(b)(1)(A), (b)(1)(A)(vii). That felony, in fact, qualifies as a "serious drug offense" under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1), (e)(2)(A)(i), reflecting a strong public policy against enforcement of the Agreement. *See* Second Restatement § 178 cmt. b (noting that "unenforceability is plain" when a contract involves "a serious crime").

*Factor 5.* The fifth *Jackson Purchase* factor is "the likelihood that refusal to enforce will further [public] policy." 646 F.2d at 267. The district court found that nonenforcement "would undermine … Rohrabacher-Farr's policy of allowing and encouraging state medical marijuana markets." Post-Trial Tr., RE319, PageID.15694 (italics omitted). And it found that, to the extent that the CSA retained any force, "refusing to enforce this contract would not go a long way toward furthering [its] policy," which is "already being substantially undermined" by other "medical marijuana transactions in Michigan." MSJ Hearing Tr., RE147, PageID.8332.

Once again, the first rationale misinterprets the Rohrabacher-Farr riders (which do not *encourage* medical-marijuana markets but simply direct DOJ to ignore them) and then improperly elevates that supposed

46

policy over the clear federal policy Congress expressed in the CSA. And the second rationale gets things precisely backwards. Rather than throw up its hands at other marijuana transactions in Michigan, all of which "remain[] criminal" notwithstanding Rohrabacher-Farr, *Trevino*, 7 F.4th at 427, the court should have seen that this widespread lawbreaking *enhances* "the likelihood that refusal to enforce [the Agreement here] will further [public] policy," *Jackson Purchase*, 646 F.2d at 267, by underscoring the CSA's continued vitality and thus "tend[ing] to diminish the number of illegal agreements" going forward, *Restatement (First) of Contracts* § 598 cmt. b (1932).

**Factor 6.** Finally, *Jackson Purchase* directs courts to consider "the seriousness of the misconduct." 646 F.2d at 267. The district court concluded that the marijuana transactions here did not constitute serious misconduct "given that they are carved out from criminal law enforcement," Post-Trial Tr., RE319, PageID.15694, and are "lawful under Michigan law," MSJ Hearing Tr., RE147, PageID.8332. Those rationales fail for the reasons given above. The Agreement calls for the commission of a "serious drug offense," 18 U.S.C. § 924(e)(2)(A)(i), and

neither Rohrabacher-Farr nor Michigan's decision to legalize marijuana as a matter of state law alter that reality.

For all of these reasons, the Agreement in this case is unenforceable even under the balancing approach described in *Jackson Purchase*.

### 3. Regardless, Because the Agreement Was Not One for Medical Marijuana, It Is Unenforceable Even if the Appropriations Riders Alter Federal Policy.

Even if the Court were to conclude that the Rohrabacher-Farr riders *do* change federal policy to permit enforcement of medical-marijuana contracts, which it should not, reversal is still required. Because the purpose of the illegality doctrine is to disincentivize the making of agreements that contravene public policy, the operative question in any illegality case is whether the contract "is illegal on its face[.]" *Ewing v. Howard*, 74 U.S. 499, 501 (1868). Thus, the Restatement asks whether "[a] *promise or other term* of an agreement is unenforceable," Second Restatement § 178(1) (emphasis added), not whether the contract *as actually performed* involved the commission of a crime, *see, e.g., Barry v. Capen*, 23 N.E. 735, 735-36 (Mass. 1890)

(Holmes, J.).[6] On its face, the Agreement here was not limited to medical marijuana. Accordingly, the Agreement is unenforceable even if Hello Farms were correct about federal marijuana policy. The district court erred by concluding otherwise.

As the district court correctly observed, "within the four corners of the [Agreement] here, we don't find language that strictly limits the transaction to medical marijuana." Post-Trial Tr., RE319, PageID.15691; *see id.*, PageID.15630 ("[T]he contract, itself, doesn't specify medical marijuana."). Quite the opposite: The Agreement did not specify whether Hello Farms would be producing marijuana for medical or recreational purposes, and it obligated Defendants to purchase Hello Farms's biomass *regardless* of whether it was grown under a medical or adult-use license. As a result, "on its face," *Ewing*, 74 U.S. at 501, the Agreement falls outside of the protections of Rohrabacher-Farr.

