<u>Case No. 25-1759</u>

UNITED STATES COURT OF APPEALS
<u>FOR THE SIXTH CIRCUIT</u>

HELLO FARMS LICENSING MI, LLC,

Plaintiff-Appellee,

v

GR VENDING MI, LLC, and CURA MI, LLC,

Defendants-Appellants.

Appeal from the United States District Court
Eastern District of Michigan
<u>Case No. 1:21-cv-10499</u>

**PLAINTIFF-APPELLEE'S BRIEF ON APPEAL**

**CERTIFICATE OF COMPLIANCE/CERTIFICATE OF SERVICE**

**DESIGNATION OF RELEVANT DISTRICT COURT
DOCUMENTS**

| | |
|---|---|
| Patrick Lannen<br>STINAR LANNEN, PLLC<br>Attorney for Plaintiff-Appellee<br>280 West Maple, Suite 230<br>Birmingham, Michigan 48009<br>(248) 565-2690<br>Patrick@StinarLannenLaw.com | Jeffrey C. Gerish<br>PLUNKETT COONEY<br>Attorney for Plaintiff-Appellee<br>38505 Woodward Ave, Suite 100<br>Bloomfield Hills, MI 48304<br>(248) 901-4031<br>jgerish@plunkettcooney.com |

# CORPORATE DISCLOSURE

Pursuant to Sixth Circuit Rule 26.1, Hello Farms Licensing MI, LLC, makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?  No.

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  No.

DATED:  February 27, 2026                          /s/Jeffrey C. Gerish
                                                                     Jeffrey C. Gerish

62049054.1

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE .................................................................... 1

TABLE OF AUTHORITIES.................................................................iv

STATEMENT REGARDING ORAL ARGUMENT ................................. x

COUNTER-INTRODUCTION .................................................................. 1

COUNTER-STATEMENT OF ISSUES PRESENTED ........................... 5

COUNTER-STATEMENT OF THE CASE.............................................. 6

    I.  The parties and their agreement in compliance with
        Michigan law........................................................................ 6

    II.  Performance by Hello Farms and breach by Curaleaf.............. 8

    III. Pertinent proceedings....................................................... 11

        A.  Defendants' motion for summary judgment........................ 11

        B.  Pertinent evidence at trial ................................................ 15

        C.  Post-trial motions.............................................................. 18

SUMMARY OF ARGUMENT.................................................................. 18

ARGUMENT I ........................................................................................ 21

        THE DISTRICT COURT CORRECTLY HELD
        THAT THE AGREEMENT IS ENFORCEABLE
        UNDER THE *JACKSON PURCHASE*
        BALANCING TEST. .......................................................... 21

    A.  Relevant public policy considerations. ................................... 23

    B.  Federal marijuana policy is deferential to marijuana
        business conducted under State law following the
        Rohrabacher-Farr appropriations bills. ................................. 30

    C.  The *Jackson Purchase* balancing factors favor
        enforcement, especially given federal policy indifferent to
        marijuana transactions under state law.................................. 41

        1.  The justified expectations of the parties ............................. 43

2. The forfeiture that would result from non-enforcement of the agreement..................................................................45

3. Any special public interest in enforcement ..........................45

4. The strength of the public policy that the agreement violates, as shown by legislation or court decisions .............47

5. The likelihood that refusal to enforce will further that policy..................................................................................48

6. The seriousness of the misconduct .....................................49

D. Defendants' attempts to avoid *Jackson Purchase* are without merit. ...................................................................50

E. Even if *Jackson Purchase* did not apply, the parties' contract is enforceable. ..........................................................54

ARGUMENT II..................................................................................57

THE DISTRICT COURT CORRECTLY REJECTED DEFENDANTS' ATTEMPT TO AVOID PAYING DAMAGES FOR HARVEST SOLD AS RECREATIONAL MARIJUANA WHERE, AT THE TIME OF CONTRACTING, HELLO FARMS ONLY HAD MEDICAL-USE LICENSES, AND RECREATIONAL LICENSES WERE OBTAINED BY HELLO FARMS TO COMPLY WITH ITS DUTY TO MITIGATE DAMAGES ........................................................................57

ARGUMENT III .................................................................................59

THE JURY HAD A LEGALLY SUFFICIENT EVIDENTIARY BASIS TO AWARD DAMAGES FOR THE 2021 HARVEST .................................................59

A. Applicable standard for overturning a damages award. .........59

B. Ample evidence allowed the jury to award the damages it did, and *Defendants* did not meet *their* burden on damages mitigation. ..........................................................62

1. Damages were properly awarded based on Hello Farms' mitigation and Defendants' failure to meet

their burden to prove that mitigation was not commercially reasonable. .................................................... 62

2. Despite having no burden to do so, Hello Farms still furnished evidence supporting the jury's damages award. .................................................................................. 66

C. The jury was free to reject Defendants' argument that the 2021 harvest was contaminated by pesticides. ......................... 67

CONCLUSION ............................................................................................ 70

CERTIFICATE OF COMPLIANCE ........................................................... 1

CERTIFICATE OF SERVICE .................................................................... 1

ADDENDUM – DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ............................................................................... 1

iii

**CASES**

*Advance Sign Grp. v. Optec Displays, Inc.*,
    722 F.3d 778 (6th Cir. 2013) ..................................................................59

*Am Cas Co of Reading, Pennsylvania v. FDIC*,
    39 F.3d 633 (6th Cir. 1994) ...................................................................24

*Ambassador Steel v. Ewald Steel*,
    190 N.W.2d 275 (Mich. Ct. App. 1971) ...............................................63

*Associated Press v. Taft-Ingalls Corp.*,
    340 F.2d 753 (6th Cir. 1965)...........................................................25, 26

*Bartch v. Barch*,
    No. CV 23-0101-BAH, 2024 WL 5146010 (D. Md. Dec.
    17, 2024) ...............................................................................................55

*Bloom v. State of Ill.*,
    391 U.S. 194 (1968) ..............................................................................41

*Body Rustproofing, Inc. v. Michigan Bell Tel. Co.*,
    385 N.W.2d 797 (Mich. Ct. App. 1986) ...............................................61

*Bonelli v. Volkswagen of America, Inc.*,
    421 N.W.2d 213 (Mich. Ct. App. 1988) ...............................................61

*Continental Wall Paper Co. v. Louis Voight & Sons,
Co.*,
    212 U.S.227 (1909) .........................................................................54, 56

*Delta Marina, Inc. v. Plaquemine Oil Sales, Inc.*,
    644 F.2d 455 (5th Cir. 1981)..................................................................53

*Dervin Corp. v. Banco Bilbao Vizcaya Argentaria, S.A.*,
    2004 WL 1933621 (S.D.N.Y. Aug. 30, 2004) ......................................27

*Energy Labs, Inc.v. Edwards Engineering, Inc.*,
    2015 WL 3504974 (N.D. Il. June 2, 2015)............................................26

*Ent. Publications, Inc. v. Goodman*,
    67 F. Supp. 2d 15 (D. Mass. 1999) .......................................................27

*Erickson v. Pfiester*,
 2023 WL 6297343 (D. Alaska Sept. 27, 2023) ....................................32

*Fed. Deposit Ins. Co. v. Aetna Cas. & Sur. Co.*,
 903 F.2d 1073 (6th Cir. 1990).....................................................................25

*Fulkerson v. Unum Life Ins. Co. of Am.*,
 36 F.4th 678 (6th Cir. 2022)......................................................................41

*Galloway v. United States*,
 319 U.S. 372 (1943) ......................................................................................60

*Ginsburg v. ICC Holdings, LLC*,
 2017 WL 5467688 (N.D. Tex. Nov. 13, 2017)......................................27

*Gonzales v. Raich,*
 545 U.S. 1 (2005) ..........................................................................................33

*Green Cross Med. Inc. v. Gally*,
 395 P.3d 302 (Ariz. Ct. App. 2017)........................................................30

*Green Earth Wellness Ctr. LLC v. Atain Specialty Ins. Co.*,
 163 F. Supp. 3d 821 (D. Colo. 2016)..............................................29, 52

*Hauf v. Life Extension Found.*,
 454 F. App'x 425 (6th Cir. 2011) .....................................................24, 34

*Hemlock Semi Conductor Operations, LLC v. SoloWorld Indust. Sachsen GmvH*,
 867 F.3d 692 (6th Cir. 2017)......................................................................26

*House Auth. Of City of El Paso v. Raza Dev. Fund., Inc.*,
 2024 W.L. 5036563 (W.D. Tex. July 19, 2024) ..................................28

*Howard v. City of Melvindale*,
 183 N.W.2d 341 (Mich. Ct. App. 1970), *abrogated on unrelated grounds* ......................................................................60

*In re Lewis*,
 845 F.2d 624 (6th Cir. 1988) ......................................................................69

*In re Malul*,
 614 B.R. 699 (Bankr. D. Colo. 2020) .....................................................32

*Jackson Purchase v. Local Union 816,*
646 F.2d 264 (6th Cir. 1981)...................................... 2, 5, 12, 14, 19, 21,
...........................................22, 28, 41, 42, 43, 44, 50, 51, 52, 53, 54, 56

*Kelly v. Kosuga,*
358 U.S. 516 (1959) ................................................. 25, 26, 28, 54, 56

*Kenney v. Helix TSS, Inc.,*
939 F.3d 1106 (10th Cir. 2019)..............................................30

*KUSH, Inc. v. Van Vranken,*
No. 220CV649JCMDJA, 2020 WL 8371452 (D. Nev.
June 19, 2020) ..........................................................32

*Lorenz Supply Co. v. Am. Standard, Inc.,*
300 N.W.2d 335 (Mich. Ct. App. 1980) ..............................60

*Mann v. Gullickson,*
2016 WL 6473215 (N.D. Cal. Nov. 2, 2016) ........................32

*McCullagh v. Goodyear Tire & Rubber Co.,*
69 N.W.2d 731 (Mich. 1955)..............................................61

*McMullen v. Hoffman,*
174 U.S. 639 (1899) ............................................... 1, 25, 42

*Morrison v Marsh & McLennan Cos,*
439 F3d 295 (6th Cir. 2006) ..............................................22

*Muskegon Agency, Inc. v. Gen. Tel. Co. of Mich.,*
85 N.W.2d 170 (Mich. 1957)..............................................61

*N. Indiana Pub. Serv. Co. v. Carbon Cnty. Coal Co.,*
799 F.2d 265 (7th Cir. 1986)..................................... 28, 42, 53

*Northeast Patient's Group v. United Cannabis Patients
and Caregivers of Maine,*
45 F.4th 542 (1st Cir. 2022)..............................................35

*Occidental Life Ins. Co. of N. Carolina v. Pat Ryan &
Assoc., Inc.,*
496 F.2d 1255 (4th Cir. 1974)..............................................25

*People v. Bailey,*
873 N.W.2d 855 (Mich. Ct. App. 2015) ..............................59

*Peridot Tree, Inc. v. City of Sacramento*,
94 F.4th 916 (9th Cir. 2024) ................................................. 32

*Riggs v. Szymanski*,
233 N.W.2d 670 (Mich. Ct. App. 1975) ............................... 69

*Shivers v. Schmiege*,
776 N.W.2d 669 (Mich. Ct. App. 2009) ......................... 60, 69

*Standing Akimbo, LLC v. United States*,
141 S. Ct. 2236 (2021) .......................................................... 33

*Steele v. Drummond*,
275 U.S. 199 (1927) ............................................ 24, 42, 50, 56

