No. 25-1759

IN THE

# United States Court of Appeals for the Sixth Circuit

HELLO FARMS LICENSING MI, LLC,

*Plaintiff-Appellee*,

v.

GR VENDING MI, LLC, *and* CURA MI, LLC,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Michigan, No. 1:21-cv-10499
(Hon. Matthew F. Leitman)

**PLAINTIFF-APPELLEE'S PETITION FOR REHEARING AND REHEARING EN BANC**

PATRICK LANNEN
STINAR LANNEN, PLLC
280 W. Maple Rd., Ste. 230
Birmingham, MI 48009

NEAL KUMAR KATYAL
*Counsel of Record*
EZRA P. LOUVIS
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellee*

October 8, 2026

## TABLE OF CONTENTS

Page

INTRODUCTION AND RULE 40(b)(2) STATEMENT .......... 1

BACKGROUND .......... 2

REASONS FOR REHEARING AND REHEARING EN BANC .......... 5

I. THE PANEL'S ILLEGALITY-DEFENSE HOLDING CONFLICTS WITH SUPREME COURT PRECEDENT AND DECISIONS OF OTHER CIRCUITS .......... 5

II. THE PANEL SEPARATELY CREATED AN INTER- AND INTRA-CIRCUIT CONFLICT OVER THE APPLICABLE ILLEGALITY-DEFENSE TEST .......... 9

III. THE PANEL DECISION IS WRONG .......... 13

CONCLUSION .......... 17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Bartch v. Barch*,
111 F.4th 1043 (10th Cir. 2024) .......... 8, 11, 12

*Bassidji v. Goe*,
413 F.3d 928 (9th Cir. 2005) .......... 12

*Cont'l Wall Paper Co. v. Louis Voight & Sons Co.*,
212 U.S. 227 (1909) .......... 6

*DHS v. League of Women Voters*,
No. 26A308, 2026 WL 2879700 (U.S. Sep. 25, 2026) .......... 14, 15

*Ellingburg v. United States*,
607 U.S. 163 (2026) .......... 8, 9

*Fid. & Deposit Co. of Md. v. Conner*,
973 F.2d 1236 (5th Cir. 1992) .......... 12

*Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*,
867 F.3d 692 (6th Cir. 2017) .......... 10

*Hurd v. Hodge*,
334 U.S. 24 (1948) .......... 13, 15

*Jackson Purchase Rural Elec. Co-op. Ass'n v. Loc. Union 816, Int'l Bhd of Elec. Workers*,
646 F.2d 264 (6th Cir. 1981) .......... 3, 4, 9, 10

*Kaiser Steel Corp. v. Mullins*,
455 U.S. 72 (1982) .......... 6, 7, 10, 13

*Kelly v. Kosuga*,
358 U.S. 516 (1959) .......... 1, 5, 6, 7, 10, 11

**TABLE OF AUTHORITIES—Continued**

Page(s)

*McMullen v. Hoffman*,
174 U.S. 639 (1899)........................................................................6

*Morrison v. Marsh & McLennan Cos.*,
439 F.3d 295 (6th Cir. 2006)........................................................10

*Muschany v. United States*,
324 U.S. 49 (1945)....................................................................6, 10

*N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co.*,
799 F.2d 265 (7th Cir. 1986)..................................................7, 8, 12

*Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.*,
45 F.4th 542 (1st Cir. 2022)..........................................................14

*Shadis v. Beal*,
685 F.2d 824 (3d Cir. 1982)..........................................................12

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010)..............................................................2, 16, 17

*Twin City Pipe Line v. Harding Glass,*
283 U.S. 353 (1931)...........................................................1, 6, 10, 13

*United States v. Hemani*,
608 U.S. 772 (2026)....................................................................15, 16

*United States v. McIntosh*,
833 F.3d 1163 (9th Cir. 2016).......................................................8, 9

*United States v. Wheat*,
988 F.3d 299 (6th Cir. 2021)............................................................8

*Viereck v. United States*,
318 U.S. 236 (1943)........................................................................11

**TABLE OF AUTHORITIES—Continued**

Page(s)

**STATUTES:**

15 U.S.C. § 1 .......... 6, 11

21 U.S.C. § 841(a)(1) .......... 3

21 U.S.C. § 841 .......... 4, 5

21 U.S.C. § 846 .......... 4, 5, 8

29 U.S.C. § 158(e) .......... 7

Mich. Comp. Laws § 333.27501 .......... 2, 3

Mich. Comp. Laws § 333.27951-67 .......... 2, 3

Rohrabacher-Farr Amendment,
Pub. L. No. 113-235, § 538, 128 Stat. 2130 (Dec. 16, 2014) .......... 4

Rohrabacher-Farr Amendment,
Pub. L. No. 119-74, § 531, 140 Stat. 5 (Jan. 23, 2026) .......... 14

**RULES & REGULATIONS:**

6th Cir. R. 32.1(b) .......... 11

Schedules of Controlled Substances,
91 Fed. Reg. 22,714 (Apr. 28, 2026) .......... 4, 15

**OTHER AUTHORITIES:**

Amul Thapar, *The People's Justice: Clarence Thomas and the Constitutional Stories That Define Him* (2023) .......... 16

Jeffrey S. Sutton, *Who Decides?: States as Laboratories of Constitutional Experimentation* (2021) .......... 15

Restatement (Second) of Contracts § 178 .......... 9, 10

**TABLE OF AUTHORITIES—Continued**

Page(s)

Sam Kamin, *Cooperative Federalism and State Marijuana Regulation*, 85 U. Colo. L. Rev. 1105 (2014) .......... 15

## INTRODUCTION AND RULE 40(b)(2) STATEMENT

The panel wiped out a $31.8 million jury verdict for a licensed medical-marijuana grower, holding the 1970 Controlled Substances Act categorically bars federal-court enforcement of contracts to purchase such goods. That breathtaking rule cannot be squared with contract-law principles or precedent—much less repeated Congressional riders prohibiting interference in state medical-marijuana markets, a decade of executive acquiescence to those laws, and the judgment of a supermajority of states that such conduct is lawful. The consequences of that holding will cause unimaginable instability for the states in this circuit that have legalized marijuana for medical or recreational use. Rehearing is warranted.

Underlying this appeal is the bare breach of a major purchaser's promise to buy Hello Farms's crop. To excuse that breach, the panel relied upon a judicially manufactured doctrine known as the federal-illegality defense. A narrow exception to the "general rule" that parties' voluntary agreements "shall be held valid and enforced in the courts," *Twin City Pipe Line v. Harding Glass,* 283 U.S. 353, 356 (1931), the doctrine applies only where statutes create a policy against enforcing *contracts*—not merely when a "wrongdoer[ ]" has engaged in unlawful acts, *see Kelly v. Kosuga*, 358 U.S. 516, 520 (1959). The panel held that, because the Act could be read to cover activity in marijuana markets, federal policy bars enforcing "agreement[s] to purchase marijuana." A20. Full stop.

Nothing compelled that result. To the contrary, the panel's illegality-defense rule contravenes the Supreme Court precedent that established it. Its method of applying the defense conflicts with decisions of this Court and its sister circuits, which at least required accounting for the Controlled Substances Act's contested status. And the panel's analysis cannot be squared with a rational understanding of federal drug policy—which has long been deferential to lawful state markets. Each of those errors provides a basis for rehearing.

Further, the consequences of the panel's holding make this case a matter of exceptional importance. Left to stand, contracting parties in this circuit risk seeing their bargains unravel as soon as a counter-party removes a suit for breach to federal court. Precedent abjures the enormous incentive for forum-shopping such a rule creates, *e.g.*, *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 415-416 (2010) (plurality op.), not to mention the havoc it would wreak on markets throughout this circuit, which depend on parties dealing fairly and faithfully to properly function. This Court should grant the petition.

**BACKGROUND**

A. At the core of this case is a stark breach of contract. Curaleaf, a purchaser acting through its named-party subsidiaries, agreed to buy two years of marijuana crop from Hello Farms, a grower of medical marijuana licensed in

Michigan, under state law authorizing the production and sale of such products. Mich. Comp. Laws §§333.27501, 333.27951-67.

The parties agreed on a pricing schedule, and Curaleaf accepted one delivery from Hello Farms's 2020 harvest. But Curaleaf refused further shipments when the market price of marijuana fell. A5-6. As a result, Hello Farms cut its losses, selling to another buyer at a lower price. A6.

Hello Farms sued Curaleaf for breach in Michigan state court. A6. Curaleaf removed, and the case proceeded to trial. After two weeks of testimony, a jury found Curaleaf liable for $31.8 million in damages—the maximum available under the contract. A6.

Curaleaf raised an illegality defense at summary judgment and again post-trial. A6. It argued that, despite its voluntary bargain, the contract was unlawful under the Controlled Substances Act (CSA), which makes it a crime to "knowingly or intentionally … manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense" marijuana. 21 U.S.C. § 841(a)(1). Curaleaf thus claimed that the agreement was unenforceable in federal court.