The district court's interpretation of the Agreement also produces absurd results. The Agreement *expressly permitted* Defendants to reject

---

[6] Michigan law applies the same rule. *See Federoff v. Ewing*, 192 N.W.2d 242, 245-46 (Mich. 1971) (contract's illegality turns not on "what is actually done, but [on] that which may or might be done under the terms of the contract").

any biomass that did not "pass[] local and state *recreational* cannabis testing requirements." Agreement, RE32-1, PageID.2789 (emphasis added). That provision reflects a joint understanding that Defendants would distribute Hello Farms's biomass to recreational users. No other reading makes sense. As Farah testified, the "action limits [for] … microbials" were ten times as stringent for medical than for adult-use cannabis. Tr.7-A, RE252, PageID.13800. If this were indeed a contract for medical marijuana, it would be an odd one, since it evidently required Defendants to accept delivery of marijuana that failed medical testing requirements and so could not be sold as medical marijuana. Michigan courts interpret contracts so as "to avoid [those sorts of] absurd or unreasonable conditions and results." *Hastings Mut. Ins. Co. v. Safety King, Inc.*, 778 N.W.2d 275, 281 (Mich. Ct. App. 2009).

Even if this Court were to look beyond the Agreement's four corners, the district court still got it wrong. The evidence proves that the parties understood the Agreement in line with its plain terms—as a contract for *recreational* cannabis. Undisputedly, Defendants saw the Agreement as a means to "take advantage of the very large and growing opportunity in adult use" cannabis. Tr.5-A, RE239, PageID.12758.

50

Undisputedly, too, Defendants (as Michigan law allows) "convert[ed] the product from medicinal to recreational" status upon receiving it from Hello Farms. Tr.3-B, RE231, PageID.12018. And there is evidence that Hello Farms understood that Defendants would do so. As Whitney Conroy testified, "in early conversations" Farah said he wished to "secure adult use licensure," *id.*, the implication being that cannabis grown under such licenses would come within the Agreement, as its plain terms permitted. And Hello Farms made good on that plan, *in fact* securing recreational licenses for 2021. *See* Tr.6-B, RE247, PageID.13439-40.

All of this makes abundantly clear that the parties' meeting of the minds was not limited to medical marijuana. This was a contract for marijuana simpliciter. Yet the district court concluded otherwise, finding that "the intent and understanding of the parties" was "that the transaction here was [for] the sale of medical marijuana from a medical marijuana farm" because (1) Hello Farms held only medical licenses in 2020, and (2) several of Defendants' employees testified that they knew this to be true. Post-Trial Tr., RE319, PageID.15691, 15627. But the court ignored the fact that the Agreement was for *two* harvests—2020 *and 2021*. *See* Agreement, RE32-1, PageID.2789. And nothing in the

Agreement prohibited Hello Farms from obtaining adult-use grow licenses for 2021 (as it did) and requiring Defendants to purchase that adult-use marijuana.

Those facts confirm what the Agreement's plain language already made clear: the Agreement here was not limited to medical marijuana. It is therefore unenforceable even if the district court correctly understood federal public policy.

## II. At Minimum, the District Court Erred by Allowing Hello Farms to Collect Damages for Recreational Marijuana.

At minimum, the district court erred by permitting Hello Farms to recover damages for marijuana grown under the recreational licenses Hello Farms secured in 2021. It is undisputed that part of Hello Farms's 2021 harvest was planted and grown under the authority of adult-use licenses not entitled to any protection under Rohrabacher-Farr. *See* Tr.6-B, RE247, PageID.13439-40. The district court saw no problem with this, because in its view, Hello Farms secured these recreational licenses in "an effort … to mitigate [its] damages," and any sales it made directly into the recreational market "[i]nured to [Defendants'] benefit, because they received a credit for [said] sales" as part of the damages calculation. *See* Post-Trial Tr., RE319, PageID.15692. Not so.

Hello Farms submitted only one proposed calculation of damages for the 2021 harvest—one based on the actual quantity of marijuana it grew in 2021. *See* Tr.8-A, RE260, PageID.13876. And there is no evidence that the 2021 harvest would have been as large as it ended up being (more than 37,000 pounds) had Hello Farms not obtained these recreational licenses. Necessarily, therefore, the jury awarded Hello Farms damages for growing recreational marijuana—conduct which unquestionably falls outside Rohrabacher-Farr's ambit.