*Stonemen Grp., Inc. v. Metal-forming Techs., Inc.*,
362 F. Supp. 2d 896 (E.D. Mich. 2005) ............................... 59

*Taylor v. TECO Barge Line, Inc.*,
517 F.3d 372 (6th Cir. 2008) ................................................ 60

*TCP Indus., Inc. v. Uniroyal, Inc.*,
661 F.2d 542 (6th Cir. 1981) ................................................ 63

*Toth v. Yoder Co.*,
749 F.2d 1190 (6th Cir.1984) ............................................... 69

*Tracy v. USAA Cas. Ins. Co.*,
2012 W.L. 928186 (D. Haw. Mar. 16, 2012) .................... 29, 52

*Twin City Pipeline Co v. Harding Glass Co*,
283 U.S. 353 (1931) .......................................................... 23, 40

*United States v. Bilodeau*,
24 F.4th 705 (1st Cir. 2022), *cert denied*, 142 S. Ct.
2875 (2022) ............................................................................ 34

*United States v. McIntosh*,
833 F.3d 1163 (9th Cir. 2016) ......................................... 34, 35

*United States v. Nixon*,
839 F.3d 885 (9th Cir. 2016) ............................................... 42

*United States v. Thompson*,
966 F.2d 1455 (6th Cir. 1992) ............................................. 41

*United States v. Trevino*,
7 F.4th 414 (6th Cir. 2021) ................................................. 35

*United States v. Wheat,*
988 F.3d 299 (6th Cir. 2021).................................................................55

*Vassidji v. Goe,*
413 F.3d 928 (9th Cir. 2005)................................................................26

*Viereck v. United States,*
318 U.S. 236 (1943) ..............................................................................41

*Wendt v. Auto Owners Ins. Co.,*
401 N.W.2d 375 (Mich. Ct. App. 1986) .............................................61

*Young v. Frank's Nursery & Crafts, Inc.,*
569 N.E.2d 1034 (Ohio 1991) .............................................................64

## STATUTES

21 U.S.C. § 812 .....................................................................................31

21 U.S.C. § 841 .....................................................................................30

21 U.S.C. § 846 .....................................................................................55

M.C.L. § 333.27960(3) ..........................................................................46

M.C.L. § 440.2704(2) .......................................................................63, 64

M.C.L. § 440.2706(2) ............................................................................64

MCL § 333.27952......................................................................................6

MCL §§ 333.26421...................................................................................6

MCL §§ 333.27951...................................................................................6

Rohrabacher-Farr Amendment, Pub. L. No. 113-235, §
538, 128 Stat. 2130, 2217 (2014)......................... 19, 30, 31, 32, 34, 35,
.........................................................36, 38, 43, 46, 47, 48, 52, 57, 58

## RULES

Fed. R. Civ. P. 50...............................................................................59, 2

## OTHER AUTHORITIES

§ 1.2(d) Necessity for prescribed punishment, 1 Subst.
Crim. L. § 1.2(d) (3d ed.) (LaFave)....................................................41

13 Williston on Contracts § 39:41 (4th ed.)..........................................3

13 Williston on Contracts 39:41 (4th ed.) ..............................................63

2 Williston on Contracts § 3:3 (4th ed. 2024)...........................................28

Doug Rendleman, Illegal Contracts and Agreements: A
    New Standard for Prostitution and Marijuana
    Agreements, 81 Wash. & Lee L. Rev. 711, 772–73
    (2024) ................................................................................56

Restatement (Second) of Contracts §352 cmt.a (1981)...........................61

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellee Hello Farms Licensing MI, LLC ("Hello Farms") requests oral argument, as it could be beneficial to the Court in the event the Court has questions about Hello Farms' position as set forth in this brief, and in the event Defendants' reply brief raises anything that merits addressing by Hello Farms.

# COUNTER-INTRODUCTION

Armed with no honest defense for reneging on their contractual obligations to Hello Farms, Defendants must resort to what the Supreme Court has rightly called a "very dishonest one."[1] Defendants seek to avoid the consequences of their breach on the grounds that the contract they knowingly entered into with Hello Farms was illegal.

Defendants claim they were "clearheaded" and always understood that parties cannot "turn to the courts to enforce contracts for the purchase and sale of marijuana." (Defendants' brief, p 2). To call that assertion disingenuous would be an understatement. Not only would Defendants be willing to sue Hello Farms if the shoe were on the other foot, they *did so in this case;* Defendants filed a counterclaim alleging that Hello Farms did breach.[2] Defendants did not "order" their affairs differently than Hello Farms. And Curaleaf's own CEO Joseph Bayern testified that he believed marijuana contracts are legal if performed in

---

[1] *McMullen v. Hoffman*, 174 U.S. 639, 669 (1899).

[2] That the parties asserted competing breach-of-contract claims makes it noteworthy that only Defendants are advancing the dishonest illegality defense. Hello Farms has never sought to escape its contractual obligations and has been content from the beginning to have the parties' competing claims resolved by judge and jury.

states, like Michigan, where marijuana is legal.  Indeed, Curaleaf's entire business is the cultivation, processing, and sale of marijuana. Yet in this one case they adopt the position that the very contracts on which their entire business depends are void and unenforceable.

The trial court correctly ruled that Defendants' position is wholly without merit.  As this Court has recognized, even "illegal" contracts are properly enforced when, as here, a balancing of certain factors warrants enforcement.[3]

Defendants' fallback argument is that damages cannot be awarded for the 2021 harvest because Hello Farms sold *a portion of* it as recreational marijuana.  That argument simply ignores that Hello Farms had only medical-marijuana licenses at the time of contracting, and that the sale to another buyer, only a portion of which was recreational marijuana, was done only to mitigate damages Defendants would owe—something Hello Farms was required to do and that inured to Defendants' benefit.

---

[3] *Jackson Purchase v. Local Union 816*, 646 F.2d 264, 267 (6th Cir. 1981).

Finally, Defendants' challenge to the sufficiency of the evidence on damages fails for two reasons. First, the District Court correctly recognized that Hello Farms was permitted to mitigate its damages by not conducting testing once Defendants announced they were reneging on their contractual obligation to purchase the crop. That's the law. "[T]he party facing the repudiation need not perform or even tender performance by showing a readiness, willingness, and ability to perform; rather, that party need only show that before the repudiation, it was ready, willing, and able to perform and would have rendered that performance had the other party not repudiated." 13 Williston on Contracts § 39:41 (4th ed.). Hello Farms was ready, willing, and able to perform when Defendants repudiated in January 2021.

Regardless, there was plenty of evidence to allow the jury to award damages affirming not only the ability to perform, but actual performance. Hello Farms presented R&D testing showing THC levels substantially above 12%; testimony that cultivation inputs, fields, personnel, and techniques remained constant between 2020 and 2021 (and likewise continued into 2022, 2023, and 2024, all producing similar

results (RE 241, PageID.13119–20, 13122–24); and evidence that 2021 growing conditions were even more favorable than 2020.

The District Court thoroughly analyzed every one of Defendants' arguments and correctly rejected them.

# COUNTER-STATEMENT OF ISSUES PRESENTED

## I.

Whether the District Court correctly held that the Agreement is enforceable under the *Jackson Purchase* balancing test?

## II.

Whether the District Court correctly rejected Defendants' attempt to avoid paying damages for harvest sold as recreational marijuana where, at the time of contracting, Hello Farms only had medical-use licenses, and recreational licenses were obtained by Hello Farms to comply with its duty to mitigate damages?

## III.

Whether the jury had a legally sufficient evidentiary basis to award damages for the 2021 harvest?

# COUNTER-STATEMENT OF THE CASE

**I. The parties and their agreement in compliance with Michigan law**

Hello Farms is a Michigan-licensed medical marijuana cultivator operating under the comprehensive regulatory framework established by Michigan's voters and the Michigan Legislature. Michigan voters approved the medical use of marijuana in 2008 through the Michigan Medical Marihuana Act ("MMMA"), MCL §§ 333.26421, et seq. The MMMA provides a caregiver and patient system for medical marijuana, and it provides immunity from state prosecution of marijuana offenses for those participating lawfully under the MMMA.

In 2018, voters approved the Michigan Regulation and Taxation of Marihuana Act ("MRTMA"), MCL §§ 333.27951, *et seq.*, which generally decriminalized recreational possession and use of marijuana for people 21 years of age or older and provides for the legal production and sale of marijuana. The purpose of MRTMA, among other things, is to "control the commercial production and distribution of marihuana under a system that licenses, regulates, and taxes the businesses involved." MCL § 333.27952.

Curaleaf is "the world's leading cannabis company," according to its former CEO, Joseph Bayern. (RE 128-2, PageID.6155). On October 5, 2020, Curaleaf affiliate GR Vending executed a purchase order agreement with Hello Farms by which "Curaleaf agree[d] to purchase 100% of the marijuana biomass produced by Hello Farms in its 2020 and 2021 harvests ("Biomass"), and the biomass delivered is to be no less than the entire plantable land at the outdoor grow facility in Au Gres, Michigan." (RE 128-3, PageID.6171). The initial contract called for pricing as high as $2,100 per pound. (*Id.*, PageID.6172).

On November 23, 2020, the parties signed an Amended and Restated Purchase Order Agreement ("Agreement"). (RE 128-4, PageID.6181). The biomass for the 2020 harvest was priced at $1,000 per pound for biomass with an average THC potency of 12% and above. (*Id.*, PageID.6182). The price for the 2020 harvest was firm and "shall not be subject to any change pursuant to the Index Price Adjustments." It also said:

> For the 2021 harvest, the adjusted price for
> twelve percent (12%) and above THC potency
> shall be no less than $850.00 per pound (or more),
> as calculated by the Index Price Adjustment and
> decreased from that price by $83 per the

7

> applicable Average Lot THC Potency Testing
> Level.

(RE 128-4, PageID.6183).

At the time of both the initial contract and the Agreement Hello Farms possessed only medical-marijuana licenses and, therefore, was not permitted to sell recreational marijuana. The witnesses all testified the parties knew the Defendants were buying medical cannabis from Hello Farms under the Agreement and Defendants, independent of Hello Farms, would "convert" the product from "medicinal" to "recreational," separate and apart from the Agreement. (RE 229, PageID.11818-19, RE 231, PageID12018)

## II.    Performance by Hello Farms and breach by Curaleaf

On November 24, 2020, the first samples for testing were collected and sent to the independent laboratory Infinite Chemical Analysis Labs, LLC ("Infinite"). (RE 128-69, PageID.6723). For the 2020 harvest Hello Farms produced 16,362 pounds of biomass and obtained certificates of analysis (COAs) for every 50-pound batch as required by the Agreement. (RE 241, PageID.13098-101). Hello Farms tested over 300 batches, the COAs demonstrated that the entire harvest exceeded 12% THC potency, and the entire harvest also passed testing for heavy

8

metals, additives and pesticides. (RE 230, PageID.11952-59). Hello Farms' expert, Jacob Katz, confirmed that the harvest qualified for the maximum contract price. (RE 260, PageID.13874-75).

On December 18, 2020, Hello Farms shipped the first lot and Curaleaf accepted it. (RE 128-89, PageID.6920). Curaleaf confirmed internally that it should pay Hello Farms for lot 1 because it had received the entire harvest's passing COAs. (RE 128-90, PageID.6921-22). But Curaleaf representatives also began complaining about the agreed-to price, presumably because the market price for cannabis was dramatically dropping by that time. On January 8, 2021, Robert Sciarrone, Curaleaf's consultant, proposed dropping the price from $1,000/pound to $400/pound "for the biomass as stipulated in the agreement." (RE 128-96, PageID.7012-7013). Neither Sciarrone nor Curaleaf suggested Hello Farms had breached, but they complained that "market prices" had fallen. Ultimately, Defendants paid for only 2,000 pounds that they picked up, at agreement prices, and declined to purchase the balance of the 2020 harvest. (RE 36, PageID.2814). Defendants did not ask for a discount on the amount they purchased.