B. The district court rejected Curaleaf's defense. Summary Judgment Hearing Transcript ("SJ Tr."), R.147, PageID#8332-33; Motion Hearing Transcript ("JMOL Tr."), R.319, PageID#15688-94. The court principally relied on the illegality-defense test set out in this Court's precedent. *Id.* (citing *Jackson Purchase*

*Rural Elec. Co-op. Ass'n v. Loc. Union 816, Int'l Bhd. of Elec. Workers*, 646 F.2d 264 (6th Cir. 1981)). The court weighed several factors, including the parties' "expectations" and "the strength of the public policy that the agreement violates." *Jackson Purchase*, 646 F.2d at 267. And it determined all relevant factors favored Hello Farms, especially given Curaleaf's "hypocrisy" and "gamesmanship." SJ Tr., R.147, PageID#8328.

Important, too, were Congress's annual reenactments of a rider preventing the use of federal funds to interfere with state laws regarding the "use, distribution, possession, or cultivation of medical marijuana"—the Rohrabacher-Farr Amendment (RFA), Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217 (Dec. 16, 2014). *See* SJ Tr., R.147, PageID#8326. The court concluded that the RFA reflected a "material policy shift," leaving any federal policy against enforcing the parties' contract "muddled" at best. *Id*.

While this appeal was pending, the Department of Justice issued a final rule rescheduling state-licensed medical marijuana under the CSA to Schedule III, subject to federal approval and registration requirements. Schedules of Controlled Substances, 91 Fed. Reg. 22,714 (Apr. 28, 2026).

C. A panel of this Court reversed. The panel first concluded that the illegality defense applied automatically because the CSA established a policy against contracts that might require activity proscribed by the CSA through performance.

A8-10 (citing, inter alia, 21 U.S.C. §§ 841, 846). To reach that view of federal policy, the panel looked past the RFA. It reasoned that Hello Farms's crop, which was only licensed for medical use, could eventually be put to recreational use by Curaleaf, A8-9,[1] and that the RFA, which covers distribution of medical marijuana, was thus categorically irrelevant. A15-16.

The panel further declined to balance the CSA's policy against the factors listed in *Jackson Purchase*. A13-17. It theorized, but did not hold, that balancing was inconsistent with cases appearing to apply the illegality defense automatically. A14-15. And it stated that balancing would not apply where a contract occasions criminal—as opposed to just civil—penalties. A15-17. The panel explained what that decision meant going forward: "Federal courts can't enforce contract claims founded on an agreement to purchase marijuana illegally." A20.

This petition followed.

## REASONS FOR REHEARING AND REHEARING EN BANC

### I. THE PANEL'S ILLEGALITY-DEFENSE HOLDING CONFLICTS WITH SUPREME COURT PRECEDENT AND DECISIONS OF OTHER CIRCUITS.

The panel's rule is vastly and dangerously overbroad. The Supreme Court has recognized an illegality defense when the parties' contract is the "precise conduct made unlawful" by a federal statute—but nowhere beyond that point. *Kelly*, 358

[1] Judge Hermandorfer did not join this part of the panel opinion.

U.S. at 520. The panel contravenes the limits in that precedent and breaks from the other courts of appeals to apply it.

A. The illegality defense is an exception to the general principle that fair and voluntary contracts are to be enforced in federal courts. *See Twin City,* 283 U.S. at 356. The defense arose in the antitrust context and has allowed parties to void an agreement where enforcement would command "carrying out the terms" of an unlawful restraint of trade. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982) (citation omitted); *see also Cont'l Wall Paper Co. v. Louis Voight & Sons Co*., 212 U.S. 227, 262 (1909) (refusing to permit recovery at price set by "illegal" price-fixing agreement). The defense has long been disfavored, however, because it is "a very dishonest one." *McMullen v. Hoffman*, 174 U.S. 639, 669 (1899). Due to that inequity, the defense was understood to attach "only on account of the public interest," *id*., where "definite indications in the law" require invalidating the contract itself, *Muschany v. United States*, 324 U.S. 49, 66 (1945).

The Court's modern precedents—*Kaiser Steel* and *Kelly*—establish that the defense is "narrow" and tied to the statutory context in which it was recognized. *Kelly*, 358 U.S. at 520. Those cases sustained the defense only where a judgment would make courts "a party" to "the very restraints forbidden by the Sherman Act," *id.*—a statute that expressly bars certain "contract[s]," 15 U.S.C. § 1. The Court has gone "no further." *Kelly*, 358 U.S. at 520. "[P]ast the point where the judgment"

would "enforc[e] the precise conduct made unlawful by the Act," the general pro-contract-enforcement rule applies. *Kaiser Steel*, 455 U.S. at 80 (quoting *Kelly*, 358 U.S. at 520-521). That limitation holds even if the parties are "wrongdoers" in other respects. *Kelly*, 358 U.S. at 520. The Court has applied this reflexive defense under only one law besides the Sherman Act—the National Labor Relations Act—and it, too, barred the very act of contracting itself. *Kaiser Steel*, 455 U.S. at 85; *see* 29 U.S.C. § 158(e) (expressly proscribing certain "contract[s] or agreement[s]").

The panel's holding conflicts with that precedent. The panel held that the illegality defense applied invariably, despite the CSA containing no Sherman-esque bar on contracts and without disputing that a judgment "wouldn't be commanding any party" or the court "to violate the law." A11. The panel instead proposed a new theory: that "fulfill[ing]" the parties' promises to buy and sell marijuana would effectively require unlawful conduct downstream, through drug distribution and the like. A11. But even assuming the CSA could be enforced against such conduct—conduct Congress has repeatedly shielded, *infra* § III—*Kelly* confirms that the parties' status as "wrongdoers" "is not in itself determinative." 358 U.S. at 520. The panel had to identify an on-point limit on contracting itself. It did not. And that square conflict calls for review.

B. The panel's application of the illegality defense also conflicts with the decisions of other circuits. Following precedent, the Seventh Circuit distinguishes

between contracts that are "intrinsically illegal" in the Sherman Act sense, where the defense properly applies, and situations where a party merely "commits unlawful acts to carry out his part of the bargain," where it does not. *N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co.*, 799 F.2d 265, 273 (7th Cir. 1986) (Posner, J.) (citation modified) ("*NIPSCO*"). Others agree, and with respect to the CSA specifically: The panel acknowledged that its approach is inconsistent with a recent Tenth Circuit decision, which refused to automatically apply the illegality defense where "the judgment" did not require parties to "violate the CSA" and instead remanded for further factual development. *Bartch v. Barch*, 111 F.4th 1043, 1062-63 (10th Cir. 2024); *see* A11 (citing *Bartch*).

Until now, the furthest any federal appeals court has gone is to suggest that *Kaiser Steel* might also apply where a contract gives rise to a "criminal conspiracy." *NIPSCO*, 799 F.2d at 272. The panel relied on similar logic, asserting that *Kaiser Steel* controls because the parties may have violated the CSA conspiracy provision, 21 U.S.C. § 846. A10. But this Court has "long held that a buyer-seller agreement alone" cannot trigger that provision. *United States v. Wheat*, 988 F.3d 299, 304 (6th Cir. 2021). There have been no charges of acts necessary to give rise to a conspiracy in this case. Nor would a prosecution have been possible given Congress's anti-enforcement rider. *Cf. United States v. McIntosh*, 833 F.3d 1163, 1177 (9th Cir. 2016). The panel's speculation that prosecutions could reach back in time if the rider

expired "today," A16, ignores both the reality of Congress's judgment and principles underlying the *Ex Post Facto* Clause. *See Ellingburg v. United States*, 607 U.S. 163, 169-170 (2026) (Thomas, J., concurring). Regardless, the panel went on to hold that *Kaiser Steel* applies even "[w]ithout [a] § 846" conspiracy, A10 n.2—a proposition that sweeps away the limits other appellate courts have placed on the illegality-defense doctrine.

## II. The Panel Separately Created An Inter- And Intra-Circuit Conflict Over The Applicable Illegality-Defense Test.

Even assuming the illegality defense applies in some form, the panel erred in a second, significant way. Where a contract judgment does not itself command unlawful action, *see* A11, binding circuit precedent requires "balancing" any policy set out by the CSA against the limited "interest in [its] enforcement" and the parties' "justified expectations." *Jackson Purchase*, 646 F.2d at 267. Yet the panel reversed "without applying a balancing test." A13. That approach creates an intra-circuit conflict and breaks with other circuits, which routinely apply a balancing approach.

A. Start with this Court's precedent. As the panel recognized, *Jackson Purchase* "adopted" a test for illegality defenses premised on an agreement to engage in an allegedly unlawful practice. A13 (citing *Jackson Purchase*, 646 F.2d at 267). Under that test, illegality operates as a "presumption" that an agreement "will not be sanctioned by the courts," which can be overcome if "the denial of relief is disproportionately inequitable." 646 F.2d at 267. *Jackson Purchase* accordingly

directs courts to balance several factors, including the parties' "justified expectations," any resulting "forfeiture," and "the likelihood that refusal to enforce [the agreement] will further" the policy it violates. *Id*. (citing Restatement (Second) of Contracts § 178). While illegality cases are few and far between, this Court has continued to recognize *Jackson Purchase* as providing the relevant rule. *See Morrison v. Marsh & McLennan Cos.*, 439 F.3d 295, 300 (6th Cir. 2006).