That Defendants "received a credit" for the price Choice Labs paid for this recreational marijuana, Post-Trial Tr., RE319, PageID.15692, is immaterial. Choice paid roughly $60/pound for the 2021 biomass, *see* Tr.6-A, RE241, PageID.13149-50, far less than the $850/pound the jury awarded Hello Farms in damages, *see* Tr.8-A, RE260, PageID.13877. So, for every pound of recreational marijuana that Hello Farms grew in 2021, it netted $790 in damages (before accounting for avoided costs). For every 10% of the 2021 harvest grown under adult-use licenses, therefore, the district court's judgment necessarily awarded Hello Farms around $3 million for growing and selling recreational marijuana.

That result cannot stand. At minimum, this Court should remand for a new trial so that damages can be reduced to the extent that Hello Farms's 2021 damages were attributable to its adult-use licenses.

## III. Hello Farms Failed to Carry Its Burden to Prove Damages for the 2021 Harvest With Reasonable Certainty.

If the Court concludes that the Agreement is enforceable—which it is not—it should nonetheless reverse. Under Michigan law, "[t]he party asserting a breach of contract has the burden of proving its damages with reasonable certainty." *Alan Custom Homes, Inc. v. Krol*, 667 N.W.2d 379, 383 (Mich. Ct. App. 2003); *see, e.g.*, *Hillside Prods., Inc. v. Cnty. of Macomb*, 389 F. App'x 449, 457 (6th Cir. 2010). Doing so requires "produc[ing] a satisfactory and convincing method of arriving at the profits that [the plaintiff] would have received" absent the breach. *Nurmi v. Beardsley*, 278 N.W. 805, 810 (Mich. 1938). Those damages, moreover, "must not be conjectural or speculative in their nature, or dependent upon the chances of business or other contingencies...." *Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 922 (Mich. Ct. App. 2014) (citation omitted). And the law requires that a plaintiff's evidence of damages "not be so meager or uncertain as to afford no reasonable basis for inference,

leaving the damages to be determined by sympathy and feelings alone."
*Fera v. Vill. Plaza, Inc.*, 242 N.W.2d 372, 374 (Mich. 1976).

Hello Farms failed to carry its burden. The parties' Agreement was not a contract to manufacture widgets at a fixed price. It was a contract to produce a volatile crop with the price set according to a sliding scale based on the quality of that crop. The jury awarded the maximum price for 2021, but for those damages to constitute a reasonable estimate of the harm caused by the breach, Hello Farms needed to show that its 2021 harvest could have actually satisfied the contractual conditions that would have commanded that top-tier price. Here, it fell well short of carrying that burden.

The contract price depended on the crop's across-the-board THC content, yet the record contains no non-speculative evidence that the 2021 harvest exceeded the 12% threshold of THC that would have qualified the harvest for the premium price the jury assigned. To use the maximum contract price as a fair estimate of its damages, Hello Farms also needed to show it could have produced a harvest free from pesticides and heavy metals, as doing so was a condition precedent to Defendants' obligation to purchase the biomass, *see* Agreement, RE32-1,

PageID.2789-90; yet, again, the record contains no credible evidence that the 2021 harvest so qualified.

Each of these failures, both separately and together, requires vacating the jury's award of maximum damages for the 2021 harvest.

## A.  The District Court's Ruling

The district court found that Hello Farms carried its burden to prove damages with reasonable certainty, rejecting Defendants' arguments as to the THC content and contamination of the 2021 harvest.

***THC content.*** Calling the issue "very, very close," the district court concluded that, through a "constellation of evidence," the jury could have determined that the 2021 harvest had a THC content of over 12%, thus entitling Hello Farms to the maximum contract price of $850/pound. Post-Trial Tr., RE319, PageID.15700. In the court's view, that constellation was as follows: Hello Farms's "past performance" from 2020; the 2021 R&D tests, "five of which showed THC levels substantially higher than the 12[%]"; Farah's testimony that in 2021, Hello Farms planted the "same general area of land" under the "same conditions" with the "same people" using the "same techniques"; and Farah's testimony that "the weather … was better in 2021." *Id*. Taking these facts together

with what it called "a relaxed standard for the amount of damages," the court concluded that "the jury reasonably could have found that the 2021 harvest would have been 12[%]." *Id.*, PageID.15700-01.