Defendants admit they informed Hello Farms by February 2021 that they would not perform as to the 2021 harvest. (RE 7, PageID.93-94).

For the 2021 harvest, Hello Farms grew 37,492 pounds of biomass using the same farm, same grower, same employees, and same cultivation techniques as in 2020. (RE 249, PageID.13505-11, 13521-27). In fact, 2021 was a better growing season with more favorable weather conditions. (*Id.*). Because Defendants had already announced their repudiation of their contractual obligation for the 2021 harvest, Hello Farms was forced to find a different buyer. That buyer, Choice Labs, did not require testing. (RE 247, PageID.13384-86). Consequently, Hello Farms conducted only limited R&D testing of the 2021 harvest. Five of the six R&D tests showed THC levels substantially above 12%, and only one test failed for heavy metals, which one would have been retested under the Agreement, not thrown out. (*Id.*, PageID.13391-99, and RE 1–1, PageID.30). Hello Farms sold the entire 2021 harvest to Choice Labs for $2.2 million, i.e., approximately $60 per pound, a tiny fraction of the contract price it was to receive from Defendants. (*Id.*, PageID.13381). There was no evidence

10

that that was not a market price; it was a high-market price, as confirmed by Hello Farms's industry expert. (RE 241, PageID.13048-53).

III.   Pertinent proceedings

Hello Farms sued Defendants for breach of contract in Michigan state court on February 1, 2021.  Defendants removed the case to federal court based on diversity jurisdiction.  Hello Farms filed the operative amended complaint seeking damages for the difference between the Agreement price and the actual sale price for both the 2020 and 2021 harvests.  (RE 32, PageID.2782).

A.   Defendants' motion for summary judgment

Following discovery, both parties moved for summary judgment.[4] Defendants sought summary judgment on the grounds that the contract they entered into with Hello Farms is "illegal" and, therefore, cannot be enforced by a federal court. (RE 80).  Hello Farms opposed the motion, arguing that illegality was no defense for Defendants to avoid their

---

[4] Hello Farms' motion for summary judgment and supporting brief are at RE 128 and provide a thorough recitation of the factual history culminating in Defendants' breach and Hello Farms subsequent mitigation.  The District Court denied that motion, and Hello Farms is not appealing that ruling.

contractual obligations.  (RE 142).  Hello Farms argued that under Sixth Circuit precedent, specifically *Jackson Purchase v. Local Union 816*, 646 F.2d 264 (6th Cir. 1981), the illegality defense is governed by a multi-factor test to determine whether dismissal is appropriate.  Under those factors, Hello Farms argued, illegality does not warrant dismissal of Hello Farms' complaint.  See RE 142, PageID.7667-7678.  This is especially so given federal marijuana policy has changed dramatically since the enactment of the CSA in 1971.  (*Id.*, PageID.7655-7657).

The District Court heard oral argument on Defendants' motion at substantial length.  The court asked many questions of both sides, demonstrating a thorough understanding of the issues.  Hello Farms' counsel focused heavily on the congressional appropriations riders that were issued beginning in 2014 that provided safe havens for marijuana producers such as Hello Farms.  (RE 118, PageID.5898).  After arguments the District Court issued an order inviting supplemental briefing.  (RE 117, PageID.5875).  That order directed the parties to address the appropriations bills passed by Congress and the impact those bills had on the illegality argument.  (*Id.*).  Hello Farms filed a

12

supplement (RE 123, PageID.5963), and Defendants filed a response. (RE 136, PageID.7400).

On July 29, 2024, the District Court denied Defendants' motion from the bench and provided substantive reasons for that decision. After some initial observations, the court began its analysis by recognizing that

> [t]he best way to think of this illegality defense, as set forth in the Supreme Court cases, including the ones that I cited, is really in the nature of what I would call public policy defense. As I see it, the theory underlying this defense is that courts don't enforce contracts that are against public policy, and the law sets forth the public policy, and that's the reason courts don't enforce contracts that violate the law.

(RE 147, PageID.8324). The court recognized that appropriations riders passed by Congress beginning in 2014 "are additional acts of Congress that help to make up, in my view, what is the whole of the congressional policy with respect to marijuana." (*Id.*, PageID.8326). The court continued, "And while these riders do not technically legalize marijuana, in my view, they do evidence a meaningful and material policy shift by Congress… ." (*Id.*). The court further noted that, while it is usually easy to discern federal policy because there exists a single law

that reflects the policy, in this case "We have one law, the CSA... that points one way, and these funding riders that point the other way. And the policy, in my view, that these funding riders support is one that effectively allows states to develop medical marijuana markets and to permit medical marijuana treatment." (*Id*., PageID.8326).

The court noted authorities recognizing that the illegality defense is "a very dishonest one and it lies ill in the mouth of the defendant to allege it, and it is only allowed for public consideration and in order to better secure the public against dishonest transactions." (*Id*., PageID.8327). The court also noted that, "if there was ever a case in which this defense, in the words of the Supreme Court, lies ill in the mouth of the defendant, this is it," given that "the defendants' entire business here is . . . marijuana." (*Id*., PageID.8328).

The court nevertheless stressed that, notwithstanding the hypocrisy of the Defendants in raising this dishonest defense, the illegality doctrine nevertheless does apply under Supreme Court precedent. (*Id*., PageID.8328-8329). And the court also recognized that controlling Sixth Circuit precedent, *Jackson Purchase*, requires a balancing of factors to determine ultimately whether a complaint

should be dismissed under the illegality defense. (*Id.*, PageID.8329). The court proceeded to analyze those factors and concluded that every one of them favored enforcing the contract rather than precluding its enforcement based on illegality, particularly in light of the modification of federal policy through the appropriations riders. (*Id.*, PageID.8330-8332).

## B.      Pertinent evidence at trial

The case was tried before a jury for two weeks. The District Court rendered numerous rulings during trial, and Defendants make no suggestion that the trial was unfair in any way. After deliberating, the jury found Defendants liable for breach of contract and awarded Hello Farms $31,848,279 in damages, which represented the maximum contract price for both the 2020 and 2021 harvests based on Defendants' contractual breach.

The evidence adduced at trial showed that the parties contracted for medicinal marijuana. Chris Ramos, the leader of Curaleaf in Michigan, testified that he knew Hello Farms "was a medicinal farm" that sold only medicinal cannabis. (RE 229, PageID.11818). Whitney Conroy, another Curaleaf witness, testified that Hello Farms was a

medicinal-only farm and Curaleaf was the only party that would potentially use the product for recreational purposes—and would do so only on its own watch. (RE 231, PageID.12018-20). Chris Ramos of Curaleaf also testified that they knew Hello Farms was a medicinal-only farm, and if there was to be a change to selling the product to recreational use, that would be done by Curaleaf, exclusive of Hello Farms or performance of the Agreement. (RE 229, PageID.11818-19).

Hello Farms did ultimately obtain a recreational grow license in 2021, only after Curaleaf first materially breached by failing to pay for the 2020 harvest. (*Id.*).

On the issue of the THC potency of the 2020 and 2021 harvests, there was considerable evidence the threshold was met. *All* the biomass delivered from the 2020 harvest received passing COAs above 12%–more than 16,300 pounds. (RE 231, PageID.12017-18; RE 234, PageID.12385). The only reason formal potency testing was not conducted on the 2021 harvest was because Curaleaf breached, and the replacement buyer did not require it; testing would have cost more than $500,000 while Hello Farms was already suffering from Defendants' breach and in search of a new buyer. (RE 247, PageID.13384-86). Hello

Farms nevertheless presented evidence that five of the six samples passed all contaminant testing and showed THC potency above 12%. (RE 241, PageID.13144). Those tests represented approximately 300 pounds of the total 37,000-pound harvest. (RE 241, PageID.13176-13177).

Hello Farms' damages expert Jacob Katz was able to determine that the biomass would qualify for the highest price of $1,000 per pound for the 2020 harvest. (RE 260, PageID.13874). In 2021, Hello Farms had the same grower, the same farm, the same employees working the same field, and the same output from the plants, albeit with more weight. (RE 251, PageID.13814). It also had the same processor, Choice, process its 2020, 2021 and 2022 harvests. (RE 247, PageID.13372). In fact, the weather in 2021 was more favorable to growing the crop. (*Id.*). And Hello Farms's sale of the 2021 harvest over many years because of market saturation was confirmed by expert testimony to be a high market price, another indicator of quality. (RE 241, PageID.13053).

## C.    Post-trial motions

After the jury verdict, Defendants filed a renewed motion for judgment as a matter of law. (RE 277).  That motion repeated the illegality argument and also argued Hello Farms could not recover damages for the 2021 harvest because it did not prove that harvest complied with all contract requirements. Hello Farms' response (RE 284) made numerous points refuting all of Defendants' arguments, and the District Court denied Defendants' motion.

## SUMMARY OF ARGUMENT

Defendants' attempt to avoid their contractual obligations, and to escape the jury's verdict holding them to those obligations after a fair trial, was properly rejected by the District Court, and that court's rulings should be affirmed.

Defendants' illegality argument is predicated entirely on the simplistic assumption that all claims to enforce a contract involving illegality are automatically barred.  But that is not the law.  The District Court correctly recognized that the illegality defense, aside from being "very dishonest," is one based on public policy—nothing

more, nothing less.  And caselaw makes clear that there are other relevant federal public policies, including one that requires enforcement of parties' contracts.  Those competing public policy concepts are exactly why this Court and others have repeatedly recognized that illegal contracts are not automatically unenforceable.  Instead, courts must apply a balancing test to determine whether unenforceability is the right result in a particular case.  In this Circuit, *Jackson Purchase* provides that balancing test.

The District Court correctly recognized that every one of the *Jackson Purchase* factors favors enforcement of the parties' contract, particularly given the Rohrabacher-Farr amendments that have been enacted by Congress beginning in 2014 and ever since, which make federal public policy on cannabis deferential to the States.

Defendants seem to suggest that this Court should not follow *Jackson Purchase*, but they offer no reason why that decision is not binding, or even why it is incorrect.  Law from the Supreme Court and from around the country confirms the correctness of the approach espoused by *Jackson Purchase*.  Defendants also argue that the parties'

contract is unenforceable when the *Jackson Purchase* factors are applied, but that argument is easily refuted.

The District Court correctly rejected Defendants' fallback argument that Hello Farms could not recover damages for recreational marijuana that it sold in mitigating damages caused by Defendants' breach. At the time of contracting Hello Farms possessed only medicinal-use licenses. Defendants' argument that Hello Farms could, and later did, obtain recreational licenses has no relevance to the meaning of the parties' contract or to the fact that at the time of contracting Hello Farms could only sell marijuana for medicinal purposes.

Third, the jury had a legally sufficient evidentiary basis to award damages for the 2021 harvest. The District Court correctly recognized that Hello Farms's subsequent sale into the recreational market constituted mitigation by Hello Farms that benefited Defendants. Under basic damages principles, Defendants anticipatory breach shifted the burden on damages to them to prove improper mitigation, so long as Hello Farms showed that it was able to perform, which it did show— and Defendants do not suggest otherwise. *Defendants* did not meet

20

*their* burden to prove those mitigation efforts were improper.  Moreover, the jury heard ample evidence that the 2021 harvest satisfied the criteria for the damages the jury awarded, even setting aside Defendants' failure to prove a failure to mitigate.