But the panel refused to apply that precedent, and its reasons for doing so lack merit. The panel first speculated—but did not "definitively" hold—that *Jackson Purchase* was inconsistent with *Kaiser Steel* because *Kaiser Steel*, and this Court at times, have addressed the defense without "gestur[ing] toward equitable balancing." A13-14. That the panel stopped short of a holding is a tell: Nothing in *Kaiser Steel* places balancing off-limits. In fact, other cases expressly consider factors set out in *Jackson Purchase*, including concerns about forfeiture. *Kelly*, 358 U.S. at 520-521; *Muschany*, 324 U.S. at 66; *see also Twin City*, 283 U.S. at 356 (explaining there is "no fixed rule" for discerning public policy). To the extent *Kaiser Steel could* displace balancing, it would do so only in the context that case considered: where the agreement was itself forbidden by statute, *see Kaiser Steel*, 455 U.S. at 80—a circumstance that does not arise here.[2]

---

[2] Indeed, one case cited by the panel refused to apply the defense as a threshold matter for this reason. *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 701-702 (6th Cir. 2017); A15.

The panel's next rationale fares little better. It held that balancing covered only circumstances that were "unlawful but not criminal," A15, because *Jackson Purchase* noted that a criminal penalty for willful violations did not apply in that case. Apart from that factual observation, the panel pointed to nothing that supports narrowing precedent in that way. That is unsurprising. The Supreme Court has declined to sustain an illegality defense even where a transaction "furnished the occasion for a restrictive agreement" barred by Section 1 of the Sherman Act, *Kelly*, 358 U.S. at 521—which expressly provides that signatories to such an agreement are "guilty of a felony," 15 U.S.C. § 1. That goes well beyond even this case, where Congress has prevented imposition of the penalties necessary to make sales by licensed medical-marijuana growers a crime in the first place. *See Viereck v. United States*, 318 U.S. 236, 241 (1943). That an applicable federal policy contains criminal restrictions covering the parties' conduct is therefore not enough for the illegality defense to apply automatically.

With that reasoning put aside, the panel was bound to apply precedent. 6th Cir. R. 32.1(b). To the extent members of this Court are inclined to revisit that precedent, that is yet another reason to grant rehearing.

B. The panel's approach also breaks with the decisions of other circuits. The Tenth Circuit in *Bartch* recently directed courts to apply a "balancing" analysis in another illegality-defense case premised on a claim that a contract would

"effectively require" parties to "violate the CSA." 111 F.4th at 1062-63 & n.23. The court rejected the suggestion that *Kaiser Steel* required a different approach and recognized that case "would leave room" for balancing at least where "relief would not directly order unlawful conduct." *Id.* at 1063 n.23. And it did so despite the same "criminal penalties" the panel found decisive here. *Compare id.* at 1062-63 & n.23, *with* A15-17. The Seventh Circuit has applied an analogous approach post-*Kaiser Steel*—and even cited *Jackson Purchase* for the proposition that the defense "requires" "a comparison of the pros and cons of enforcement." *NIPSCO*, 799 F.2d at 273.

Other circuits are in accord. *See Bassidji v. Goe*, 413 F.3d 928, 936-937, 939 (9th Cir. 2005) (finding "considerable room for … balancing" post-*Kaiser Steel* and applying such an approach); *Fid. & Deposit Co. of Md. v. Conner*, 973 F.2d 1236, 1241 & n.12 (5th Cir. 1992) (recognizing *Jackson Purchase* as the test for the public policy defense); *Shadis v. Beal*, 685 F.2d 824, 833 (3d Cir. 1982) (citing *Jackson Purchase* and applying balancing test).

C. Had the panel taken the correct approach, this case would not have been close. As the district court explained, SJ Tr., R.147, PageID#8330-32, every factor courts customarily balance favors Hello Farms: The parties expected the contract to be enforced; the "strength" of any contrary policy in the CSA is severely diminished by Congress's repeated RFA enactments and the April 2026 rescheduling; the parties

engaged in transactions authorized by state law, not any serious misconduct; and, as the panel candidly recognized, nonenforcement would be a "windfall" for Curaleaf, A20. Those factors should have been decisive here. The panel's decision not to consider them warrants review.

## III. The Panel Decision Is Wrong.

Finally, the panel's policy conclusion is wrong on its own terms. Correctly construed, there is no federal policy against enforcing contracts in lawful state medical-marijuana markets. A20. While the panel fixated on the CSA, a clear-eyed view of federal law demonstrates that federal policy shields these very transactions. The panel's myopic conclusion will have exceptionally severe consequences for states, businesses, and consumers in this circuit that alone merit review.

A. The panel reasoned that the CSA, in a vacuum, "gave us our policy." A18. Because the 1970 CSA "made the growth, distribution, and possession of marijuana a crime," the panel brushed everything else aside. A2. But no precedent has treated a single criminal prohibition as the sum total of federal policy for purposes of the federal-illegality defense. To the contrary, the Supreme Court has measured private agreements against "the public policy of the United States as manifested in federal *statutes*"—plural, *Kaiser Steel*, 455 U.S. at 84 (emphasis added) (citation modified)—as well as "applicable legal precedents," *Hurd v. Hodge*, 334 U.S. 24, 35 (1948); *accord Twin City*, 283 U.S. at 357.

The CSA was not Congress's only word on marijuana. Every year since 2014, Congress has enacted the RFA, which bars the Department of Justice from using federal funds to prevent states from implementing "laws that authorize the use, distribution, possession, or cultivation of medical marijuana." *E.g.*, Pub. L. No. 119-74, § 531, 140 Stat. 5, 57 (Jan. 23, 2026). The RFA necessarily "acknowledge[s] the existence of a market in medical marijuana" that is "free from federal criminal enforcement and thus subject only to state regulation." *Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542, 553-554 (1st Cir. 2022).

Those repeated enactments refute the panel's holding. Indeed, the Supreme Court recently held that an analogous statute "prohibiting interference" with certain DHS functions "necessarily authorized" those functions. *DHS v. League of Women Voters*, No. 26A308, 2026 WL 2879700, at *2 (U.S. Sep. 25, 2026). Any distinction "between laws and those tasked with enforcing them," the Court explained, is "illusory." *Id.* at *2 n.1. So too here. The RFA necessarily authorizes state medical-marijuana regimes and reflects a federal policy of accommodating, not condemning, the very transactions the panel refused to enforce.

B. The panel sidestepped the RFA by interpreting the contract to reach medical *and* recreational marijuana. A8-9. That too was error. Hello Farms held only medical licenses when it contracted. Trial Tr., R.229, PageID#11818. And undisputed evidence confirmed that the only way for Curaleaf to sell any crop for

recreational use would be to "convert" the product in a separate event from medical to recreational, independent of Hello Farms and outside the terms of the contract. *See* Trial Tr., R.231, PageID#12018. Regardless, the panel's rationale would at most support the illegality of *Curaleaf's* potential dealings; none of it suggests that the contract is categorically unenforceable.

Authorities from the other two branches confirm the common-sense reality of federal marijuana policy. The Supreme Court—whose precedents inform "public policy," *Hurd*, 334 U.S. at 34-35—recognized that "most States" have "legaliz[ed] marijuana use," and that "the federal government … helped fuel" this trend, *United States v. Hemani*, 608 U.S. 772, 793 (2026). And the DOJ—"tasked with enforcing" the CSA, *League of Women Voters*, 2026 WL 2879700, at *2 n.1—recently explained that "cooperative federalism" does not detract from but "serves the statutory purposes of the CSA" in the context of a regulated medical-marijuana market. 91 Fed. Reg. at 22,720.

The panel thus erred in fixating on the fact that Congress has not affirmatively legalized medical marijuana. A18. The entire point of the RFA is to leave the issue to the states—something a blanket legalization statute could not accomplish. *See* Sam Kamin, *Cooperative Federalism and State Marijuana Regulation*, 85 U. Colo. L. Rev. 1105, 1112 (2014); *cf.* Jeffrey S. Sutton, *Who Decides?: States as Laboratories of Constitutional Experimentation* 8-9 (2021). Some states may prefer

enforcement of the CSA, and others may not. Michigan made the latter choice. And that choice confirms what the parties expected when they originally put pen to paper: that federal policy would not bar their agreement.

C. The consequences of the panel's blinkered view of federal marijuana policy are impossible to ignore. The marijuana farms, distributors, and retailers that compose the "multi-billion-dollar marijuana business," *Hemani*, 608 U.S. at 807 (Alito, J., concurring in the judgment), order their affairs in reliance on the expectation that the judicial system will honor and enforce their agreements.

The panel decision gravely threatens these markets. For one, the decision hands any diverse party to a contract to buy or sell marijuana a free "heads I win, tails you lose" option: remove to federal court and walk away from the bargain. The resulting incentive for forum-shopping "is unacceptable when it comes as the consequence of judge-made rules," *cf. Shady Grove*, 559 U.S. at 415-416 (plurality op.), and looms as a chilling specter for producers and consumers in this circuit.