> ***Pesticide contamination.*** Next, the district court concluded that the jury "could have found that there wasn't a full-blown [pesticide] contamination … that preclude[d] Hello Farms from recovering, as a matter of law, [for] the 2021 harvest." *Id.*, PageID.15699. The district court discounted Bayern's testimony, expressing doubt as to whether it was properly admitted, despite the lack of any objection from Hello Farms at trial. *Id.*, PageID.15698. The court also concluded, without analysis, that "the jury could have decided not to believe Mr. Bayern." *Id.*, PageID.15698-99. Additionally, in the court's view, the six R&D tests for 2021 "are at least some evidence that, to some extent, contradicts Mr. Bayern's testimony." *Id.*, PageID.15699. The court did not discuss the fact that one of the six R&D tests failed for heavy metals, meaning that marijuana would be non-saleable under the Agreement. *See* Tr.7-A, RE252, PageID.13723-25.

## B.    Analysis

The jury's task was to calculate "reasonabl[y] certain[]" damages that approximated Hello Farms's lost profits attributable to Defendants' purported breach. Tr.8-B, RE263, PageID.14078 (jury instructions). To do so, the jury looked to the pricing structure in the parties' Agreement to determine how much Hello Farms would have been owed for the 2021 harvest had Defendants performed. But under that Agreement, Hello Farms could only collect the maximum price of $850/pound for all 37,492 pounds of the 2021 harvest (resulting in the more than $31 million in damages the jury awarded) if it showed with reasonable certainty that the entire harvest's THC potency exceeded 12% and that none of the harvest was contaminated with pesticides or heavy metals.

Hello Farms did not even attempt to make that showing. This is demonstrated by Hello Farms's closing argument, in which it argued it was entitled to the maximum contract price for 2021 simply because it received the maximum price in 2020. *See* Tr.8-B, RE263, PageID.14084 ("[W]e have the capability to perform because we did it [in 2020]."); *id.*, PageID.14097 ("It would be no different than [2020]. We've proven ourselves…."). Hello Farms's position was evidently driven by its view

that it needed to show only that it was "able" to plant seeds in the ground in 2021 and that it could collect maximum damages even if those seeds produced a harvest with "1% THC," "contaminated with every pesticide ever made," and "contain[ing] 100 times the limits for heavy metals." Pl.'s Rule 50(b) Opp'n, RE284, PageID.15286, 15290-91.

This is flat wrong, and it shows the jury's damages award for the 2021 harvest must be vacated. The district court properly instructed the jury not to award Hello Farms "a greater amount as damages than it could have gained" absent the breach. Tr.8-B, RE263, PageID.14078. Yet Hello Farms's theory of the case—and the paltry evidentiary submission it put forth—asked the jury to do precisely that. If Hello Farms's 2021 harvest indeed had only "1% THC," then it would have been valued at $17/pound under the Agreement, not the $850/pound the jury awarded. And if the 2021 harvest was indeed riddled with pesticides, then Defendants would have been entitled to refuse delivery outright.

In short, to collect the maximum contract price, Hello Farms was required to produce *some* evidence showing those eventualities would not come to pass. Yet the record is devoid of nonspeculative evidence as to the 2021 harvest's potency, and unrebutted evidence shows the harvest

was contaminated with pesticides. At Hello Farms's invitation, the jury ignored all of that, awarding Hello Farms a massive windfall. The court should vacate the speculative damages award for 2021.

### 1. No Credible Evidence Permitted the Jury to Find the 2021 Harvest Had a THC Potency Over 12%.

At the outset, the jury had no nonspeculative evidentiary basis for concluding that the entire 2021 harvest would have qualified for the maximum contract price by virtue of its THC content.

Two crucial points with respect to potency were undisputed at trial. First, growing marijuana is a risky endeavor, and a farm's harvests can vary materially year to year. *See* Tr.6-A, RE241, PageID.13123 (Farah: "Mother Nature dictates all."); Tr.6-B, RE247, PageID.13394 (Farah: farming is "far from" a "perfect science"); Trial Tr., Vol. 4-A, RE233, PageID.12206 (Conroy, agreeing that "the weather," coupled with the fact that "it's a living plant," puts harvest quality "outside of your control, more than in other sectors of the economy"); Tr.5-B, RE240, PageID.12951-52 (Mastro: "[Y]ou are growing a plant so there's a lot of variables."); *id.*, PageID.12994 (Mastro: The "potency [of] outdoor biomass [is] something that could change year over year.").