## ARGUMENT I

### THE DISTRICT COURT CORRECTLY HELD THAT THE AGREEMENT IS ENFORCEABLE UNDER THE *JACKSON PURCHASE* BALANCING TEST.

Defendants' argument that they were entitled to summary judgment on the grounds that the parties' contract is illegal is based entirely on their assertion that courts will never allow damages to be awarded for breach of an illegal contract—a proposition for which Defendants cite a secondary authority, Richard A. Lord, Williston on Contracts.  (Defendants' brief, p 30).  That blanket statement is directly refuted by this Court's recognition in *Jackson Purchase* that "it is *not* the case that all unlawful agreements are ipso facto void.  If the denial of relief is disproportionally inequitable the right to recover will not be denied."  *Jackson Purchase*, 646 F2d at 267 (emphasis added).  Nowhere in their 67-page brief do Defendants make any attempt to deal with this

Court's correct recognition in *Jackson Purchase* that not all unlawful agreements are ipso facto void, and that "[i]f the denial of relief is disproportionally inequitable the right to recover will not be denied." *Id.*

The basis for the legal principle that illegal contracts are often deemed unenforceable is that illegal contracts are contrary to federal public policy. The District Court correctly recognized as much, as do Defendants; they cite this Court's decision in *Morrison v Marsh & McLennan Cos*, 439 F3d 295, 300 (6th Cir. 2006) for the statement that, "as a matter of *public policy*, this Court is *generally* precluded from enforcing illegal contracts." (emphasis added). It is precisely because public policy is not always clear and easy to ascertain, and because oftentimes there are competing public policy considerations, that it is necessary for courts to balance considerations before flatly declaring unenforceable an "illegal contract." As set forth below in subsections A. and B., there are several competing public policy considerations that should be taken into account in a case like this, most of which Defendants completely ignore. The District Court correctly applied the *Jackson Purchase* factors, as discussed below in subsection C.,

particularly given how those factors are impacted by all relevant public policy considerations.

## A. Relevant public policy considerations.

As the Supreme Court has correctly recognized, "the general rule is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts." *Twin City Pipeline Co v. Harding Glass Co*, 283 U.S. 353, 356 (1931) (citations omitted). And, while contracts in violation of public policy may be unenforceable, "[t]he meaning of the phrase 'public policy' is vague and variable; courts have not defined it, and there is no fixed rule by which to determine what contracts are repugnant to it." *Id.* Consequently, "[t]he principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which the doctrine rests." *Id.* at 356-357. "It is only because of the dominant public interest that one who… has had the benefit of performance by the other party will be permitted to avoid his own promise." *Id.* at 357. *See also Am Cas Co of Reading, Pennsylvania v.*

*FDIC*, 39 F.3d 633, 638 (6th Cir. 1994); *Hauf v. Life Extension Found.*, 454 F. App'x 425, 433 (6th Cir. 2011).

In *Steele v. Drummond*, 275 U.S. 199 (1927), the Court said the following about the petitioner's contention that a contract was illegal and, therefore, unenforceable:

> While the principle is readily understood, its right application is often a matter of much delicacy. It is only because of the dominant public interest that one, who has had the benefit of performance by the other party, is permitted to avoid his own obligation on the plea that the agreement is illegal. And it is a matter of great public concern that freedom of contract be not lightly interfered with.

*Id.* at 205. *Steele* further recognized, "It is only in clear cases that contracts will be held void [as illegal]. The principle must be cautiously applied to guard against confusion and injustice. … Detriment to the public interest will not be presumed, where nothing sinister or improper is done or contemplated." *Id.* at 205.

This Court has also recognized that "the usual and most important function of courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligations on the pretext of public policy, unless it clearly appears that they

24

contravene the public right or the general welfare." *Fed. Deposit Ins. Co. v. Aetna Cas. & Sur. Co.*, 903 F.2d 1073, 1078 (6th Cir. 1990) (internal quotation and citations omitted). This principle is especially apt where, as here, "the defence (of illegality) is a very dishonest one, and it lies ill in the mouth of the defendants who allege it, and it is only allowed for public considerations and in order to better to secure the public against dishonest transactions." *McMullen v. Hoffman*, 174 U.S. 639, 669 (1899). *See also Kelly v. Kosuga*, 358 U.S. 516, 519 (1959) (quoting same passage from *McMullen*); and *Occidental Life Ins. Co. of N. Carolina v. Pat Ryan & Assoc., Inc.*, 496 F.2d 1255, 1267 (4th Cir. 1974) ("unless the public interest requires, we are reluctant to nullify a contract which has been executed").

In fact, both the Supreme Court and this Court have expressed a reluctance to apply the illegality defense at all "where the plea has been made by a purchaser in an action to recover from him the agreed price of goods sold." *Kelly*, 358 U.S. at 518; *Associated Press v. Taft-Ingalls Corp.*, 340 F.2d 753, 769 (6th Cir. 1965). "This holding is rooted in the principle that a party to an illegal contract cannot subsequently use this illegality to avoid his contractual obligations." *Associated Press*, 340

F.2d at 769.[5]  See also *Hemlock Semi Conductor Operations, LLC v. SoloWorld Indust. Sachsen GmvH*, 867 F.3d 692, 699 (6th Cir. 2017) (where a seller sues a purchaser who failed to make contractually mandated payments, "the policy interests in preventing [purchaser] from obtaining the benefit of its bargain without paying applies." (citing *Kelly*, 358 U.S. at 520)).

It is precisely because of these competing policy considerations that courts have taken a nuanced approach to the illegality defense. For example, in *Vassidji v. Goe*, 413 F.3d 928 (9th Cir. 2005), the court explained that "nuanced approaches to the illegal contract defense, taking into account such considerations as the avoidance of windfalls or forfeitures, deterrence of illegal contract, and relative moral culpability, remain viable in federal court and represent no departure from *Kaiser Steel*… as long as the relief ordered does not mandate illegal conduct." *See also Energy Labs, Inc.*, 2015 WL 3504974, at *3 ("[E]ven if a

---

[5] Both *Kelly* and *Associated Press* noted an exception to this principle, "where the judgment of the court would itself be enforcing the precise conduct made unlawful by the act." *Associated Press*, 340 F.2d at 769, citing *Kelly*, 358 U.S. at 520.  As discussed below, the judgment of the District Court in this case does *not* enforce the precise conduct made unlawful by the CSA.

contract is illegal, it is not automatically unenforceable. Under federal law, the illegality of contract defense involves a balancing of the 'pros and cons of enforcement,' taking into account the benefits of enforcement 'that lie in creating stability in contract relations and preserving reasonable expectations.' " (citations omitted)); *Dervin Corp. v. Banco Bilbao Vizcaya Argentaria, S.A.*, 2004 WL 1933621, at *3 (S.D.N.Y. Aug. 30, 2004) (recognizing that illegal contracts are not necessarily unenforceable, and "courts are to be guided by the overriding general policy ... of preventing people from getting other people's property for nothing when they are purporting to be buying it." (punctuation and citations omitted)); *Ent. Publications, Inc. v. Goodman*, 67 F. Supp. 2d 15, 18 (D. Mass. 1999) ("illegality per se, however, does not automatically render the contract unenforceable."); and *Ginsburg v. ICC Holdings, LLC*, 2017 WL 5467688, at *8–9 (N.D. Tex. Nov. 13, 2017) (similar holding).

Even the secondary source Defendants cite to support their argument for a flat prohibition on enforcing illegal contracts says otherwise. It specifically recognizes that "[a]ll illegal agreements are not automatically void, however, and may not even be unenforceable." 2

Williston on Contracts § 3:3 (4th ed. 2024). "Whether a bargain is illegal or otherwise contrary to public policy is a question of law to be determined by the court according to the circumstances of the particular case." *Id*. *See also House Auth. Of City of El Paso v. Raza Dev. Fund., Inc.*, 2024 W.L. 5036563, at *8 (W.D. Tex. July 19, 2024) (rejecting defendant's illegality defense based on the circumstances, citing 2 Williston on Contracts, § 3:3).

A decision from the Seventh Circuit is particularly instructive. In *N. Indiana Pub. Serv. Co. v. Carbon Cnty. Coal Co.*, 799 F.2d 265 (7th Cir. 1986), the court recognized, correctly, that "the course of decision has not run completely true" when it comes to deciding whether illegal contracts are necessarily unenforceable. *Id.* at 273. The court discussed a number of cases, including *Kelly* and *Kaiser*, before concluding, "The best generalization possible is that the defense of illegality, being in character if not origins an equitable and remedial doctrine, is not automatic but requires . . . a comparison of the pros and cons of enforcement." *Id*. at 273. For that ultimate proposition the court cited both *Jackson Purchase* and Williston. The court ultimately concluded that the parties' illegal contract was enforceable based on

balancing relevant factors. *Id*. at 273-274. Of particular note here, the

court based its reasoning in part on the grounds that the violated

statute was "an anachronism" because, though still valid, developments

since its enactment suggested the statute had become obsolete.

Ultimately, the court held as follows:

> NIPSCO does not argue that Carbon County's alleged violation of the statute hurt NIPSCO or that invalidating this contract under section 2(c) would help anyone, anywhere, at any time. The only consequence, other than to the parties to this suit, would be to throw a cloud of uncertainty over hundreds, perhaps thousands, of contracts . . . and to inject uncertainty into the contracting process generally.

*Id*. at 274.

In fact, this approach has been extended to the very context of this

case: a party seeking avoidance of a contract made illegal under the

CSA. In *Green Earth Wellness Ctr. LLC v. Atain Specialty Ins. Co.*, 163

F. Supp. 3d 821 (D. Colo. 2016), the defendant sought to avoid

enforcement of a contract that insured a marijuana business. The

defendant cited one of the cases Defendants cite, *Tracy v. USAA Cas.*

*Ins. Co.*, 2012 W.L. 928186 (D. Haw. Mar. 16, 2012), which invalidated

a contract under similar circumstances. *Green Earth* declined to follow

*Tracy*, finding that a balancing of public policy considerations warranted enforcement of the contract. *Id*. at 835. *See also Kenney v. Helix TSS, Inc.*, 939 F.3d 1106 (10th Cir. 2019) (holding employers are not excused from complying with obligations under federal law merely because their business practices are federally prohibited under the CSA); *Green Cross Med. Inc. v. Gally*, 395 P.3d 302, 308-309 (Ariz. Ct. App. 2017) (declining to dismiss contract claim on ground contract was illegal under CSA, given shifting federal public policy on marijuana).

In short, numerous decisions have recognized the importance of applying the illegality defense cautiously, including by balancing competing public policy interests before declaring a contract unenforceable—including in the context of the CSA.

**B.      Federal marijuana policy is deferential to marijuana business conducted under State law following the Rohrabacher-Farr appropriations bills.**

The sole premise for Defendants' illegality argument is that Congress passed the CSA in 1970, which states that "it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense a controlled substance." 21 U.S.C. § 841.

Marijuana is deemed a "controlled substance" under 21 U.S.C. § 812 at Schedule I(c)(17).