Nor is the blast radius of the panel decision limited to industry players. Indeed, it threatens to harm consumers, including patients who depend upon access to medical marijuana for relief from chronic pain and other debilitating conditions. *Cf.* Amul Thapar, *The People's Justice: Clarence Thomas and the Constitutional Stories That Define Him* 67-69 (2023) (describing marijuana's palliative effect on Angel Raich's debilitating pain). State-regulated markets are subject to

comprehensive regulation that both displaces illicit activity and protects consumers from contaminated or adulterated products. But where Congress has given state regulatory regimes its stamp of approval, the panel thrusts states back in the direction of the unregulated black market those regimes were built to displace.

Those consequences call out for review.

**CONCLUSION**

This Court should grant rehearing or rehearing en banc.

Dated: October 8, 2026

Respectfully submitted,

*/s/ Neal Kumar Katyal*

NEAL KUMAR KATYAL
EZRA P. LOUVIS
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

PATRICK LANNEN
STINAR LANNEN, PLLC
280 W. Maple Rd., Ste. 230
Birmingham, MI 48009

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

I certify that this petition complies with the type-volume limitations of Fed. R. App. P. 40(d)(3)(A) because it contains 3,848 words, excluding the items exempted by Fed. R. App. P. 32(f).

I further certify that this petition complies with the typeface and type-style requirements of Fed. R. App. P. 32(c)(2) because it has been prepared using Microsoft Office Word for Office 365 in 14-point Times New Roman font.

Dated: October 8, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on October 8, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 8, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

**ADDENDUM**

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0260p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

HELLO FARMS LICENSING MI, LLC,
*Plaintiff-Appellee*,

*v*.

GR VENDING MI, LLC; CURA MI, LLC,
*Defendants-Appellants*.

No. 25-1759

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:21-cv-10499—Matthew F. Leitman, District Judge.

Argued: June 2, 2026

Decided and Filed: September 10, 2026

Before: SILER, NALBANDIAN, and HERMANDORFER, Circuit Judges.

---

## COUNSEL

**ARGUED:** Andrianna D. Kastanek, JENNER & BLOCK LLP, Chicago, Illinois, for Appellants. Patrick Lannen, STINAR LANNEN, PLLC, Birmingham, Michigan, for Appellee. **ON BRIEF:** Andrianna D. Kastanek, Simon A. de Carvalho, JENNER & BLOCK LLP, Chicago, Illinois, William B. Berndt, HONIGMAN LLP, Chicago, Illinois, for Appellants. Patrick Lannen, STINAR LANNEN, PLLC, Birmingham, Michigan, Jeffrey C. Gerish, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellee.

NALBANDIAN, J., delivered the opinion of the court in which SILER, J., concurred, and HERMANDORFER, J., concurred in all but Part II.A.1.

Case: 25-1759 Document: 43-2 Filed: 10/08/2026 Page: 2



## OPINION

NALBANDIAN, Circuit Judge. Hello Farms, a Michigan marijuana grower, entered a contract to supply marijuana to Defendants GR Vending and CURA MI. When GR Vending breached, Hello Farms sued. And a jury awarded Hello Farms $31.8 million. Defendants argue that because the contract was illegal under federal law, the district court erred by not granting them judgment as a matter of law on their illegality defense.

When the parties contracted, federal law made the growth, distribution, and possession of marijuana a crime. Michigan, like many other states, made it a business. But despite the legalization of marijuana in Michigan, federal courts cannot enforce agreements to commit federal crimes. We reverse.

### I.

### A.

Congress enacted the Controlled Substances Act (CSA) in 1970. *See* 21 U.S.C. § 801 *et seq.* The CSA categorizes controlled substances into five schedules, with Schedule I substances receiving that classification based on a determination that they have a high potential for abuse, no currently accepted medical use in the United States, and a lack of accepted safety for use under medical supervision. *Id.* § 812(b)(1). By contrast, substances in Schedule III, for instance, receive that classification because they have a currently accepted medical use and a lower risk for abuse and dependency. *Id.* § 812(b)(3).

When enacted, the CSA classified marijuana as a Schedule I controlled substance, *id.* § 812(c), making it "contraband for *any* purpose," *Gonzales v. Raich*, 545 U.S. 1, 27 (2005). And as contraband, trafficking marijuana is a felony: It's unlawful to "knowingly or intentionally . . . manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense" marijuana, except as authorized by the CSA (like for government-approved studies). 21 U.S.C. § 841(a); *see Raich*, 545 U.S. at 13. For an individual's first

offense, prison terms range from up to five years for quantities less than 50 kilograms of marijuana, to ten years to life for quantities over 1,000 kilograms (or more than 1,000 marijuana plants). 21 U.S.C. § 841(b)(1)(A), (D). Fines for offenses involving less than 50 kilograms can reach up to $250,000 for an individual and $1 million for non-individual defendants. *Id.* § 841(b)(1)(D). Offenses involving over 1,000 kilograms can result in fines of up to $10 million for an individual, and $50 million for non-individual defendants. *Id.* § 841(b)(1)(A). And those figures aren't ceilings: The CSA authorizes the greater of the listed amount or a fine allowed under Title 18, which may reach twice the gross gain or loss from the offense. *Id.*; *see* 18 U.S.C. § 3571(d). Simple possession and attempts or conspiracies to violate the CSA are crimes as well. 21 U.S.C. §§ 844(a), 846; *see United States v. Shabani*, 513 U.S. 10, 11 (1994) (holding that conspiracy under § 846 doesn't have an overt-act requirement).

But in 2014, Congress passed an appropriations rider known as the Rohrabacher-Farr Amendment (RFA). The RFA provided that "[n]one of the funds made available in this Act to the Department of Justice may be used, with respect to the [32 states and D.C.] . . . [including] Michigan . . . to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of *medical* marijuana." Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217 (Dec. 16, 2014) (emphasis added). According to the circuits that have interpreted the RFA, the rider bars the DOJ from spending funds appropriated by the act to prosecute offenses involving state-legal medical marijuana where the underlying conduct complied with state law. *See, e.g.*, *United States v. McIntosh*, 833 F.3d 1163, 1177 (9th Cir. 2016).[1]

[1]The Ninth Circuit in *McIntosh* was the first appellate court to address the RFA's effect on federal prosecutions. It concluded that defendants may enjoin a marijuana prosecution "*only if* they 'strictly compl[ied]'" with state medical-marijuana laws. *United States v. Pisarski*, 965 F.3d 738, 741 (9th Cir. 2020) (quoting *McIntosh*, 833 F.3d at 1178). That's because the federal government "prevent[s] the state from giving practical effect" to its medical-marijuana laws with such prosecutions. *McIntosh*, 833 F.3d at 1176–77. And the First and Tenth Circuits have interpreted the RFA similarly, though they didn't embrace the strict-compliance standard. *United States v. Stacy*, 156 F.4th 994, 1012 (10th Cir. 2025) ("[W]e conclude that the rider bars the prosecutions of private individuals who comply with state medical-marijuana laws."); *United States v. Bilodeau*, 24 F.4th 705, 714–15 (1st Cir. 2022) (rejecting the strict-compliance approach but declining to define precisely the degree of compliance required). All three circuits placed the burden on defendants to prove their compliance with state law. *See Stacy*, 156 F.4th at 1014; *United States v. Sirois*, 119 F.4th 143, 152 (1st Cir. 2024); *Pisarski*, 965 F.3d at 742.

Until recently, that's been the federal landscape. Each year since 2014, Congress has reenacted the RFA using substantially the same language. *United States v. Trevino*, 7 F.4th 414, 420 n.3 (6th Cir. 2021); *see, e.g.*, Pub. L. No. 119-74, § 531, 140 Stat. 5, 57 (Jan. 23, 2026). And marijuana stayed a Schedule I substance—contraband for all purposes. But in April 2026, the landscape changed. While this appeal was pending, the U.S. Department of Justice issued a final rule rescheduling FDA-approved marijuana products and marijuana covered by a state medical license to Schedule III. *See* 91 Fed. Reg. 22714–23 (Apr. 28, 2026). Despite the rescheduling, state-licensed marijuana businesses must receive FDA approval before introducing marijuana products into interstate commerce, and they must register with the DEA to lawfully grow or distribute marijuana for medical use. *See id.* at 22719–20.

Shifting to state law, Michigan, like other states, has charted its own path by legalizing marijuana for medical and recreational use. In 2008, it legalized certain medical uses of marijuana. *See* Mich. Comp. Laws §§ 333.26421–30. And by 2018, it had enacted a robust regulatory framework for the legal cultivation, distribution, and possession of marijuana for medical and adult recreational use. *See generally id.* §§ 333.27101–801, 333.27951–67. As part of its framework, Michigan requires regulated marijuana products to be tested for contaminants and tetrahydrocannabinol (THC), the main psychoactive compound in marijuana, regardless of the marijuana's medical or recreational purpose. *See, e.g.*, *id.* §§ 333.27505, 333.27958.