Second, and unsurprisingly given the first point, there is "no way" to know the potency of a given batch of marijuana without a test. Tr.4-B, RE234, PageID.12439 (Sciarrone); *see* Tr.2-B, RE229, PageID.11783 (Ramos: "[Y]ou need a test result to know the potency."). That is why one witness testified that a biomass producer "hoping to get a good price" would "[n]ever try to sell [the biomass] without test results." Tr.5-A, RE239, PageID.12819-20. Together, these two facts mean that Hello Farms's core contention—that its ability to produce an Agreement-compliant 2020 harvest necessarily meant it was "able to" produce an Agreement-compliant 2021 harvest, Pl.'s Rule 50(b) Opp'n, RE284, PageID.15286—does not hold up.

Hello Farms introduced no evidence permitting the jury to bridge that logical gap without resorting to impermissible speculation. True, the jury heard that Hello Farms grew marijuana in 2021 (and 2022 through 2024) in the same general area with similar personnel using similar techniques as in 2020. *See* Tr.7-A, RE252, PageID.13814; Tr.6-A, RE241, PageID.13122-24. But missing from this "constellation" of assertions, Post-Trial Tr., RE319, PageID.15700, was *any* evidence suggesting— much less proving with reasonable certainty—that these passing

similarities would have translated to harvest-wide THC levels above 12%. As the district court recognized, *no* witness in this case "testif[ied] that[,] with respect to the growing of marijuana, past performance is an accurate predictor of future performance[.]" *Id.*, PageID.15676. That absence of evidence is fatal to Hello Farms's request for damages.

This evidentiary gap is exacerbated by Hello Farms's substantial expansion, from seven to 25 acres, between 2020 and 2021. *See* Tr.7-A, RE252, PageID.13730. The record reveals nothing at all about those additional 18 acres. *See id.* (Farah admitting that "[i]t would [have] ma[de] sense to test" the farm's new plantable land). And while Farah vaguely alluded to 2021 being "a better growing season" with "[m]ore favorable conditions" than 2020, *id.*, PageID.13801, he did not explain *how* the conditions were "better" or why that would have translated into any particular THC potency.

Also irrelevant are the six R&D tests that Hello Farms conducted for the 2021 harvest. Hello Farms introduced no evidence showing that these six samples were representative of the harvest as a whole, and indeed, the district court expressly barred Farah from testifying to that effect. *See* Tr.6-A, RE241, PageID.13193. As far as Defendants are aware,

62

the jury was comprised of neither statisticians nor marijuana farmers, so without any testimony as to the representativeness of these tests—which covered just 300 of the 2021 harvest's 37,492 pounds, *see* Tr.7-A, RE252, PageID.13725—it could not permissibly use them to infer Hello Farms's ability to deliver an entire harvest's worth of marijuana meriting the maximum contract price.

Indeed, if the jury *did* use the R&D tests in this fashion, its verdict was irrational. If the jury believed the R&D tests were representative of the 2021 harvest, it was required to take the bitter with the sweet: One of those same six tests failed for heavy metals, meaning that batch of biomass "would not be saleable under the … [A]greement." *Id.*, PageID.13724-25. Hello Farms cannot have it both ways.

What all of this reveals is a failure of proof on Hello Farms's part. It was Hello Farms's burden to prove lost profits—and that the maximum contract price approximated loss profits—with "reasonable certainty" and without relying on "conjectur[e] or speculat[ion]." *Van Buren Charter Twp. v. Visteon Corp.*, 904 N.W.2d 192, 200 (Mich. Ct. App. 2017); *Fera*, 242 N.W.2d at 374 (evidence cannot be "so meager or uncertain as to

63

afford no reasonable basis for inference"). Yet conjecture and speculation is all the jury had to go on with respect to the 2021 harvest's THC levels.