However, in 2014 Congress passed the Consolidated and Further Continuing Appropriations Act, 2015. See Pub. L. No. 113-235, 128 Stat. 2130 (2014). The Act appropriated funds to run the federal government but included a pivotal rescission at § 538 that provides, "None of the funds made available in this Act to the DOJ may be used, with respect to [Michigan and 31 other U.S. states and jurisdictions], to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana." *Id.* at § 538. Section 538 has been called the Rohrabacher-Farr amendment, and it has been continued by Congress without interruption to this day.[6]

---

[6] Defendants noted that as of the date of their brief it was unclear whether the rider would be reauthorized again in 2025. (Defendants' brief, p. 8). It was, on January 23, 2026, see All Info - H.R.6938 - 119th Congress (2025-2026): Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026 | Congress.gov | Library of Congress.

Numerous courts have recognized that, based on the Rohrabacher-Farr amendment, current federal policy on marijuana use is unclear at best. *See, e.g., Peridot Tree, Inc. v. City of Sacramento*, 94 F.4th 916, 923–24 (9th Cir. 2024) ("Put simply, the legal landscape governing recreational marijuana is in flux and hardly straightforward.") *Mann v. Gullickson*, 2016 WL 6473215, at *4 (N.D. Cal. Nov. 2, 2016) ("Nevertheless, federal policy regarding enforcement of the CSA has been less than clear since 2009."); *In re Malul*, 614 B.R. 699, 706 (Bankr. D. Colo. 2020) ("[T]here remains an ever-shifting landscape of federal enforcement of marijuana criminalization where the same activity is fully legal under state law."); *KUSH, Inc. v. Van Vranken*, No. 220CV649JCMDJA, 2020 WL 8371452, at *4 (D. Nev. June 19, 2020)("As states legalized medical marijuana, federal policy regarding the enforcement of the CSA has been unclear. Further, the federal government's concern over the CSA's medical marijuana prohibition has waned in recent years, and the underlying policy purporting to support this prohibition has been undermined."); *Erickson v. Pfiester*, 2023 WL 6297343, at *5 (D. Alaska Sept. 27, 2023)(similar observations).

Justice Thomas recognized that federal policy on marijuana has shifted since *Gonzales v. Raich,* 545 U.S. 1,5 (2005). In dissenting from the denial of certiorari in *Standing Akimbo, LLC v. United States*, 141 S. Ct. 2236, Judge Thomas pointed out that "[w]hatever the merits of *Raich* when it was decided, federal policies of the past 16 years have greatly undermined its reasoning. Once comprehensive, the federal government's current approach is a half-in, half-out regime that simultaneously tolerates and forbids local use of marijuana." *Id*. at 2236-2237. He continued, "Suffice it to say, the Federal Government's current approach to marijuana bears little resemblance to the watertight nationwide prohibition that a closely divided Court found necessary to justify the Government's blanket prohibition in *Raich*." *Id*. at 2238. Justice Thomas also recognized that, even as of 2021, "the Government is now content to allow States to act as laboratories and try novel social and economic experiments" with respect to marijuana. *Id*. (punctuation omitted).

In short, and unlike "long-standing federal policy… that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and

33

enforced in the courts," *Hauf*, 454 F. App'x at 433, federal policy on use of medical marijuana is anything but clear and firmly established.

Several circuit courts have recognized the Rohrabacher-Farr Amendment's practical effect on federal marijuana policy. In *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016), the court explained that, "[b]y officially permitting certain conduct, state laws provide for non-prosecution of individuals who engage in such conduct. If the federal government prosecutes such individuals, it has prevented the state from giving practical effect to its laws providing for non-prosecution." *Id.* at 1176-77. The First Circuit agreed with *McIntosh*'s reasoning in *United States v. Bilodeau*, 24 F.4th 705 (1st Cir. 2022), *cert denied*, 142 S. Ct. 2875 (2022). It held that "DOJ may not spend funds to bring prosecutions if doing so prevents a state from giving practical effect to its medical marijuana laws." *Id.* at 713. *Bilodeau* cited another First Circuit case that made this instructive observation:

> This is not a case in which congress may be understood to have criminalized a national market with no expectation that an interstate market would continue to operate. Quite the opposite. Congress has taken affirmative steps to thwart efforts by federal law enforcement to shut down that very market, through the annual enactment of the annual Rohrabacher-Farr

> amendment.  And it has taken those steps, presumably, with an awareness of the beneficial consequences that those steps will have for consumers who seek to obtain medical marijuana.

*Northeast Patient's Group v. United Cannabis Patients and Caregivers of Maine*, 45 F.4th 542, 553 (1st Cir. 2022).

Even this Court, though it has not directly addressed the amendment's full scope, has assumed its validity.  In *United States v. Trevino*, 7 F.4th 414 (6th Cir. 2021), this Court said that it was "assuming without deciding that the rider is as robust as the Ninth Circuit suggested in *McIntosh*."

Because the Rohrabacher-Farr amendment prohibits the expending of funds "to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana," it very clearly reflects federal policy explicitly not disapproving of the implementation of state laws that authorize the use, distribution, position, or cultivation of medical marijuana.  In other words, Congress has unambiguously and intentionally suspended the CSA's marijuana prohibition in States, like Michigan, where medical marijuana is regulated.

Defendants claim the Rohrabacher-Farr riders did not "change federal policy toward marijuana." (Defendants' brief, p. 26). Defendants are simply wrong; the riders absolutely changed federal policy, as the many above-cited authorities and others have recognized. Defendants claim the District Court erred in recognizing that the riders "marked a shift in 'federal policy' to 'permit sales of medical marijuana in states that allow them.'" (Defendants' brief, p. 36, quoting the District Court). They also criticize the District Court's conclusion that reading the CSA together with the riders reflects "a federal policy of staying out of the way of states with respect to the implementation of medical marijuana regimes that would be undermined if courts declined to enforce contracts involving medical marijuana." (Defendants' brief, pp. 37-38). Defendants' criticisms are baseless; the District Court was spot-on in recognizing the riders marked a shift in federal policy toward staying out of the way of states implementing medical marijuana regimes. That is literally what the Rohrabacher-Farr amendment says. It is, therefore, not surprising that Defendants cannot cite a single decision from any jurisdiction supporting their argument that the riders

did not mark a shift in federal policy to permitting medical marijuana transactions in states that allow them.

The reason the District Court was wrong, Defendants argue, is that the "federal policy of staying out of the way of states" does not translate into courts "lending their assistance toward carrying out the terms" of marijuana contracts. (Defendants' brief, p. 38 (citations and punctuation omitted)). Defendants also make a new argument they did not make below: that marijuana companies are not afforded certain *privileges* under federal law that other companies enjoy, such as eligibility for loans from the Small Business Administration, federal trademark protection, the ability to bring a RICO claim, and the ability to file for bankruptcy protection. (Defendants' brief, pp. 40-41). Defendants claim these examples "eviscerate the district court's conclusion that the appropriations riders embody a federal policy of staying out the way of states with respect to medical marijuana." (Defendants' brief, p. 41 (punctuation and citation omitted)).

Defendants' examples do no such thing. While Defendants' examples might "eviscerate" a conclusion that federal policy *favors* medical marijuana production and distribution, that is hardly what

Congress has done with its deference to the States, and certainly is not what the District Court concluded. As Defendants acknowledge, the District Court concluded—correctly—that the federal policy is simply that of "staying out of the way of states" that allow such activity. *Id*. None of Defendants' examples of federal cases denying privileges for marijuana companies based on the CSA has any relevance to the Rohrabacher-Farr riders reflecting Congress' policy of staying out of the way of states implementing their medical marijuana regimes. Indeed, none of the authorities Defendants cite for their examples even mentions the Rohrabacher-Farr amendments—those examples simply do not address what is presented in this case.

Defendants repeat the same error in arguing that the privileges withheld from marijuana businesses "'undermine' any supposed federal policy in favor of medical marijuana." (Defendants' brief, p. 41). No one is saying there is a federal policy *in favor of* medical marijuana. But there most definitely is a federal policy that is specifically and intentionally *indifferent to* medical marijuana businesses conducting business under state law. Hypocritically, when it comes to conducting business, Defendants recognize budget riders have *full* effect—that's

why they are in business at all.  Yet, after filing a counterclaim to enforce a cannabis contract but losing a jury trial and verdict over $30 Million, Defendants assert cannabis remedies are "limited." (Defendants' brief, p 3).  Not only does this inconsistency reflect bad faith, it is irrational.

Defendants are controlled by the world's largest cannabis company, which has filed hundreds of SEC statements repeatedly acknowledging, including through today, that Defendants are part of a "vertically integrated multi-State cannabis operator in the U.S."[7] and have obtained and closed a $500 Million loan.[8]  Defendants and their business are part of the markets today.  It is irrational to say Congress sat idly by and watched a multibillion market be constructed and grown, but that it is all a legal fiction that, with the stroke of a pen, this Court must light into a forest fire.  It would breed chaos in the legal and business world if the erection and growth of the public and capital markets, as a reflection of more than a decade of Congressional and

---

[7]https://www.sec.gov/Archives/edgar/data/1756770/00017567702500000 8/q424-exx991xaif.htm
[8]https://www.sec.gov/Archives/edgar/data/1756770/00017567702600001 4/a2026-02x19xcuraleafxann.htm

Executive actions, were reduced to brush by the Court in spite of the budget riders, hundreds of billions of dollars in revenue (and taxes), and Congressional recognition of the industry.

Ultimately, Defendants' legal argument is aimed at the proposition that unless there is a federal policy in favor of certain activity, contracts between private parties carrying out such activity are unenforceable. Defendants thus completely ignore the "long-standing federal policy… that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily made shall be held valid and enforced in the courts." *Twin City*, 283 U.S. at 356. There is no requirement under federal law that, in order for a contract to be enforced, the contract must relate to an activity specifically endorsed by a federal public policy. Where, as here, federal public policy is deferential to the States and to the activity that is the subject of a contract, the contract is enforceable. At a minimum, the shifting and deferential federal public policy regarding marijuana as authorized by state laws cannot be squared with a blanket rule declaring all such contracts unenforceable.

**C.** **The *Jackson Purchase* balancing factors favor enforcement, especially given federal policy indifferent to marijuana transactions under state law.**

The proper way to analyze Defendants' illegality defense is by applying the balancing test required by this Court's decision in *Jackson Purchase*. Before turning to that test, Hello Farms notes initially that a crime generally requires the existence of two elements: proscribed conduct and the availability of a punishment. Where either is lacking, no criminal conduct exists. *Bloom v. State of Ill.*, 391 U.S. 194, 201 (1968). *See also, Viereck v. United States*, 318 U.S. 236, 241 (1943). This Court follows that definition. *United States v. Thompson*, 966 F.2d 1455, *3 (6th Cir. 1992); *Fulkerson v. Unum Life Ins. Co. of Am.*, 36 F.4th 678, 681 (6th Cir. 2022) (holding that a "crime" is defined as conduct that is punishable by the state) (citation omitted). A leading treatise on the topic is in accord. See § 1.2(d) Necessity for prescribed punishment, 1 Subst. Crim. L. § 1.2(d) (3d ed.) (LaFave).

Performance of the Agreement is not punishable by law. Defendants' formulation is thus incorrect; the Appropriations Acts ensure the conduct called for by the Agreement is not punishable as a crime. A contract calling for conduct that the law expressly states

cannot be subject to any criminal penalty, is, by definition, not a crime.[9]

Defendants interpret *United States v. Nixon*, 839 F.3d 885, 888 (9th Cir. 2016) to suggest what would be an unconstitutional construction. A contract does not become legal by a change in law made after the contract was signed, just as no *ex post facto* law renders a contract that is not against public policy when signed suddenly against public policy based on later enacted legislation.