Michigan also issues licenses authorizing the holder to grow and distribute marijuana within either the medical- or recreational-use markets. On the growing side, a medical grower's license allows the licensee to cultivate marijuana and sell only to other licensed medical entities, like processors, other growers, or provisioning centers. *Id.* § 333.27501. And a recreational grower's license allows the licensee to sell marijuana to businesses with recreational licenses. *See id.* § 333.27953(m). Both types of growing licenses come with limits on how many marijuana plants can be grown under a single license, so a business can acquire multiple licenses to increase its allowed yield. *See id.* §§ 333.27501(1), 333.27959(2). On the consumer-facing

---

We, on the other hand, have yet to interpret the RFA's effect on federal prosecutions. *See United States v. Trevino*, 7 F.4th 414, 422 (6th Cir. 2021) (assuming without deciding that the RFA "is as robust as the Ninth Circuit suggested in *McIntosh*"). And we have no occasion to do so here.

side, as one example, a provisioning-center medical licensee can sell only to registered qualifying patients or their caregivers. *Id.* § 333.27504. And a recreational-retailer license allows a business to sell marijuana for recreational use to consumers who are at least 21 years old. *See id.* § 333.27953(q). Finally, a business holding medical and recreational licenses of an equivalent type—for instance, a provisioning-center medical license and a recreational-retailer license—can transfer its product between its medical and recreational inventories. *See id.* § 333.27903; Mich. Admin. Code r. 420.214.

**B.**

With that backdrop in mind, we turn to the contract here. In November 2020, Defendants GR Vending and CURA MI, both subsidiaries of Curaleaf Holdings, Inc., entered an outputs contract for Hello Farms's marijuana: GR Vending agreed to buy all the marijuana grown by Hello Farms in its 2020 and 2021 harvests. At that time, Hello Farms was licensed by Michigan to grow only medical marijuana. And GR Vending held Michigan licenses to operate as a provisioning center and retailer—in other words, to sell marijuana for medical and recreational use. CURA MI acted as GR Vending's guarantor.

The contract noted the parties' expectation that Hello Farms would produce 12,000 to 15,000 pounds of marijuana (or 6,000 plants) in its 2020 harvest. GR Vending also agreed to pay Hello Farms $2.2 million as a deposit that was subject to refund under certain conditions. One such condition required Hello Farms's marijuana to "pass[] local and state *recreational* cannabis testing requirements." R.128-4, Agreement, PageID 6181 (emphasis added). Hello Farms agreed to test every 50-pound batch of marijuana for THC potency and contaminants, like heavy metals and pesticides. And whenever any 10 to 20 batches passed testing, Hello Farms would tell GR Vending, and GR Vending would buy that part of the harvest. If any 50-pound batch didn't pass testing requirements, GR Vending could reject the batch or renegotiate the price. And if enough batches failed, GR Vending could end the contract.

Hello Farms's 2020 harvest yielded around 16,300 pounds of marijuana, all of which passed the contractually required testing. GR Vending paid the deposit and accepted the first shipment of around 2,000 pounds. But by January 2021, the price of marijuana was in freefall.

So GR Vending refused to accept any more deliveries from Hello Farms. In response, Hello Farms sold the rest of its 2020 harvest to a third party at lower prices. And for its 2021 harvest, it expanded its arable land from 7 to 25 acres and acquired recreational growing licenses. This enabled Hello Farms to produce around 37,500 pounds in 2021, which it sold to the same third party, again at lower prices than it would've received from GR Vending.

**C.**

In February 2021, Hello Farms sued Defendants for breach of contract in Michigan state court to recover lost profits from Defendants' breach. Defendants removed to federal court based on diversity jurisdiction, asserted counterclaims, and raised an illegality defense based on the federal illegality of marijuana. After discovery, the parties cross-moved for summary judgment. The district court denied Defendants' summary-judgment motion and rejected their illegality defense, and the case went to trial.

The jury found Defendants liable for breaching the contract and awarded Hello Farms \$31.8 million. Then Defendants renewed their motion for judgment as a matter of law and, alternatively, moved for a new trial. Again, Defendants argued that the district court couldn't enforce the contract because marijuana is federally illegal. And again, though describing it as a close call, the court rejected that defense. It held the contract enforceable for two reasons: The contract was a medical-marijuana contract, and the RFA reflects a federal policy that tolerates medical-marijuana markets in states where they are legal.

Defendants appeal the district court's post-trial denial of their motions for judgment as a matter of law and a new trial. They raise three issues. First, they argue that Hello Farms can't recover from the breach because marijuana is federally illegal. Second, they argue that, even if the contract is enforceable in part, the federal illegality of marijuana prevents Hello Farms from collecting damages that arise from its 2021 sale of recreational-use marijuana. And third, they argue that Hello Farms didn't present enough evidence to justify the \$31.8 million jury award. Because we agree with Defendants on the first issue, and because that issue resolves this appeal, we don't address the other two issues.

## II.

Defendants argue that the district court erred by rejecting their illegality defense. In Defendants' view, Hello Farms's breach-of-contract claim fails as a matter of law because federal courts can't enforce federally illegal agreements. We review de novo the district court's denial of Defendants' renewed Rule 50 motion for judgment as a matter of law. *Balsley v. LFP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012). And though we generally apply state substantive law in diversity cases, "the effect of illegality under a federal statute is a matter of federal law, even in diversity actions in the federal courts after [*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)]." *Kelly v. Kosuga*, 358 U.S. 516, 519 (1959) (citation omitted) (evaluating whether a violation of the Sherman Act made a contract unenforceable in a diversity case); *see Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 173, 176–77 (1942); *Associated Press v. Taft-Ingalls Corp.*, 340 F.2d 753, 769 (6th Cir. 1965).

"[A] federal court has a duty to determine whether a contract violates federal law before enforcing it." *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83 (1982). This duty has a long pedigree. *See, e.g.*, *McMullen v. Hoffman*, 174 U.S. 639, 669–70 (1899); *Holman v. Johnson*, 98 Eng. Rep. 1120, 1121 (K.B. 1775) ("No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act."). And it exists because "[t]he power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in federal statutes." *Kaiser Steel*, 455 U.S. at 83–84 (citation modified). Though "the term 'public policy' is vague," federal courts don't ascertain federal policy from "general considerations of supposed public interests." *FDIC v. Aetna Cas. & Sur. Co.*, 903 F.2d 1073, 1077 (6th Cir. 1990) (quoting *Muschany v. United States*, 324 U.S. 49, 66 (1945)). Rather than engaging in a nose-in-the-air, freewheeling venture, we limit our inquiry to "explicit" and "well defined" federal policies announced by "laws and legal precedents." *Id.* (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43 (1987)).

So when enforcing a judgment in a breach-of-contract action "would itself be enforcing the precise conduct made unlawful" by explicit and well-defined federal law, *Kelly*, 358 U.S. at

520, federal courts have "the obligation . . . to refrain from such exertions of judicial power," *Kaiser Steel*, 455 U.S. at 84 (citation modified). And, specifically, when a party's claim to damages is founded on an illegal agreement, we can't permit recovery. *See, e.g.*, *id.* at 77–79; *Cont'l Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 262 (1909); *McMullen*, 174 U.S. at 669. We leave the parties as we find them. *McMullen*, 174 U.S. at 670.

Because the reason that we won't enforce these agreements is to avoid enforcing the precise conduct that is unlawful, we distinguish between cases where a party tries to enforce a legal agreement despite an illegal provision contained within the parties' broader bargain, and cases where the agreement a party wants to enforce is itself illegal. *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 699 (6th Cir. 2017). In the former case, federal courts can enforce the legal agreement, at least where it's "an intelligible economic transaction" separate from the individual promises tainted by illegality. *Kelly*, 358 U.S. at 521 (enforcing the defendant's promise to purchase onions from the plaintiff even though the parties had also agreed to withhold onions from the market, likely a violation of the Sherman Act). And in the latter case, the agreement is unenforceable. *See Kaiser Steel*, 455 U.S. at 81–82; *Hemlock*, 867 F.3d at 699.

**A.**

**1.**

To apply those principles here, we must first assess the bargain that Hello Farms seeks to enforce. In simple terms, Hello Farms promised to distribute all its marijuana to GR Vending. GR Vending promised to pay for it. And because GR Vending didn't pay, Hello Farms took it to court. But the parties dispute how we should classify the marijuana, because whether the RFA—which applies only to medical marijuana—is a relevant federal policy depends on that classification. Hello Farms says that the contract was limited to medical-use marijuana; Defendants say that the contract included recreational-use marijuana.

We agree with Defendants' position. Nothing in the contract limited the transaction to the medical-marijuana market. In fact, the contract required that Hello Farms's marijuana meet "local and state recreational cannabis testing requirements." R.128-4, PageID 6181. This

requirement reveals that the parties didn't limit their transaction to medical marijuana. And because GR Vending held medical and recreational licenses, under Michigan law it could introduce the marijuana it purchased from Hello Farms into the recreational market. *See* Mich. Admin. Code r. 420.214. So in other words, Hello Farms was supplying Michigan's medical- and recreational-marijuana markets.