Hello Farms could have carried its burden by eliciting testimony that "past [THC potency] is an accurate predictor of future [THC potency]," Post-Trial Tr., RE319, PageID.15676, or that growing conditions in 2021 were likely to result in high-THC biomass, or perhaps even that *other* farms in the area that *did* test their 2021 harvests saw elevated THC potency. It did none of this. For all the purported similarities between the 2020 and 2021 harvests, Farah was ultimately left to admit that "it was a possibility" that "some lots [in 2021] could have come in under the 12[%] [THC] threshold." Tr.7-A, RE252, PageID.13725-26. In other words, he had no idea. Nor could the jury have had any idea.

The jury's maximalist award requires a reasonable justification, and there is none. This Court should reverse the district court's judgment and remand for the verdict to be reduced to the minimum contract price of $17 per pound for 2021, resulting in damages of $0 for 2021. At a minimum, the district court abused its discretion by declining to order a new trial as to Hello Farms's 2021 damages.

### 2. No Evidence Permitted the Jury to Conclude That the 2021 Harvest Was Not Contaminated With Pesticides.

Just as Hello Farms was required to prove that it was reasonable to value its 2021 harvest as if the harvest met the Agreement's 12% THC threshold, it was likewise required to demonstrate that the harvest was not contaminated with pesticides or heavy metals, making the product non-saleable. Yet again, it failed to do so.

Start with some table stakes: As just discussed, "with respect to the growing of marijuana," there was no evidence that "past performance is an accurate predictor of future performance," Post-Trial Tr., RE319, PageID.15676, and a wealth of evidence indicating the opposite—that a farm is "only as good as [its] last harvest," Tr.5-B, RE240, PageID.12987. From there, add Farah's acknowledgment that Hello Farms was "surrounded by cornfields" that used "pesticides and herbicides" capable of "drift[ing]" onto Hello Farms's crops, such that "it could [have] ma[de] sense to test" the previously unplanted 18 acres of the farm for pesticides. Tr.7-A, RE252, PageID.13730-31. And to round it out, add Bayern's unrebutted, unobjected-to testimony that Choice Labs had "to remediate pesticides" in Hello Farms's 2021 biomass. Tr.4-B, RE234, PageID.12357.

Taken together, it is unrebutted that at least some of Hello Farms's 2021 harvest was contaminated with pesticides, meaning Defendants would not have been required to take and pay for it under the Agreement.

The district court disagreed, concluding that "the jury could have decided not to believe Mr. Bayern" and could have found that the six R&D tests, none of which failed for pesticides, "contradict[ed] Mr. Bayern's testimony." Post-Trial Tr., RE319, PageID.15698-99. But if the jury credited the R&D tests to find that the 2021 harvest was free of pesticides, then its verdict was once again irrational, because those same tests showed the presence of heavy metals, and the jury did not account for that when awarding damages.

And even if the jury chose to disbelieve Bayern *without* relying on the R&D tests, what remained was Farah's admission that pesticides could have drifted onto Hello Farms's land and the undisputed testimony that harvests vary from year to year, meaning that Hello Farms's ability to tender a pesticide-free 2020 harvest had no bearing on its ability to do so again in 2021. What remained, in other words, was a complete absence of evidence demonstrating that Defendants would have been required to accept all 37,492 pounds of marijuana under the Agreement.

Because Hello Farms has failed to carry its burden to demonstrate that its 2021 harvest was compliant with the parties' Agreement and thus should be valued according to that Agreement, this Court should reverse and remand for the 2021 damages to be reduced to $0. At a minimum, this Court should remand for a new trial as to damages.

## CONCLUSION

The district court's judgment should be reversed and the case remanded either for entry of judgment for Defendants, for a reduction in the jury's damages award, or for a new trial on the issue of damages.

Date: November 6, 2025

William B. Berndt
Nicholas A. Burandt
HONIGMAN LLP
321 North Clark Street
 Suite 500
Chicago, IL 60654
(312) 701-9300
wberndt@honigman.com
nburandt@honigman.com

Respectfully submitted,

/s/ *Andrianna D. Kastanek*
Andrianna D. Kastanek
 *Counsel of Record*
Simon A. de Carvalho
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
akastanek@jenner.com
sdecarvalho@jenner.com

*Counsel for Defendants-Appellants*

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,826 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Office Word 365 in 14-point Century Schoolbook font.