Regardless, the *Jackson Purchase* test applies, and it is especially helpful here, given how federal policy regarding marijuana has shifted, and given the other important public policy considerations that call for the defense to be "cautiously applied to guard against . . . injustice." *Steele*, 275 U.S. at 205. Indeed, if ever there were a case that called for the "very dishonest," *McMullen*, 174 U.S. at 669, illegality defense to be cautiously applied, it is this one. If ever there were a case that called for "a comparison of the pros and cons of enforcement," *Indiana Pub.*, 799 F.2d at 273, it is this one. If ever there were a case where "the

---

[9] Hello Farms never argued the CSA (that applies to hundreds if not thousands of substances beyond medicinal cannabis, such as heroin) was *in toto* "repealed" as Defendants inaccurately urge (*see,* Defendants' brief, p 15, and misciting RE 117, PageID.5875-76, 5972-76, 5986-88, where "repealed" does not exist).

denial of relief is disproportionately inequitable [such that] the right to recovery [should] not be denied," *Jackson Purchase,* 646 F.2d at 267, it is this one.

Under *Jackson Purchase*, the factors a court should consider in performing the balancing include: the justified expectations of the parties; the forfeiture that would result from non-enforcement of the agreement; any special public interest in enforcement; the strength of the public policy that the agreement violates, as shown by legislation or court decision; the likelihood that refusal to enforce will further that policy; and the seriousness of the misconduct. *Jackson Purchase,* 646 F.2d at 267. The District Court correctly recognized that every single factor in the *Jackson Purchase* balancing test favors enforceability, especially in the wake of the Rohrabacher-Farr amendments. At a minimum, the factors do so on balance.

### 1. The justified expectations of the parties

The District Court correctly concluded that the parties had justified expectations that the contract would be enforced. As the court astutely reasoned:

> I think those expectations were justified in light of the Michigan law regarding medical marijuana, the fact

that the contract specifies Michigan law will govern, and in light of the changes in federal policy that I mentioned, the appropriation riders, it seems to me that both sides could justifiably expect and, indeed, I think both sides did expect that this contract would be enforced.

(RE 147, PageID.8330). The District Court was correct as matter of undisputed fact that both parties believed the contracts were legal and would be performed in states where cannabis is legal. Curaleaf's then CEO, Joseph Bayern, testified as much. (RE 142-11, PageID.8125). In fact, both parties had entered into many marijuana contracts, and indeed both parties sued for breach of contract.

Defendants' argument that the parties' admitted expectations were not "justified" is based solely on their blanket assumption that illegal contracts are automatically unenforceable. But that ignores this Court's recognition that "it is not the case that all unlawful agreements are ipso facto void . . . ." *Jackson Purchase*, 646 F.2d at 267. The District Court was correct to assess this factor objectively, without bootstrapping the assumption of unenforceability. And the court correctly reasoned that, objectively assessed, the factor favors enforceability.

## 2. The forfeiture that would result from non-enforcement of the agreement

The forfeiture that would result from non-enforcement is enormous: Defendants would reap a windfall in escaping contractual obligations of the very type on which their entire business model is based. Following a fair trial, a jury awarded $31.8 million as what it deemed to be fair compensation for Defendants' breach. The District Court correctly recognized that this factor favors enforcement since non-enforcement "would be very large and have serious consequences if this contract is not enforced." (RE 147, PageID.8330).

Defendants' only argument that this factor favors non-enforcement is to bootstrap their already-bootstrapped argument that the parties lack justifiable expectations based on their assumption that illegal contracts are automatically void and unenforceable. (Defendants' brief, p. 44). They do not even bother trying to assess this factor on its own, presumably understanding that it quite clearly favors enforcement.

## 3. Any special public interest in enforcement

The District Court correctly recognized that this factor also favors enforcement based on Michigan law in this area, which expresses a

view that there is a public interest in having a medical marijuana market consistent with the will of the voters.  (RE 147, PageID.8330-8331).  Michigan law confirms "[i]t is the public policy of this state that contracts related to the operation of marihuana establishments or tribal marihuana businesses be enforceable." M.C.L. § 333.27960(3).  And, of course, the public has an interest in the enforcement of contracts generally, as Hello Farms has pointed out elsewhere in this brief—and as Defendants have completely ignored.

Defendants simply declare that "[t]here is no such interest," (Defendants' brief, p. 54), once again completely ignoring the public interest in the enforceability of contracts.  Defendants also revert to their argument that the Rohrabacher-Farr amendments did not render marijuana legal under federal law.  But, as discussed above, those amendments at a minimum render federal public policy indifferent to state law systems allowing marijuana businesses.  The unequivocal federal public policy in favor of contract enforcement outweighs the muddled federal public policy indifferent to marijuana transactions in compliance with state law.

**4.    The strength of the public policy that the agreement violates, as shown by legislation or court decisions**

This factor also favors enforcement, because the strength of federal public policy on the illegality of marijuana has essentially vanished in the wake of the Rohrabacher-Farr amendments prohibiting the federal government spending money interfering with state marijuana policies.  The District Court correctly analyzed this factor as well in a passage that merits quoting:

> I think the federal policy with respect to marijuana – medical marijuana here, is, at best, muddled, given the appropriation riders and the CSA and what the President has done as well. And given that the policy is so muddled, that, to me, weighs heavily in favor of enforcement.  This contrasts sharply with a case where we have a clean, clear law that unambiguously expresses a policy that was enacted by the legislature and signed by a president.

(RE 147, PageID.8331).

In their analysis of this factor, Defendants once again simply default to the only arrow in their quiver: that marijuana is illegal under the CSA enacted in 1970.  (Defendants' brief, pp. 45-46).  As noted elsewhere, that simplistic approach is a woefully incomplete and

insufficient assessment of the strength of federal policy in the wake of the Rohrabacher-Farr amendment.

5.      **The likelihood that refusal to enforce will further that policy**

Refusing to award damages in this case would do nothing to further the public policy embodied in the CSA even setting aside the impact on federal policy had by the Rohrabacher-Farr amendments. Both the 2020 and 2021 Hello Farms harvests have been sold.  This case is about nothing but contract damages and whether Defendants must pay them to Hello Farms.  When the riders are taken into account as they must be, it becomes even more apparent that refusing to enforce the contract would do nothing to further the muddled federal policy.

As Justice Thomas aptly put it, the federal government is now content to allow states to serve as laboratories for the social experiment on legalization of marijuana, in Michigan medical marijuana.  Whatever federal public policy still exists regarding marijuana, refusing to enforce the parties' contract would do nothing to further it.

The District Court's analysis of this factor is also sound and merits quoting:

> Even assuming that there was a policy against enforcement of marijuana contracts, refusing to enforce this contract would not go a long way toward furthering that policy. There was and is a huge amount of medical marijuana transactions in Michigan, and the policy was already being substantially undermined to the extent that there was any policy against enforcing these contracts, and declining to enforce this one contract, seems to me, will hardly provide important enhancement for whatever the policy against marijuana contracts is, if there is one.

(RE 147, PageID.8331-8332). Defendants have no persuasive answer to the court's analysis.

## 6. The seriousness of the misconduct

This factor unquestionably favors enforcement, given the shifting federal public policy toward not interfering with execution of state laws legalizing marijuana. Congress' passage of laws prohibiting the DOJ from prosecuting anyone for violating the CSA in states where marijuana has been legalized confirms that this case involves *no* misconduct that Congress deems worth addressing, much less serious misconduct. The District Court got this factor right as well, correctly pointing to the fact the conduct is lawful under Michigan law and that "it's been carved out from federal prosecution for years." (RE 147, PageID.8332).

\*     \*     \*

In short, all six *Jackson Purchase* factors favor enforcement, as the District Court correctly reasoned. If anything, the District Court understated the point, since the court gave no indication that it was applying the defense "cautiously . . . to guard against . . . injustice," *Steele*, 275 U.S. at 205, or balancing the other important federal public policies discussed in section A. At a minimum, the factors on balance favor enforcement and, therefore, the District Court correctly denied Defendants' request for dismissal of Hello Farms's complaint based on their illegality defense.

## D.     Defendants' attempts to avoid *Jackson Purchase* are without merit.

Defendants seem to suggest that *Jackson Purchase* does not control, but any such suggestion is without merit. Defendants make no attempt to deal with the very straightforward statement in *Jackson Purchase* that "[i]t is not the case that all unlawful agreements are ipso facto void. If the denial of relief is disproportionately inequitable the right to recover will not be denied." *Jackson Purchase*, 646 F.2d at 267. Nor do they develop any argument anywhere in their brief explaining a basis for not applying the *Jackson Purchase* test in this case. Instead,

50

they make just two cryptic statements hinting at limitations on *Jackson Purchase* that they wish existed.

First, Defendants say that *Jackson Purchase's* balancing test "is inapplicable to a contract calling for the commission of a federal crime." (Defendants' brief, p. 26). That argument is entirely undeveloped in their brief, and no authority is cited for it. Nothing in *Jackson Purchase* suggests that its balancing test is inapplicable to a contract calling for the commission of a federal crime, let alone conduct that is no longer punishable, given the riders.

Defendants later make a second off-the-cuff statement: "Even if the Court were to deem it proper to conduct the balancing inquiry reserved for lesser public-policy violations, the *Jackson Purchase* factors confirm that the Agreement cannot be enforced . . . ." (Defendants' brief, p. 42). No authority is cited, and no argument is proffered, for Defendants' suggestion that the *Jackson Purchase* balancing inquiry is "reserved for lesser public-policy violations." Again, nothing in *Jackson Purchase* supports that suggestion. To the contrary, the balancing test applies in any case involving an unlawful agreement. Where, as here, even assuming the contract involved a lesser public-policy violation

51

(Congress's actions reflect policy deferential to enforcing State-complicit medicinal cannabis contracts), that mitigates in favor of enforcement. But even if this case involved a serious public-policy violation, that does not mean the *Jackson Purchase* balancing test would not apply. It would mean only that certain factors, most notably factor four (the strength of the public policy the agreement violates), would counsel less in favor of enforcement.

Defendants find it significant that several federal district court decisions found contracts to purchase and sell marijuana unenforceable. (Defendants' brief, pp. 34-35.) Not one of those decisions conducted a balancing test of the type required in this Circuit under *Jackson Purchase*. Nor did any of them even discuss the crucial impact of the Rohrabacher-Farr amendments. The earliest of those district court decisions simply declared that illegality required nonenforcement, without any analytical discussion, and the ones that followed generally repeated the earlier decisions.[10]

---

[10] One decision that Defendants apparently did not find, *Green Earth*, *supra,* cited *Tracy*, but declined to follow it and instead conducted a balancing test to find the parties' contract enforceable, as discussed above at p. 29.

Defendants' reliance on a handful of distinguishable district court decisions gets them nowhere given the irrefutable fact that *Jackson Purchase* is good law, which the District Court correctly followed.  Other circuit courts have similarly recognized the propriety of applying a balancing of pros and cons before dismissing a claim based on illegality. *See Northern Indiana*, 799 F.2d at 273-274 (declining to dismiss a contract claim based on a legality defense by employing a balancing of factors, citing *Jackson Purchase*); and *Delta Marina, Inc. v. Plaquemine Oil Sales, Inc.*, 644 F.2d 455, 458 (5th Cir. 1981) (declining to dismiss claim based on illegality defense where circumstances did not warrant it).  Applying the *Jackson Purchase* balancing test is especially appropriate here, where the party asserting the "very dishonest" illegality defense is a company whose entire business model is predicated on the enforceability of marijuana contracts and that defendant is asserting the defense just this one time in order to escape a contractual obligation by which it has been held liable for damages in excess of $30 million.  The District Court was right to apply the *Jackson Purchase* test and applied that test correctly.