Arguing that we should view the contract as limited to medical-use marijuana, Hello Farms relies on the fact that it held only medical growing licenses when entering the contract. So under Michigan law, Hello Farms could sell only to entities with medical licenses. *See* Mich. Comp. Laws § 333.27501. But this argument confuses the licensing needed to make the transaction legal under state law with the markets that GR Vending could legally serve under state law. And it ignores the fact that GR Vending held medical and recreational licenses. Michigan law allows a medical grower to sell to a buyer holding medical licenses alongside recreational ones, and it allows medical-to-recreational inventory transfers. *See id.* § 333.27903; Mich. Admin. Code r. 420.214. So Hello Farms's possession of only medical licenses when entering the contract doesn't mean the transaction was limited to the medical-marijuana market.

What's more, Hello Farms has no retort to the recreational-testing provision. In fact, it can't point to any provision in the contract that could be read as limiting the transaction to the medical-marijuana market.

Because the contract wasn't limited to medical-use marijuana, the analysis is straightforward. The RFA and the April 2026 rescheduling apply only to medical marijuana, so they don't influence our evaluation of federal policy here. *See* 91 Fed. Reg. 22714–15; *e.g.*, *Canna Provisions, Inc. v. Bondi*, 138 F.4th 602, 608 (1st Cir. 2025). Federal policy against recreational marijuana, as reflected in the CSA, is explicit and well-defined. *See Aetna Cas. & Sur. Co.*, 903 F.2d at 1077. On the face of the contract, the parties promised to commit felonies. *See* 21 U.S.C. § 841(b). Hello Farms's cause of action seeks to enforce its claim to lost profits from the parties' felonious agreement. Its claim isn't founded on a legal agreement separate from an illegal one. *See Kaiser Steel*, 455 U.S. at 82. Nor is the illegality incidental to an otherwise legal agreement, like when "a party to a lawful contract . . . commits unlawful acts to

carry out his part of the bargain." *N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co.*, 799 F.2d 265, 273 (7th Cir. 1986). So ordering Defendants to pay Hello Farms would enforce the parties' agreement to engage in "an illegal undertaking under the federal statutes." *Kaiser Steel*, 455 U.S. at 79. That we cannot do. *Id.* at 77.

**2.**

Hello Farms contends that whatever the scope of its contract, we wouldn't be enforcing the precise conduct made illegal by the CSA because the transaction at issue "was an agreement merely to *sell* marijuana by Hello Farms to Defendants." Appellee Br. at 55. So in Hello Farms's view, the contract didn't involve an agreement to violate the CSA. But this assertion ignores the obvious. The parties' agreement was itself illegal. *See* 21 U.S.C. § 846.[2] And that's enough.

We can continue, though. To perform the contract, Hello Farms had to possess the marijuana with the intent of distributing it to GR Vending—a crime. *See id.* § 841(a)(1). It then had to distribute the marijuana to GR Vending—another crime. *See id.* And GR Vending would then possess the marijuana with the intent of distributing it or dispensing it to consumers—yet another crime. *See id.* § 802(10)–(11) (defining "distribute" and "dispense"). Simply put, the agreement was founded on each party's promise to commit crimes. Enforcing the agreement would enforce the precise conduct that the CSA criminalized. *See Kaiser Steel*, 455 U.S. at 77, 84.

---

[2]Hello Farms contends that, under *United States v. Wheat*, 988 F.3d 299 (6th Cir. 2021), a buyer-seller agreement doesn't establish a drug-distribution conspiracy under 21 U.S.C. § 846. *See id.* at 304. But that's too broad of a statement. *Wheat*, which involved a defendant giving a prospective buyer a free .3-gram sample of heroin, rejected turning every exchange of drugs for the buyer's personal use into a drug-distribution conspiracy. *Id.* at 304, 307. But "if a buyer makes repeated purchases of large quantities of drugs from a seller, . . . these purchases allow a jury to conclude that the buyer and seller have reached a tacit agreement for the buyer to resell the drugs to downstream customers." *Id.* at 308 (citation modified). GR Vending didn't purchase Hello Farms's marijuana for personal use. And GR Vending agreed to repeated purchases of 500 to 1,000 pounds of marijuana.

Even so, concluding that the parties violated § 846 isn't necessary to our holding. Without § 846, enforcing Hello Farms's claim for damages would still be enforcing the parties' agreement to violate § 841, even if they didn't share the same criminal objective.

Nor do we accept Hello Farms's suggestion that we can enforce its claim to lost profits because we wouldn't be commanding any party to violate the law—we'd just be transferring money. Some courts have proposed this as well. *See Bartch v. Barch*, 111 F.4th 1043, 1063 n.23 (10th Cir. 2024); *Polk v. Gontmakher*, 2019 WL 4058970, at *2 (W.D. Wash. Aug. 28, 2019) (citing *Bassidji v. Goe*, 413 F.3d 928 (9th Cir. 2005)). But the "long established" rule is that "a court will not lend its aid, in any way, to a party seeking to realize the fruits" of an illegal agreement. *Cont'l Wall Paper Co.*, 212 U.S. at 262; *see also Associated Press*, 340 F.2d at 759 ("A party to an illegal bargain cannot recover damages for breach thereof." (citation modified)). The illegality defense isn't limited to cases where the plaintiff seeks a judgment that commands an unlawful act.[3] We must not enforce illegal conduct, not just refrain from commanding illegal conduct. We look to the agreement the plaintiff wants to enforce: GR Vending was obligated to pay Hello Farms only if Hello Farms fulfilled its obligation to give GR Vending marijuana. So by enforcing Hello Farms's claim to lost profits, we'd be enforcing the performance Hello Farms expected to be paid for—distributing an illegal drug. And if the shoe were on the other foot, the result would be the same. If Hello Farms had breached its promise to distribute marijuana to GR

[3]Both *Kaiser Steel* and *Continental Wall Paper*, for example, are premised on this unsurprising proposition—that a transfer of money, which might be innocuous in and of itself, can be tainted by illegality. Federal courts can't award lost profits from an illicit deal gone wrong just because transferring money is, by itself, not illegal. In *Kaiser Steel*, the plaintiff sued the defendant to enforce the latter's promise to contribute to a union welfare fund. 455 U.S. at 76. Though the defendant's contribution to the fund would, by itself, be legal, the Supreme Court held that it couldn't enforce the agreement (assuming it was illegal) by ordering the defendant to contribute because the defendant's promise "arose from and was measured by" the illegal agreement to penalize the defendant for doing business with certain employers. *Id.* at 78–79. And nowhere does *Kaiser Steel* suggest that the result would be different if the plaintiffs had crafted their request for relief as damages rather than specific performance. *Continental Wall Paper* rests on the same logic. The plaintiff's sale of wallpaper to the defendant was itself lawful, and it had been completed. *Cont'l Wall Paper Co.*, 212 U.S. at 252–53. Yet the Supreme Court refused to enter judgment for the unpaid balance because giving judgment for the excessive, combination-fixed purchase price would enforce the fixed prices, which is what the Sherman Act forbade. *Id.* at 266–67.

Hello Farms's claim to lost profits arises from and is measured by GR Vending's promise to purchase an illegal drug. Crafting a distinction between GR Vending's illegal promise to pay and a (supposedly innocuous) judgment ordering GR Vending to pay now is untenable. *See Kaiser Steel*, 455 U.S. at 81 n.6 ("[I]f a promise is illegal at its inception and cannot be enforced during the term of the contract, it does not spring to life and become enforceable when the contract expires . . . . The suit is still a suit on a presumptively illegal undertaking.").

Vending and GR Vending sued for monetary damages, Hello Farms's illegality defense would succeed.[4]

And finally, Hello Farms relies on *Kelly*, noting the "overriding general policy" of enforcing contracts to "prevent[] people from getting other people's property for nothing when they purport to be buying it." *Kelly*, 358 U.S. at 520–21 (quoting *Cont'l Wall Paper*, 212 U.S. at 271 (Holmes, J., dissenting)). It is, of course, the general policy of federal courts to enforce contracts, and we don't invalidate them lightly. *See Muschany*, 324 U.S. at 66. That's why *Kelly* enforced the "*lawful* sale" of onions. *Kelly*, 358 U.S. at 521 (emphasis added). And that's why we refrain from enforcing contracts only in special circumstances—when enforcing the agreement would enforce the precise conduct made unlawful by explicit and well-defined federal policy.[5] *See Kaiser Steel*, 455 U.S. at 80; *Aetna Cas. & Sur. Co.*, 903 F.2d at 1077. But those are the circumstances we're presented with here. And unlike the plaintiff in *Kelly*, Hello Farms isn't trying to enforce a separable, legal agreement. *See Kaiser Steel*, 455 U.S. at 81–82; *Hemlock*, 867 F.3d at 699.

**B.**

In the alternative, even if we interpreted the contract as limited to medical-use marijuana, we would still reverse the district court. But that interpretation, according to Hello Farms, would implicate the RFA, which Hello Farms says changed federal marijuana policy. Hello Farms urges us to apply the balancing test for enforcing unlawful contracts that we used in *Jackson Purchase*, as the district court did. *See Jackson Purchase Rural Elec. Co-op. Ass'n v. Loc.*

---

[4]In fact, we would have the duty to refrain from enforcing the agreement, even if the defendant didn't raise the defense. *See, e.g.*, *Kaiser Steel*, 455 U.S. at 77 ("The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract." (citation modified)); *Coppell v. Hall*, 74 U.S. 542, 558 (1868) ("Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect."); *Apical Biotek, LLC v. Maitri Holdings, LLC*, 2026 WL 177927, at *1–2 (3d Cir. Jan. 22, 2026).