Dated: November 6, 2025

/s/ *Andrianna D. Kastanek*
Andrianna D. Kastanek

*Counsel for Defendants-Appellants*

# CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2025, I caused the foregoing document to be electronically filed with the Clerk of the Court for the Sixth Circuit using CM/ECF, which will send notice of this filing to all counsel of record indicated on the electronic receipt.

Dated: November 6, 2025

/s/ *Andrianna D. Kastanek*
Andrianna D. Kastanek

*Counsel for Defendants-Appellants*

# RULE 30(g)(1) ADDENDUM

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| RE | DATE | DESCRIPTION | PAGE ID # |
|---|---|---|---|
| 1 | 03/04/2021 | Defendants' Notice of Removal | 1-74 |
| 1-1 | 02/01/2020 | Complaint filed in state court | 9-38 |
| 32 | 02/21/2022 | First Amended Complaint with Exhibit A | 2769-2798 |
| 32-1 | 11/23/2020 | Amended and Restated Purchase Order Agreement | 2789-2798 |
| 80 | 10/17/2023 | Defendants' Motion for Summary Judgment | 3678-3726 |
| 90 | 11/22/2023 | Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Redacted) | 3877-4359 |
| 117 | 05/10/2024 | Order Concerning Supplemental Briefing | 5875-5876 |
| 123 | 06/24/2024 | Plaintiffs' Summary Judgment Supplement | 5963-6052 |
| 136 | 07/10/2024 | Defendants' Response to Plaintiff's Summary Judgment Supplement | 7400-7448 |
| 147 | 08/15/2024 | 7/29/2024 Transcript of Summary Judgment Hearing | 8318-8385 |
| 229 | 01/16/2025 | 1/15/2025 Trial Transcript, Vol. 2-B | 11753-11842 |
| 230 | 01/16/2025 | 1/15/2025 Trial Transcript, Vol. 2-A | 11843-11969 |

| RE | DATE | DESCRIPTION | PAGE ID # |
|---|---|---|---|
| 231 | 01/17/2025 | 1/16/2025 Trial Transcript, Vol. 3-B | 11970-12051 |
| 233 | 01/18/2025 | 1/17/2025 Trial Transcript, Vol. 4-A | 12191-12322 |
| 234 | 01/18/2025 | 1/17/2025 Trial Transcript, Vol. 4-B | 12323-12480 |
| 239 | 01/24/2025 | 1/23/2025 Trial Transcript, Vol. 5-A | 12730-12891 |
| 240 | 01/24/2025 | 1/23/2025 Trial Transcript, Vol. 5-B | 12892-13026 |
| 241 | 01/25/2025 | 1/24/2025 Trial Transcript, Vol. 6-A | 13027-13196 |
| 247 | 01/27/2025 | 1/24/2025 Trial Transcript, Vol. 6-B | 13350-13479 |
| 251 | 01/28/2025 | 1/27/2025 Trial Transcript, Vol. 7-B | 13535-13645 |
| 252 | 01/28/2025 | 1/27/2025 Trial Transcript, Vol. 7-A | 13646-13843 |
| 257 | 01/29/2025 | Verdict Form | 13851-13855 |
| 260 | 01/30/2025 | 1/28/2025 Trial Transcript, Vol. 8-A | 13859-13960 |
| 263 | 01/31/2025 | 1/28/2025 Trial Transcript, Vol. 8-B | 14061-14149 |
| 277 | 03/17/2025 | Defendants' Renewed Motion for Judgment as a Matter of Law | 15027-15202 |

| RE | DATE | DESCRIPTION | PAGE ID # |
|---|---|---|---|
| 278 | 03/17/2025 | Defendants' Motion, in the Alternative, for New Trial | 15203-15223 |
| 284 | 04/16/2025 | Plaintiff's Response in Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law | 15261-15317 |
| 295 | 05/06/2025 | Judgment on Post-Trial Motions | 15394 |
| 317 | 07/30/2025 | Post-Trial Order on Pending Motions | 15614-15616 |
| 319 | 08/05/2025 | 7/29/2025 Post-Trial Motion Hearing Transcript | 15619-15707 |
| 326 | 08/21/2025 | Defendants' Notice of Appeal | 15770-15771 |