**E.**    **Even if *Jackson Purchase* did not apply, the parties' contract is enforceable.**

Finally, and even if there was some reason not to employ the *Jackson Purchase* balancing test (there is not), the parties' contract still would be enforceable under other governing precedent. As the Supreme Court said in both *Kelly* and *Continental Wallpaper*, "Past the point where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act, the courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, of preventing people from getting other people's property for nothing when they purport to be buying it." *Kelly*, 358 U.S. at 520-521; *Continental Wallpaper*, 212 U.S. at 271 (punctuation omitted).

Even if *Jackson Purchase* did not control (it does), the above-quoted principle would also warrant enforcement because it is *not* the case that the judgment of the District Court "would itself be enforcing the precise conduct made unlawful by the" CSA.  Here, the judgment simply awards monetary damages to be paid by Defendants to Hello Farms.

Defendants' argument that the judgment would itself be enforcing the precise conduct made unlawful by the CSA is that the parties'

agreement represents a "conspiracy to manufacture and distribute marijuana" in violation of 21 U.S.C. § 846.  (Defendants' brief, p. 33).  But the sale of marijuana from Hello Farms to Curaleaf was not a conspiracy either to manufacture or distribute marijuana.  It was an agreement merely to *sell* marijuana by Hello Farms to Defendants.  Defendants rely on this Court's decision in *United States v. Wheat,* 988 F.3d 299 (6th Cir. 2021), but *Wheat* specifically recognized that, while 28 U.S.C. § 846 prohibits two individuals from knowingly reaching an agreement to distribute drugs, "[y]et we have also long held that a buyer-seller agreement alone does not establish a 'conspiracy' under § 846."  *Id*. at 304.  Nothing in the Agreement references distribution of marijuana to others by Defendants.  And the judgment requiring Defendants to pay damages to Hello Farms for its breach simply does not constitute enforcing "the precise conduct made unlawful by the" C.S.A.  *See, e.g., Bartch v. Barch*, No. CV 23-0101-BAH, 2024 WL 5146010, at \*4 (D. Md. Dec. 17, 2024) (holding that allowing payment of funds pertaining to marijuana business would not require ongoing or future violations of federal drug law).[11]

---

[11] *See also* Doug Rendleman, Illegal Contracts and Agreements: A New *(cont'd on next page)*

While this might seem like a fine distinction, it must be emphasized that such distinctions matter when it comes to applying the very dishonest illegality defense cautiously to guard against injustice, as required. That is exactly why *Continental Wallpaper* and *Kelly* recognized the propriety of such fine distinctions in focusing on whether the judgment of the court actually enforces "the precise conduct made unlawful by the Act." It is also why the Supreme Court has called for the illegality defense to be "cautiously applied to guard against . . . injustice." *Steele*, 275 U.S. at 205. Adhering to that approach in this case renders the Agreement enforceable even if the *Jackson Purchase* test is not applied.

---

Standard for Prostitution and Marijuana Agreements, 81 Wash. & Lee L. Rev. 711, 772–73 (2024) (recognizing, in the context of the illegality defense asserted by or against a marijuana company that "[a] money judgment against a judgment debtor doesn't require any conduct from the debtor in personam.").

**ARGUMENT II**

**THE DISTRICT COURT CORRECTLY REJECTED DEFENDANTS' ATTEMPT TO AVOID PAYING DAMAGES FOR HARVEST SOLD AS RECREATIONAL MARIJUANA WHERE, AT THE TIME OF CONTRACTING, HELLO FARMS ONLY HAD MEDICAL-USE LICENSES, AND RECREATIONAL LICENSES WERE OBTAINED BY HELLO FARMS TO COMPLY WITH ITS DUTY TO MITIGATE DAMAGES**

Defendants' fallback argument—that the District Court erred in allowing Hello Farms to recover for the sale of recreational marijuana because it is not entitled to protection under Rohrabacher-Farr—is wholly without merit. The District Court correctly recognized that Hello Farms secured recreational licenses *only* in order to mitigate its damages in response to Defendants' breach. That mitigation activity by Hello Farms did nothing to transform the nature of the contract itself from an enforceable agreement into an unenforceable one.

Defendants' argument that Hello Farms' mitigation efforts caused conduct that is not protected by the Rohrabacher-Farr amendments ignores two things. It ignores that Defendants' illegality argument is based solely on whether parties' contract to conduct illegal activity— because it is the act of *contracting* that violates public policy; not post-

57

breach mitigation activity by the non-breaching party. Because the contract itself is not unenforceable on illegality grounds, as discussed in Argument I, Hello Farms's mitigation efforts (to Defendants' benefit) are irrelevant.

Second, Defendants' argument ignores the undisputed fact that at the time of contracting Hello Farms only had medicinal-marijuana licenses. That means Hello Farms was only permitted to manufacture and sell marijuana for medicinal use. That contracted-for conduct by Hello Farms was *exclusively* what the evidence proved the parties expected as the District Court recognized was shown at trial and was fully in keeping with the protections afforded by the Rohrabacher-Farr amendments. Defendants cite no authority for the proposition that the illegality defense precludes damages awarded on an otherwise enforceable contract if the breaching party forces extra-contractual activity by the nonbreaching party to mitigate the damages. In fact, Defendants cite no authority whatsoever in support of their second argument.

## ARGUMENT III

## THE JURY HAD A LEGALLY SUFFICIENT
## EVIDENTIARY BASIS TO AWARD
## DAMAGES FOR THE 2021 HARVEST

Defendants' final argument, that the jury lacked an evidentiary basis for its damages award, is also wholly without merit, as the District Court correctly recognized in denying Defendants' motion for judgment under Fed. R. Civ. P. 50.

## A.     Applicable standard for overturning a damages award.

This Court's review of a jury's damages award under Rule 50 "is extremely deferential." *Advance Sign Grp. v. Optec Displays, Inc.*, 722 F.3d 778, 787 (6th Cir. 2013).  An award must stand unless "the award is contrary to all reason." *Id.*  A plaintiff need only produce a method by which damages can be calculated with reasonable certainty. *Stonemen Grp., Inc. v. Metal-forming Techs., Inc.*, 362 F. Supp. 2d 896, 902 (E.D. Mich. 2005).  In "'estimat[ing]'" damages, "'[j]uries are allowed to act upon probable and inferential, as well as direct and positive proof.'" And attorneys are "generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *People v. Bailey*, 873 N.W.2d 855, 865 (Mich. Ct. App. 2015).

In *Howard v. City of Melvindale*, 183 N.W.2d 341 (Mich. Ct. App. 1970), *abrogated on unrelated grounds*, the court stated, "[o]n the principle that where a litigant can show he has been damaged, but his damages cannot be measured with certainty, that it is better that he recover more than he is entitled to than less, the rule in Michigan is that the risk of the uncertainty is cast upon the wrongdoer, not the injured party."

Judgment as a matter of law is appropriate only where there is "no evidence from which the jury could calculate" damages. *Shivers v. Schmiege*, 776 N.W.2d 669, 675- 76 (Mich. Ct. App. 2009). Juries can make reasonable inferences from facts proven in evidence having a reasonable tendency to sustain them. *Galloway v. United States*, 319 U.S. 372, 396 (1943). The verdict "must stand," *id.,* so long as it falls within the range encompassed by the record as a whole." *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 387 (6th Cir. 2008).

Any risk of "'uncertainty is cast upon the wrongdoer, not the injured party.'" *Lorenz Supply Co. v. Am. Standard, Inc.*, 300 N.W.2d 335, 340 (Mich. Ct. App. 1980). It is sufficient if a reasonable basis for computation exists, although the result be only approximate.

*McCullagh v. Goodyear Tire & Rubber Co.*, 69 N.W.2d 731 (Mich. 1955). Moreover, the certainty requirement is relaxed where the fact of damages has been established and the only question to be decided is the amount of damages. *Bonelli v. Volkswagen of America, Inc.*, 421 N.W.2d 213 (Mich. Ct. App. 1988).

Consequently, it is "'better to run a slight risk of giving somewhat more than actual compensation, than to adopt a rule'" that will "'preclude the injured party from the recovery of a large proportion of the damages he has actually sustained from the injury.'" *Muskegon Agency, Inc. v. Gen. Tel. Co. of Mich.*, 85 N.W.2d 170, 174 (Mich. 1957). When the nature of a case permits only an estimation of damages or a part of the damages with certainty, it is proper to place before the jury all the facts and circumstances which have a tendency to show their probable amount." *Body Rustproofing, Inc. v. Michigan Bell Tel. Co.*, 385 N.W.2d 797, 800 (Mich. Ct. App. 1986). Questions regarding what damages may be reasonably anticipated are issues better left to the trier of fact. *Wendt v. Auto Owners Ins. Co.,* 401 N.W.2d 375, 378 (Mich. Ct. App. 1986); *see also*, Restatement (Second) of Contracts §352 cmt.a (1981).

Application of these principles shows that the District Court correctly denied Defendants' rule 50 motion and that Defendants misunderstand the parties' respective burdens and the role of the jury.

**B. Ample evidence allowed the jury to award the damages it did, and *Defendants* did not meet *their* burden on damages mitigation.**

There are two, independent reasons why Defendants' attack on the sufficiency of the evidence to support the jury's damages award is without merit. First, and most fundamentally, it ignores the shifting of the burden from Hello Farms to Defendants with respect to Hello Farms' damages *once Defendants breached.* Second, it fails to recognize that it is the jury's role to assess the evidence, not Defendant's or the District Court's, and there was more than ample evidence to support the award even setting aside Defendants' failure to meet its burden.

**1. Damages were properly awarded based on Hello Farms' mitigation and Defendants' failure to meet their burden to prove that mitigation was not commercially reasonable.**

Defendants' argument ignores the impact of Defendants' breach in advance, when they advised Hello Farms that they were refusing to honor their agreement to purchase the 2021 harvest. That breach shifted the parties' respective burdens, because it required Hello Farms

to mitigate its damages, which, in turn, meant Hello Farms was not required to test the entire 2021 harvest for THC level.  In fact, had it done so, *that* likely would have violated its duty to mitigate damages, because it would have represented an unnecessary expense, since the replacement buy did not require testing.

The law is clear in Michigan that it is the duty of the party injured through the breach of contract to mitigate damages and thus minimize his loss.  *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 550 (6th Cir. 1981). Michigan has also recognized the duty to mitigate damages in breach of contract cases subject to the Uniform Commercial Code. *Id; Ambassador Steel v. Ewald Steel*, 190 N.W.2d 275 (Mich. Ct. App. 1971).  Importantly, when one party repudiates the contract, "the nonbreaching party need only show that it would have been ready and willing to have performed the contract, if the repudiation had not occurred." 13 Williston on Contracts 39:41 (4th ed.).

Hello Farms proved its damages for the 2020 harvest—with test results and sales, and Defendants do not argue otherwise.  For the 2021 harvest, M.C.L. § 440.2704(2) governs:

> Where the goods are unfinished an aggrieved seller
> may in the exercise of reasonable commercial judgment

> for the purposes of avoiding loss and of effective realization either complete the manufacture and wholly identify the goods to the contract or cease manufacture and resell for scrap or salvage value or proceed in any other reasonable manner.