[5]Hesitancy in applying the general principles of the federal illegality defense has been most often expressed when the defense is based on antitrust law. We've recognized that "illegality defenses based on antitrust law are disfavored" where the "contract was legal on its face" and where "complex[]" and "speculative" proof external to the agreement would be required to prove illegality. *Hemlock*, 867 F.3d at 701. But no such circumstances are present here. And even if we extended this disfavor beyond antitrust law, the contract here was illegal on its face.

*Union 816*, 646 F.2d 264, 267 (6th Cir. 1981). In Hello Farms's view, if we apply *Jackson Purchase* balancing, the result is to enforce the contract. But we're skeptical that Supreme Court precedent permits *Jackson Purchase* balancing. And even if *Jackson Purchase* balancing survives, at least for some circumstances, on that decision's own terms it would've held this contract unenforceable without applying a balancing test.

**1.**

In *Jackson Purchase*, we considered whether to enforce an implied agreement between a union and an employer for the employer to deduct dues and pay them to the union without written employee authorizations. 646 F.2d at 266. Section 302 of the Labor Management Relations Act declared this practice unlawful but prescribed a criminal penalty only for willful violations, making them misdemeanors. *Id.* The union argued that the agreement was enforceable. *Id.* But, even though neither party willfully violated Section 302, we held that the agreement was unenforceable. *Id.* at 267–68.

To reach this result, we noted that though Section 302 didn't criminalize the parties' agreement because they didn't act willfully, the lack of a criminal penalty didn't render their unwitting violation lawful. *Id.* at 266. Their agreement was still unlawful, just not criminal. *Id.* at 267. And we recognized "a strong presumption that agreements in violation of a statute will not be sanctioned by the courts." *Id.* We found the presumption to be "stronger than usual" because "Congress not only made the act of unauthorized checking off of union dues illegal, it also made the agreement to do that act illegal." *Id.* At the same time, we said that not "all unlawful agreements are ipso facto void"—"[i]f the denial of relief is disproportionately inequitable the right to recover will not be denied." *Id.*

So to determine whether to enforce the agreement, we adopted the multi-factor balancing test from the Restatement of Contracts. *Id.* at 267; *see* Restatement (Second) of Contracts § 178 (A.L.I. 1981). Among other factors, the Restatement test tells courts to consider "the justified expectations of the parties," "the forfeiture that would result from non-enforcement of the agreement," and "the likelihood that refusal to enforce will further" the public policy that the agreement violates. *Jackson Purchase*, 646 F.2d at 267. Considering these factors and the

others, we declined to enforce the agreement even though its unlawfulness "was not serious." *Id.* at 268. Notably, the union was "trying to enforce the illegal agreement itself," and "one who has himself participated in an illegal act cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction." *Id.* at 267.

To begin with, we doubt that *Jackson Purchase*'s balancing test survived *Kaiser Steel*. There, the Supreme Court reaffirmed that federal courts decline to enforce illegal contracts "not for the benefit of the defendant, but because public policy demands that it should be denied without regard to the interests of individual parties." *Kaiser Steel*, 455 U.S. at 77–78 (quoting *Cont'l Wall Paper*, 212 U.S. at 262). Yet *Jackson Purchase* balancing gives weight to the parties' interests by considering their expectation that courts would enforce the contract and the forfeiture that would result from non-enforcement, and it assesses the harmlessness of enforcing the contract. *Jackson Purchase*, 646 F.2d at 267. In principle, such balancing raises the prospect of enforcing the precise conduct made unlawful.

The Supreme Court hasn't adopted a Restatement-style balancing test or gestured toward equitable balancing to determine enforceability of a contract. It hasn't considered the parties' interests or the harmlessness of enforcing the contract in a particular instance. *See Kaiser Steel*, 455 U.S. at 77; *Weil v. Neary*, 278 U.S. 160, 173–74 (1929) ("Enforcement of such contracts, when actual evil does not follow, would destroy the safeguards of the law and lessen the prevention of abuses."); *McMullen*, 174 U.S. at 669–70. Rather than balancing factors, it adopted a categorical rule: If "the judgment of the Court would itself be enforcing the precise conduct made unlawful," the court can't enforce the contract.[6] *Kaiser Steel*, 455 U.S. at 80 (quoting *Kelly*, 358 U.S. at 520–21). And the Supreme Court necessarily rejected the D.C. Circuit's reasoning—echoed in *Jackson Purchase*—that "considerations of equity and relative fault" might allow a federal court to enforce a contract that is illegal under federal law. *Mullins v. Kaiser Steel Corp.*, 642 F.2d 1302, 1311 (D.C. Cir. 1980) (citation modified), *rev'd* 455 U.S. 72. Solidifying our view that *Jackson Purchase* was aberrant, Hello Farms hasn't pointed us to,

[6]Consider the "justified expectations of the parties" factor. In cases where federal illegality isn't clear or well-defined, rather than inquiring into the parties' expectations about the contract's legality (and, downstream from that, whether a court would enforce it) and balancing that with other factors, we could enforce the contract because it doesn't violate an explicit and well-defined federal policy. *See Aetna Cas. & Sur. Co.*, 903 F.2d at 1077–78.

nor have we found, any case where we've applied *Jackson Purchase* balancing. *See, e.g.*, *Hemlock*, 867 F.3d at 700–02 (addressing a federal illegality defense without mentioning *Jackson Purchase*); *Anderson v. Int'l Union, United Plant Guard Workers of Am.*, 370 F.3d 542, 554–55 (6th Cir. 2004) (same); *Aetna Cas. & Sur. Co.*, 903 F.2d at 1077–79 (same).

**2.**

But we don't need to definitively condemn *Jackson Purchase* balancing as contrary to Supreme Court precedent. That's because the conditions in which we applied the balancing test in *Jackson Purchase* aren't present here. The agreement in *Jackson Purchase* was unlawful but not criminal. 646 F.2d at 266–67. And if it had been criminal, it would've been only a misdemeanor. *Id.* at 266. Only after noting those circumstances did we apply the balancing test. Though we said that not all *unlawful* agreements are void, we recognized the distinction between criminal and unlawful conduct. *Id.* at 266–67. And, in addition to applying a strong presumption of nonenforcement to an unlawful agreement, we never said that we would consider shielding criminal agreements. *See id.*

Here, by contrast, the parties entered an illegal agreement to commit felonies under the CSA, even if we view the contract as limited to medical marijuana. Hello Farms, for its part, assumes that the RFA temporarily prevents the DOJ from prosecuting Hello Farms and Defendants for their conduct. From there, it suggests that, as in *Jackson Purchase*, the parties' conduct was unlawful but without criminal penalty. *See Trevino*, 7 F.4th at 422, 427.

But preventing the DOJ's use of funds to prosecute certain federal medical marijuana crimes—which we assume without deciding is the function of the RFA—isn't the same as decriminalization, or removing all criminal penalties. "Though [the RFA] purports to temporarily deny funding for the prosecution of certain crimes, the rider's text contains no suggestion that the substantive conduct prohibited by the CSA has now been made legal." *Id.* at 427; *see Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542, 555 (1st Cir. 2022) ("The [RFA] does not in fact repeal the CSA as to medical marijuana."). The conduct prohibited by the CSA "remains criminal" despite state legalization efforts. *Trevino*, 7 F.4th at 427; *see United States v. Stacy*, 156 F.4th 994, 1000 (10th Cir. 2025). And, to

understand what this means beyond prosecutions, take *United States v. Nixon*, 839 F.3d 885 (9th Cir. 2016) (per curiam), as an example. There, the Ninth Circuit addressed the district court's denial of a motion to modify probation conditions. *Id.* at 887. Pointing to the RFA, the defendant had asked the district court to modify his probation conditions to allow him to use marijuana for medical purposes. The Ninth Circuit affirmed the district court, which had concluded that "whatever [the RFA's] impact on the Department of Justice, the appropriations rider had no effect on the Court or the Probation Office, which is an arm of the Court." *Id.* (citation modified). Notwithstanding the RFA, because medical marijuana remained federally illegal, the district court couldn't permit the defendant to violate federal law.[7] *Id.*; *see* 18 U.S.C. § 3563(a)(1).

In other words, the RFA's effect is limited, both substantively and temporally. It doesn't legalize marijuana or provide immunity from prosecution for federal marijuana offenses—whether connected to medical- or recreational-use marijuana. *McIntosh*, 833 F.3d at 1179 n.5. And if the RFA lapsed or Congress restored funds, then we see no reason why the DOJ couldn't base prosecutions on conduct that the RFA previously shielded. *See id.* ("Congress could restore funding tomorrow . . . and the government could then prosecute individuals who committed offenses while the government lacked funding."). So say Congress restored funding today. Seemingly, the only defense against the DOJ prosecuting Hello Farms and Defendants would be the five-year statute of limitations period. *See* 18 U.S.C. § 3282(a).