See also M.C.L. § 440.2706(2); cmt. 6 (nonbreaching party need only act commercially reasonably). The mitigation obligation foisted on Hello Farms by Defendants' breach shifted the parties' respective burdens. It was *Defendants'* burden, in the wake of their breach, to show that Hello Farms failed to act in a commercially unreasonable manner. Subsection 440.2704(2) permitted Hello Farms to exercise its reasonable commercial judgment to avoid loss and to proceed in a reasonable manner. That is exactly what Hello Farms did when it grew and sold the 2021 harvest for an above market price to a customer that did not require testing before delivery. Defendants failed to meet their burden to show Hello Farms was commercially unreasonable.

In *Young v. Frank's Nursery & Crafts, Inc.*, 569 N.E.2d 1034, 1037 (Ohio 1991), the Ohio Supreme Court applied Michigan law to uphold a damages award in a similar context. The buyer had repudiated the contract, and the seller sought damages based on that breach. The court quoted and applied M.C.L. 440.2704(2) as the applicable test, and

recognized that, based on the buyer's repudiation, the seller was required to mitigate, and "the burden is on the buyer to prove that the seller failed to use reasonable commercial judgment." *Id.,* at 1037 (citation and punctuation omitted). Thus, the seller proved entitlement to the damages awarded by the jury based solely on its ability to perform had the buyer not breached, and its mitigation attempts— because the buyer failed to meet its burden to prove the seller "failed to use reasonable commercial judgment" in mitigating its damages. That test applies here as well, and Defendants failed to meet their burden. Indeed, Defendants do not even suggest Hello Farms did not use reasonable commercial judgment; they instead misunderstand the shifting of the burdens in the wake of their repudiation.

In short, Hello Farms discharged its duty to mitigate based on what the paying customer needed, and those needs did not include a requirement for testing of the entire harvest to ensure THC levels above 12%. Hello Farms was not required to do something its customer did not want, would not pay for, and did not require. And, importantly, there was *no* evidence that Hello Farms could not have performed the second year as it did the first.

**2. Despite having no burden to do so, Hello Farms still furnished evidence supporting the jury's damages award.**

Despite having no burden to do so in the wake of Defendants' breach, Hello Farms nevertheless furnished evidence more than adequate to allow the jury to infer that the 2021 harvest warranted the price it ultimately awarded. In 2021, Hello Farms had the same grower, the same farm, the employees worked the same field, and it had the same output from the plants (but more weight). (RE 251, PageID.13814). And it had the same processor, Choice, process its 2020, 2021, and 2022 harvests. (RE 247, PageID.13372). The weather in 2021 was more favorable to growing. (*Id.*) Hello Farms also obtained several COAs, of which all but one was a Passing COA, which at worst under the contract would have meant re-testing. (RE 247, PageID.13390.) In 2022, 2023, and 2024, Hello Farms produced similar harvests, sold them at strong market rates, and did so from the same land, using the same techniques, and same inputs as 2021. (RE 241, PageID.13119–20, 13122–24).

That evidence was sufficient to allow the jury to conclude Hello Farms was entitled to its damages award, the measure of which was

simply the contract price less the price for which Hello Farms sold its 2021 harvest in mitigating damages caused by Defendants' breach—even if the law did require Hello Farms to prove its damages in the wake of Defendants' anticipatory breach, which it does not.

## C. The jury was free to reject Defendants' argument that the 2021 harvest was contaminated by pesticides.

Defendants claim it was Hello Farms' burden to prove "that the harvest was not contaminated with pesticides or heavy metals, making the product non-saleable." (Defendants' brief, p 65). Their basis for that supposed burden is that their witness, Mr. Bayern, testified to a belief that Choice Labs had to remediate pesticides in the 2021 harvest—an opinion that was undermined by the fact that none of the six R&D tests failed for pesticides, something Defendants themselves acknowledge. (Defendants' brief, p 66). Defendants claim the jury was required to ignore the testing evidence that contradicted Bayern's opinion on the grounds that tests showed the presence of heavy metals, i.e., they suggest the jury was not permitted to discount one aspect of testing while crediting another. (*Id*.)

Defendants simply do not understand the jury's role relative to that of the District Court. Contrary to Defendants' position, the jury

was not required to accept their argument.  Nor were they required to believe the testimony of Mr. Bayern.[12]

And it would make perfect sense for the jury to discredit that testimony, given its inconsistency with the six R&D tests, *which showed no pesticides*.  The jury also was not required to place any amount of weight on any of the pieces of evidence Defendants discuss.  To the contrary, the jury was free to believe some and not others, and to credit, or not credit, the conflicting evidence that created questions for the jury to resolve.  Defendants come nowhere close to proving there was "no

---

[12] The District Court aptly reasoned, "I have a serious question as to whether [Bayern's] testimony should have been admitted, at all, given that he lacks personal knowledge. But even assuming that it was, I'm satisfied that Mr. Lannen showed me, in reviewing the testimony from Mr. Bayern, the cross-examination, that what Mr. Lannen elicited from Mr. Bayern and, in my view, the jury could have concluded was that Mr. Bayern did not have personal knowledge of this pesticide. . . . . In addition, the six test results, the R&D test results for 2021 that we've talked about, are at least some evidence that, to some extent, contradicts Mr. Bayern's testimony. So when you put the six test results together with the point that was elicited for the jury that he lacked personal knowledge of this pesticide situation, I think the jury could have found that there wasn't a full-blown contamination or full failure to perform that preclude Hello Farms from recovering, as a matter of law, from the 2021 harvest."). See RE 234, PageID.12364, RE 319, PageID.15699.

evidence from which the jury could calculate" damages. *Shivers*, 776

N.W.2d at 675-76.

The Michigan Court of Appeals said it best in a similar context:

> Plaintiff told her story. The defendant told his. The jury was properly instructed. They believed the defendant's version. That's the way the system works. It is not for reviewing courts to assume this fact-finding function.

*Riggs v. Szymanski*, 233 N.W.2d 670, 674 (Mich. Ct. App. 1975).[13]

That correct observation applies with equal force in this case. The

District Court understood this and correctly rejected Defendants'

invitation to substitute its judgment for that of the jury in a fair trial.

This Court should do the same.

---

[13] Similarly, *see Toth v. Yoder Co.,* 749 F.2d 1190, 1194 (6th Cir.1984); *In re Lewis*, 845 F.2d 624, 632 (6th Cir. 1988).

# CONCLUSION

For the reasons set forth herein, Hello Farms requests that this Court affirm the district court's judgment. Hello Farms further requests any and all other relief to which it is entitled.

> Respectfully submitted,
>
> PLUNKETT COONEY
>
> By:   /s/Jeffrey C. Gerish
>       Jeffrey C. Gerish
>       Attorney for Plaintiff-Appellee
>       38505 Woodward Ave, Ste 100
>       Bloomfield Hills, MI 48304
>       (248) 901-4031
>       jgerish@plunkettcooney.com
>
>       and
>
>       STINAR LANNEN, PLLC
>       Patrick Lannen
>       Attorney for Plaintiff-Appellee
>       280 West Maple, Ste 230
>       Birmingham, Michigan 48009
>       (248) 565-2690
>       Patrick@StinarLannenLaw.com

DATED:  February 27, 2026

# CERTIFICATE OF COMPLIANCE

STATE OF MICHIGAN )
                       ) ss.
COUNTY OF OAKLAND )

Jeffrey C. Gerish, being first duly sworn, certifies and states the following:

1. He is an attorney with the firm Plunkett Cooney, and is in principal charge of the above-captioned cause for the purpose of preparing the attached brief on appeal;

2. The brief on appeal prepared by his office complies with the type-volume limitation, using Century Schoolbook size 14 font; and

3. The word processing system counts the number of words in the brief as 12,994.

/s/Jeffrey C. Gerish
Jeffrey C. Gerish

# CERTIFICATE OF SERVICE

Jeffrey C. Gerish, being first duly sworn, deposes and says that he is a Shareholder with the Firm of Plunkett Cooney and that on February 27, 2026, he caused a copy of this document to be served upon all parties of record, and that such service was made electronically upon each counsel of record so registered with the Sixth Circuit Court of Appeals and via U.S. Mail to any counsel not registered to receive electronic copies from the court, by enclosing same in a sealed envelope with first class postage fully prepaid and depositing said envelope and its contents in a receptacle for the U.S. Mail.

/s/Jeffrey C. Gerish
Jeffrey C. Gerish (P51338)
PLUNKETT COONEY
Plaintiff-Appellee
38505 Woodward Avenue
Suite 100
Bloomfield Hills, MI 48304
jgerish@plunkettcooney.com

# ADDENDUM – DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| RECORD ENTRY | DESCRIPTION | PageID # |
|---|---|---|
| 1-1 | Summons and Complaint | 8 - 38 |
| 7 | Answer to Complaint | 82 - 113 |
| 32 | Amended Complaint | 2769 - 2798 |
| 36 | Answer to Amended Complaint | 2804 - 2867 |
| 80 | Defendants' Motion for Summary Judgment | 3678 - 3726 |
| 117 | Order Concerning Supplemental Briefing | 5875 - 5876 |
| 118 | Transcript of Motion for Summary Judgment - May 8, 2024 | 5877 - 5941 |
| 123 | Plaintiff's Summary Judgment Supplement | 5963 - 6052 |
| 128 | Hello Farms' Amended Motion for Summary Judgment | 6105 - 7148 |
| 128-2 | Exhibit 1 – Deposition of Joseph Bayern | 6162 - 6169 |
| 128-3 | Exhibit 2 – Purchase Order Agreement | 6170 - 6179 |
| 128-4 | Exhibit 3 – Amended and Restated Purchase Order Agreement | 6180 - 6190 |
| 128-69 | Exhibit 68 – Deposition of Christopher Ramos | 6717 - 6739 |
| 128-89 | Exhibit 88 – Email Exchange re Invoice #1 | 6919 - 6920 |
| 128-90 | Exhibit 89 – Email Exchange re First Hello Farms Payment Due | 6921 - 6923 |
| 128-96 | Exhibit 95 – Email Exchange re Amended and Restated Purchase Order Agreement | 7011 - 7013 |
| 136 | Defendants' Response to Plaintiff's Summary Judgment Supplement | 7400 - 7448 |

| RECORD ENTRY | DESCRIPTION | PageID # |
|---|---|---|
| 142 | Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment | 7645 - 8137 |
| 142-11 | Exhibit J - Deposition of Joseph Bayern | 8122 - 8128 |
| 147 | Transcript of Motions for Summary Judgment - July 29, 2024 | 8318 - 8385 |
| 229 | Trial Transcript – January 15, 2025, Volume 2-A | 11843 - 11969 |
| 230 | Trial Transcript – January 15, 2025, Volume 2-B | 11753 - 11842 |
| 231 | Trial Transcript – January 16, 2025 | 11970 - 12051 |
| 234 | Trial Transcript – January 17, 2025 | 12323 - 12480 |
| 241 | Trial Transcript – January 24, 2025, Volume 6-A | 13027 - 13196 |
| 247 | Trial Transcript – January 24, 2025, Volume 6-B | 13350 - 13479 |
| 249 | Hello Farms Motion for Judgment Under Rule 50 | 13496 - 13528 |
| 251 | Trial Transcript – January 27, 2025, Volume 7-B | 13535 - 13645 |
| 260 | Trial Transcript – January 28, 2025, Volume 8-A | 13859 - 13960 |
| 277 | Defendants' Renewed Motion for Judgment as a Matter of Law | 15027 - 15202 |
| 284 | Response in Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law | 15261 - 15297 |
| 319 | Transcript of Motion Hearing – July 29, 2025 | 15619 - 15707 |