Congress knows how to legalize conduct, but it chose a different route with the RFA. So the comparison to the unlawfulness of the agreement in *Jackson Purchase* ultimately fails. The parties in *Jackson Purchase* didn't agree to commit crimes. Here, the parties did, despite the RFA.

[7]To further illustrate, the RFA's restriction on funding wouldn't affect many other collateral consequences that arise from the CSA's prohibition of marijuana. To list some: The RFA wouldn't affect marijuana businesses' inability to receive tax deductions or credits, *see* 26 U.S.C. § 280E, their inability to receive loans from the Small Business Administration, *see* 13 C.F.R. § 120.110(h), their inability to receive federal trademark protection, *see, e.g.*, *In re PharmaCann LLC*, 2017 WL 2876812, at *2 (T.T.A.B. 2017), their inability to file for bankruptcy, *see, e.g.*, *In re Burton*, 610 B.R. 633, 637–39 (B.A.P. 9th Cir. 2020); *In re Arenas*, 535 B.R. 845, 853–54 (B.A.P. 10th Cir. 2015), or the requirement that, for federally assisted housing, public housing authorities deny admission to households with a member who illegally uses a controlled substance, *see* 42 U.S.C. § 13661(b).

We find more support for rejecting the *Jackson Purchase* balancing test as applicable here by looking to the test's source—the Restatement of Contracts. "[W]hen an agreement involves a serious crime or tort, [then] unenforceability is plain." Restatement (Second) of Contracts § 178 cmt. b; *see also* 8 Williston on Contracts § 19.77 (4th ed.) ("A basic principle of contract law is that agreements to commit a crime are illegal, void. Without question, courts will not order damages for breach of such a contract."). Only in "doubtful cases," as in cases involving conduct between serious illegality and trivial illegality, do courts conduct "a careful balancing." Restatement (Second) of Contracts § 178 cmt. b.

So even if balancing has a role in some cases, it wouldn't have a role here under *Jackson Purchase*'s own terms. Hello Farms and Defendants agreed to commit serious crimes under the CSA, with penalties up to life in prison and tens of millions in fines. *See* 21 U.S.C. § 841(b)(1)(A). Unenforceability is plain.

Though Hello Farms points to the April 2026 rule rescheduling medical marijuana as a reason to enforce the contract, the rescheduling isn't a safe harbor. And that's for two reasons. First, it is a general contract-law principle that an agreement that was illegal when made cannot be made valid by a subsequent change in the law. Restatement (Second) of Contracts § 179 cmt. d ("Whether a promise is unenforceable on grounds of public policy is determined as of the time that the promise is made and is not ordinarily affected by a subsequent change of circumstances, whether of fact or law."); 15 Corbin on Contracts § 89.14 (2026); 17A Am. Jur. 2d *Contracts* § 229.[8] And the April 2026 rule didn't purport to have retroactive effect. *See generally* 91 Fed. Reg. 22714–23. So the rule has no bearing on our evaluation of the contract's enforceability here—a contract made more than five years before the subsequent change in the law. Second, the April 2026 rule wouldn't, by itself, legalize the parties' transaction. The rule reschedules

[8] To be clear, whether the illegality defense applies here is a matter of federal, not state, law. *See, e.g.*, *Kelly*, 358 U.S. at 519. Yet at the same time, "[t]here is no statutory code of federal contract law." *Kaiser Steel*, 455 U.S. at 77. So we draw on federal decisions when determining how the federal illegality defense applies in any particular case. On that note, federal caselaw on the effect of a change in the law is sparse: It seems that the only federal appellate court to have considered the Restatement's principle in this context adopted it. *See Licznerski v. United States*, 180 F.2d 862, 865 (3d Cir. 1950). We see no reason to depart from that general principle. But we aren't suggesting that Congress or agencies couldn't override the principle by giving retroactive validity to agreements.

state-licensed medical marijuana into Schedule III and requires registration with the DEA. *Id.* at 22719–20. So today, if Hello Farms and Defendants entered the same contract without DEA registration and if we assumed that the contract was limited to medical marijuana, they'd still be violating federal law.

**C.**

The illegality defense, as the Supreme Court has said, is "a very dishonest one." *McMullen*, 174 U.S. at 669. But in the same breath that the Supreme Court noted the dishonesty, it endorsed the defense to prevent enforcement of an agreement. *Id.* at 669–70. That's because, again, the defense is applied "not for the benefit of the defendant, but because public policy demands" it. *Kaiser Steel*, 455 U.S. at 77–78 (citation omitted). And federal courts do not "formulate . . . policy by judicial edict." *Am. Cas. Co. of Reading, Pa. v. FDIC*, 39 F.3d 633, 639 (6th Cir. 1994). Policymaking is the province of the political branches. *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 465 (2015) ("[W]e promote the rule-of-law values to which courts must attend while leaving matters of public policy to Congress."); *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001) ("Congress is the final authority as to desirable public policy.").

Through the CSA, Congress gave us our policy—state law notwithstanding. U.S. Const. art. VI, cl. 2; *see, e.g.*, *Raich*, 545 U.S. at 29 ("The Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail."); *Trevino*, 7 F.4th at 427 ("[I]t is an elementary feature of our federal system that a state statute cannot override or amend federal law."). And the RFA didn't accomplish what Hello Farms wishes it did—the legalization or decriminalization of medical marijuana. Congress has contemplated taking that step, but each time it has decided not to. *See, e.g.*, Marijuana Opportunity Reinvestment and Expungement Act of 2019, H.R. 3884, 116th Cong. (2020) (referred to the Senate Committee on Finance, where the bill died).

That leaves us with the obligation of rejecting Hello Farms's attempt to enforce an illegal bargain. In doing so, we do what many district courts across the country have done, often in agreements much more tangentially related to purchases of marijuana. *See, e.g.*, *Kornea v.*

*Miller*, 797 F. Supp. 3d 295, 300–01 (S.D.N.Y. 2025) (declining to enforce an agreement to invest in a marijuana business); *CCH Acquisitions, LLC v. J&J&D Holdings, LLC*, 2025 WL 601249, at *3–7 (S.D. Ohio Feb. 25, 2025) (declining to enforce an agreement to purchase a marijuana business); *AgriAuto Genetics, LLC v. Harris*, 2023 WL 8371940, at *2–3 (E.D. Okla. Dec. 4, 2023) (declining to enforce agreement to provide cannabis seeds and other services related to a marijuana business); *J. Lilly, LLC v. ClearSpan Fabric Structures Int'l, Inc.*, 2020 WL 1855190, at *11–12 (D. Or. Apr. 13, 2020) (declining to award lost profits from marijuana sale); *Polk*, 2019 WL 4058970, at *2 (declining to enforce an agreement to give the plaintiff an equity interest in a marijuana business).

And finally, the Supreme Court's recent comments on federal marijuana enforcement in *Hemani*, a Second Amendment case, don't alter our reasoning. *See United States v. Hemani*, 146 S. Ct. 1677 (2026). There, the Court, on its road to rebuffing the government's position that marijuana users are "categorically and unusually dangerous," observed how federal enforcement of marijuana offenses has fallen while public use and acceptance of marijuana has risen. *Id.* at 1693; *see also id.* at 1701 (Alito, J., concurring in the judgment) ("[A]lthough possession of [marijuana] remains a federal crime, very few persons are convicted of that offense each year."); *see also Standing Akimbo, LLC v. United States*, 141 S. Ct. 2236, 2236–37 (2021) (Thomas, J., respecting the denial of certiorari). And it noted that the federal government's reduced prioritization of marijuana offenses has helped fuel the increasing use of marijuana, as one might expect. *Hemani*, 146 S. Ct. at 1693.

But our task isn't to assess whether marijuana users are categorically and unusually dangerous or to assess the Second Amendment's scope. And the increasing use of marijuana and scaled-back executive branch enforcement of marijuana offenses don't mark a change in the law. "[I]n our constitutional order it's Congress that passes the laws, Congress that saw fit to enact 21 U.S.C. § 841, and Congress that . . . made the distribution of marijuana a federal crime." *Feinberg v. C.I.R.*, 808 F.3d 813, 816 (10th Cir. 2015) (Gorsuch, J.). Public use and acceptance of marijuana bear no weight on our task. And though federal marijuana convictions have decreased year-by-year since 2015, they are far from anomalous, with defendants still facing years in federal prison. *See* United States Sentencing Commission, Interactive Data Analyzer

(recording 386 federal sentences for marijuana trafficking in 2025); *see also CCH Acquisitions, LLC*, 2025 WL 601249, at *4 (collecting recent marijuana convictions). In any event, marijuana's illegality doesn't turn off and on based on the executive's enforcement priorities. *See Feinberg*, 808 F.3d at 816.

Whether we view the contract as encompassing recreational marijuana or limited to medical marijuana, the result is the same. Federal courts can't enforce contract claims founded on an agreement to purchase marijuana illegally. So the district court erred. Hello Farms may understandably view this outcome as a windfall for Defendants. But our task isn't to weigh the equities as we might perceive them. At day's end, we aren't free to enforce agreements to commit crimes.

## III.

For these reasons, we reverse the district court's denial of Defendants' motion for judgment as a matter of law.